UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SAMUEL ROWE and ESTELLA ROWE, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 09 CV 491 |
| vs. | ) ) | Judge Robert M. Dow, Jr. |
| BANKERS LIFE AND CASUALTY COMPANY and BANKERS LIFE INSURANCE COMPANY OF ILLINOIS, | ) ) ) ) | Magistrate Judge Martin C. Ashman |
| Bankers. | ) ) | |

<u>SECOND AMENDED COMPLAINT</u>

Plaintiffs Samuel Rowe and Estella Rowe ("Plaintiffs") bring this action against Bankers

Life and Casualty Company and Bankers Life Insurance Company of Illinois (collectively

referred to as "Bankers"), on behalf of themselves and a nationwide class of all other similarly

situated persons.  Plaintiffs state as follows:

I.    <u>INTRODUCTION</u>[1]

1.    Bankers Life and Casualty Company ("Bankers") trains sales agents ("Agents") to

"disturb" senior citizens, make them "almost cry" and treat them like "prey".[2]  Unfortunately, such

coercive, high-pressure sales tactics are effective.  In June, 2007, two of Bankers' untrained and

unsupervised Agents took virtually <u>all</u> of the retirement savings of Plaintiffs Sam Rowe, an 81 year old

---

[1] Unless otherwise specifically noted, all allegations set forth herein are made upon information and belief.
[2] *See,* video segment from June 11, 2010 broadcast of CBS News series Inside Edition, discussing Bankers' annuity sales practices, filed manually on October 25, 2010 as Exhibit 1; *See, also,* Exhibit 2, document titled "New Agent Success Participant's Guide", produced by Plaintiffs as ROWE003286 – ROWE003459, at page ROWE003315 (hereinafter "NAS Training Guide") (the designation "ROWE" depicts documents produced by Plaintiffs); Exhibit 3, document titled "Did You Close Their Worry Box", produced by Bankers as BLR038717 – BLR038739, at BLR038721, BLR038735 (hereinafter "Worry Box Guide") (the designation "BLR" depicts documents produced by Bankers).

veteran, and Estella Rowe, a retired teacher, and locked it up in an ill-performing deferred annuity that would not disburse any payment or return until Sam Rowe would turn <u>99 years old</u>;[3] eleven years after his actuarial life expectancy.

2.      Sadly, the Rowes are not alone.  Bankers' scheme targets elderly consumers, like the Rowes, despite the fact that such seniors are unlikely to receive any benefit from the annuity because of: the long-term nature of deferred annuity products and maturity dates (i.e., the date on which the annuitant's income payments will begin); high surrender charges and penalties for early withdrawal and/or illusory bonus features, and rates and other product features which do not benefit annuity purchasers.

3.      This case challenges Bankers' conspiracy, in which it engages with its independent sales Agents and others, and practice of systematically and intentionally targeting senior citizens to sell them equity-indexed deferred annuities (hereinafter "Annuities") through  a corps of  outsourced, undertrained, unsupervised Agents  using carefully-crafted sales materials that uniformly misrepresent and omit material facts.  Bankers formulated and implemented this deceptive scheme, in part, by failing to fully disclose all material facts and risks associated with the Annuities, and by gaining access to seniors' confidential financial information, often under the guise of offering "long term care" planning – as was the case with the named Plaintiffs – which Bankers use to identify seniors' available assets for Annuity sale.

4.      In addition, Bankers' sales tactics are deplorable, including specific instruction that new Agents <u>should not</u> answer questions posed by senior citizens ("prospects" under Bankers' lexicon),[4] <u>should not</u> write down prices when closing a sale of annuities[5] and should focus on

---

[3] *See,* Exhibit 4, Bankers' annuity sold to Plaintiffs, BLR000311 – BLR000351.
[4] *See,* NAS Training Guide, Exhibit 2, pg. ROWE003321.
[5] *Id.* at ROWE003414.

seniors' "emotional buying motives".[6] To Bankers, the senior market presents lucrative sales opportunities because seniors fear "spiritual death", such as subjecting family members to "bedpans and sponge baths" and "having their diaper changed be one of the last images of them that becomes embedded in their family member's memories."[7] Indeed, Bankers' entire agent training program is built around the concept of exploiting such fears through the "worry box";[8] essentially <u>creating</u> fear in seniors so they will be more likely to purchase Bankers' products.[9]

     5.     Compounding this inequitable behavior, Bankers' sales materials and annuity contracts are incredibly opaque and misleading, making it impossible for anyone to understand Bankers' deferred annuity products.[10] Indeed, Bankers actively conceals, even from its own Agents, critical information about its annuities and how they function.[11] Bankers cannot, however, conceal the lucre generated by its conspiracy: in 2007 alone, Bankers netted almost half a billion dollars in annuity premiums from seniors,[12] its "exclusive" market.[13]

     6.     Legal action is the best and only effective remedy for the senior citizens victimized by Bankers' conduct. Plaintiffs allege that Bankers' deferred annuity sales practices described herein violate the provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.,* Cal. Bus. & Prof. Code §§ 17200, *et seq.,* Cal. Bus.

---

[6] *Id.* at ROWE003426.

[7] *Id.* at ROWE003308.

[8] *Id.* at ROWE003308-003315.

[9] Such unfair sales practices have not gone completely unnoticed. As evident from Exhibit 1, the CBS News series Inside Edition completed an investigation into Bankers' annuity sales practices and its hidden-camera footage were so disturbing, it has apparently led to an investigation by the United States Senate Committee on Aging.

[10] *See,* Exhibit 6 to Plaintiffs' Motion to Certify (Doc. #96), Declaration of Plaintiffs' expert Thomas Bakos ("Bakos Decl."), pgs. 4-5 (hereinafter, references to exhibits from Plaintiffs' Motion to Certify are referred to as "Certification Exhibits").

[11] *See,* Exhibit 5, June 1, 2009 email correspondence from Bankers' officer Lori Willard, BLR016254-BLR016255, with attached document titled "Marketing Matters", BLR016265-BLR016266, (noting Agents and policyholders are not told mechanics of how key rates are determined).

[12] *See,* Exhibit 6, excerpt from Bankers' 2007 NAIC Annual Report, ROWE003464-ROWE003477, at ROWE003473.

[13] *See,* Exhibit 7, document titled "Company Profile", ROWE003478-ROWE003489 (noting that Bankers "specializes" in seniors, is a "pioneer" in the senior market and is "one of the only insurance companies solely devoted to serving the senior market").

& Prof. Code §§ 17500, *et seq.,* Cal. Well & Inst. Code §§ 15600, *et seq.,* as well as common law.

7.     Bankers and its co-conspirators subjected all Class members to the same unfair treatment, through a conspiracy designed to separate them from their money and the freedom to access it for their twilight years.  Plaintiffs seek an order enjoining Bankers from, among other things, selling an Annuity to a senior citizen without first disclosing all material facts regarding the key attributes and risks associated with the product, as well as determining that the Annuity is appropriate for the prospective purchaser.

8.     Plaintiffs further seek to enjoin Bankers from selling Annuities to senior citizens containing surrender penalties and other restrictions, and/or requiring Bankers to adequately disclose all material terms and conditions of their Annuities and determine suitability prior to sale. Plaintiffs also seek other equitable remedies, including rescission, disgorgement of ill-gotten profits and reformation as may be appropriate to redress Bankers' wrongful conduct. Plaintiffs additionally seek monetary relief and punitive, treble and/or statutory damages for violations of RICO and the elder abuse statutes of California and other states where Bankers' Annuities are marketed and sold to seniors.

## II.     <u>PARTIES</u>

9.     Plaintiffs Samuel and Estella Rowe were both over the age of 65 when they purchased an Annuity from Bankers, and at the time this action was filed, and both were an "elder" as defined by California Welfare & Institutions Code § 15610.27. Mr. and Mrs. Rowe presently, and at all times mentioned herein did, reside in West Hills, California.

10.     Bankers Life and Casualty Company is an Illinois corporation with its principal place of business in Chicago, where the majority of Bankers' total activities occur.

With more than 200 branch offices nationwide, it specializes in the sale of life insurance, long-term care insurance, and annuities to the senior population. Bankers Life and Casualty Company has sold millions of life insurance products and manages over $28 billion in assets. Additionally, it is both authorized to, and does transact substantial business in the state of California and Illinois, and throughout the United States.

11.     Bankers Life Insurance Company of Illinois is, or previously was, an affiliate of Bankers Life and Casualty Company. It serves, or served, as an underwriter of life insurance and markets products and services to consumers contracting with Bankers Life and Casualty Company. Bankers Life Insurance Company of Illinois is an Illinois corporation with its principal place of business in Chicago, where the majority of Bankers total activities occur. Bankers Life Insurance Company of Illinois may have merged with Bankers Life and Casualty. As a result of that merger, Bankers Life and Casualty may have assumed the obligations, debts and liabilities of Bankers Life Insurance Company of Illinois, including those arising from the allegations set forth herein.

12.     Bankers Life and Casualty Company and Bankers Life Insurance Company of Illinois are referred to herein collectively as "Bankers."

## III. JURISDICTION AND VENUE

13.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because Plaintiffs assert claims arising under federal law, including claims pursuant to 18 U.S.C. § 1961.

14.     This Court also has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332 because the amount in controversy of all Class Members in the aggregate exceeds the sum or value of $5,000,000, exclusive of interests and costs and less than

one-third of all Class Members are citizens of California, where Plaintiffs reside, and:

    a.    Many Class Members are citizens of states other than Illinois, which is the Bankers' state of citizenship; and

    b.    All other factual conditions precedent necessary to empower this Court with subject matter and personal jurisdiction have been satisfied.

15.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more of the Defendants is subject to personal jurisdiction in this District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

16.    The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367.

## IV. FACTUAL ALLEGATIONS WITH RESPECT TO ALL COUNTS

    A.  *Overview of Annuities*

17.    At all times mentioned herein, each and every Defendant was an agent and/or employee of each and every other Defendant. In doing the things alleged in the causes of action stated herein, each and every Defendant was acting within the course and scope of such agency or employment and was acting with the consent, permission and authorization of each of the other Defendants. All actions of each Defendant, as alleged herein, were ratified and approved by every other Defendant or its officers or managing Agents.

18.    Whenever reference in this Complaint is made to any act of any Defendant named herein or other corporate defendants as may be named in the future course of this action, such allegation shall be deemed to mean that the officers, directors, agents, subsidiaries, affiliates and employees of said Defendant did or authorized such act while actively engaged in the management, direction, or control of affairs of the corporate defendant, and while acting within

the course and scope of their employment.

19.     An annuity is a contract between a customer (i.e., the annuitant) and an insurance company pursuant to which the annuitant makes an upfront lump-sum payment, or series of payments, to the insurance company. The insurance company, in turn, agrees to make payments to the annuitant over a period of time. With a standard or "immediate" annuity, the annuitant has a right to an immediate stream of income via payments from the insurance company that is usually guaranteed to last for as long as the consumer is alive.

20.     A deferred annuity is structured differently. The annuitant foregoes receiving income payments until some point in the future. During this deferral period, the earnings on the annuitant's premium payments grow, tax-deferred. Thus, deferred annuities are very different from immediate annuities and provide a long-term investment vehicle, not an immediate income stream, effectively locking up the purchaser's money for lengthy periods, typically up to 10 years or more.

21.     There are at least two kinds of deferred annuities:  a "fixed" deferred annuity and an "equity indexed" deferred annuity. A "fixed" deferred annuity is an annuity in which the insurance company offers a guaranteed interest rate for a set period of time on the annuitant's premium payments. An "equity indexed" deferred annuity is an annuity in which the rate of interest the company provides to the policyholder fluctuates depending upon the performance of a stock market index, such as the S&P 500.[14] Equity indexed deferred annuities are complex derivative products that, because of their complicated nature, lend themselves to abusive sales practices directed toward consumers.

---

[14] The "S&P 500" is the Standard & Poor's 500 index, which is a weighted index considered to be a benchmark of the overall stock market.  This index is comprised of 500 widely-held Blue Chip stocks representing industrial, transportation, utility and financial companies with a heavy emphasis in industrials. The S&P 500 index is commonly used to measure and track market performance.

22.    With a deferred annuity, the annuitant cannot withdraw their investment or the earned interest without penalty for a number of years after the initial payment of the premium. The penalty or early withdrawal of either the principal for earnings is called a "surrender charge." The percentage of the surrender charges, which typically start as high 10%, diminishes with each passing year for a specified number of years. The surrender charge serves as a penalty to discourage early withdrawal of the annuity principal. As a result, the terms of Bankers' Annuities severely limit consumers' access to their funds until Bankers have fully recouped their high agent commission payments and otherwise substantially profited from investment of the annuity principal.

23.    The annuities at issue in this action are "equity indexed" deferred annuities ("Annuities").

24.    Bankers' Annuities pay out at maturity just like zero-coupon bonds but unlike bonds, the amount to be received is unknown until maturity. The payout is a function of the general level of price appreciation in the stock market at or shortly before maturity. Other things equal, Annuities with longer maturities provide less value to investors than annuities with shorter maturities.

25.    Bankers' Annuities guarantee a minimum cash surrender value and rate of return but the guaranteed rate is typically much less than the risk free rate of return offered on US Treasury securities with the same maturity as the Annuity. Also, the guaranteed rate of return is usually only applied to a fraction of the amount invested and sometimes without compounding. On some contracts, no interest is credited unless the Annuity is held to maturity. Bankers' Annuities may credit the investor a return under certain circumstances based on the change in the level of a stock price index. Most Annuities, including Plaintiffs' Annuity, are ostensibly linked to

the level of the S&P 500 Index. The indexes used are price appreciation indexes, so changes in the level of the indexes do not include the dividends investors would receive if they owned the underlying stocks or stock mutual funds. Exclusion of dividends causes the changes in the S&P 500 Index level used in Annuities to significantly understate the returns earned by investors in the S&P 500, as dividends have historically accounted for 20% of the returns investors in the S&P 500 stocks have earned.

27.    Bankers' Annuities also contain a "participation rate" element. The participation rate is the fraction of the change in *the contractually defined* stock index credited to the investor. Bankers sets the participation rate for its Annuities annually. Bankers does not disclose to either its Agents or to policy holders, either in the process of selling the Annuities or in any periodic post sale communications to the Annuitants or Agents, how the rate is set or the factors used by Bankers in making annual selection of the participation rate for the next policy year. Participation rates vary significantly from company to company and product to product, and can be applied to different measures of index level changes. Participation rates are easy to compare but are misleading; a higher participation rate may not mean higher payouts to investors since with Annuities, the participation rate and timing of these credits to policyholder accounts are seldom held constant. However, other things being equal, the higher the participation rate a Annuity pays, the more valuable it is. With Plaintiffs' Annuity, Bankers guaranteed a 30% participation rate.

28.    Since their introduction in the United States in approximately 1995, sales of Annuities have grown dramatically, with tens of billions of dollars in annuities sold each year. Bankers is at the vanguard of marketing these products to senior citizens, and their efforts have not been unrewarded: Bankers have taken in billions of dollars in annuity premiums over the last few years: **$1.2 billion in 2008 alone**.

B.  *Bankers' Marketing and Sale of Annuities*

29.    The factual underpinnings of Bankers' conspiracy to target seniors, and deceive them into purchasing ill-suited Annuities, centers on three common points: (1) Bankers' use of patently flawed sales practices; (2) Bankers' use of flawed Annuities products, and (3) Bankers' misrepresentations and omissions of material information when selling flawed Annuities through its flawed sales system.

a.  Bankers' Flawed Annuity Sales Systems

30.    Bankers' Annuity sales practices are designed to sell Annuities to seniors without regard to the seniors interests or needs, and are structured specifically to undermine scrutiny of these products by the seniors (the "System").

31.    Using "fishing net" techniques to locate as many Agents as possible, the System starts with a recruiting process intended to appoint Agents without any scrutiny of their aptitude, skills or ethics.

32.    The System then teaches these "rookies" aggressive, predatory sales practices designed to threaten, intimidate and scare seniors into purchasing Bankers' complex, convoluted Annuities.

33.    The System fails to educate or train these Agents in the characteristics of Bankers' Annuities, or how to determine whether they are suitable for senior citizens.

34.    Rounding out its tactics, the System fails to review or supervise the sales process to assure that seniors are properly served, and legal requirements satisfied, before Annuities are sold.

i.    Hiring Process And Lack Of Retention

35.    Bankers market and sell Annuities through their network of independent sales

Agents.  According to Bankers' 2008 Annual Report, Bankers' annuity sales occur through "a national career agency force of more than 4,600 Agents in over 200 nationwide sales offices".

36.    Banker's Agent recruiting techniques are standardized throughout its nationwide network of sales offices.[15]

37.    Bankers advertises in a variety of ways, including print and internet advertising, to solicit prospective Agents to contact its offices.[16]

38.    Responding individuals are then expected to attend a "career briefing" which is, in essence, a group session where Bankers' managers attempt to entice them to become a Bankers' Agent.[17]

39.    Bankers does not, before or after offering these individuals appointment as a Bankers' Agent, screen prospective Agents for aptitude, intelligence or knowledge related to Annuities.[18]

40.    Bankers does not require that prospective Agents even possess prior annuity sales experience, or have experience or knowledge about insurance generally.[19]

41.    Indeed, according to Scott Goldberg, Bankers' Vice-President of Strategy and Marketing, Bankers will allow even a sixteen (16) year old child to become a Bankers' Agent.[20]

42.    Furthermore, Bankers does not ascertain the ethics of these novices either before or after they are appointed Agents, or before entrusting them with the names of seniors to whom they are instructed to solicit.  Bankers' only qualification standard is a check for felony

---

[15] *See*, Exhibit 8, document titled "Agent Compliance Guidelines", ROWE00379 – ROWE00392, at ROWE00385.
[16] *See*, Exhibit 9, excerpts from the deposition of Bankers' manager Gary Downing, pg. 37:18 – 38:17.
[17] *Id.,* pg. 39:3-22.
[18] *See*, Exhibit 10, document titled "Career Opportunity Seminar" ROWE003232 – ROWE003257, at ROWE003257 (noting the "Bankers Selection Process"); Exhibit 11, excerpts from the deposition of Bankers' Senior Vice-President and corporate representative Scott Goldberg, pg. 89:20-90:25; Exhibit 12, declaration of former Bankers agent Stephen Cummings, pg. 1; Exhibit 13, declaration of former Bankers agent Pamela Haulk, pg. 1.
[19] *See*, Exhibit 11,Goldberg Depo., pg. 94:12-17.
[20] *Id.* at 93:17 – 94:11.

convictions and bankruptcies.[21]

43.    Bankers acknowledges that Annuities are complex products that most individuals would find difficult to understand.[22]  Consequently, Bankers' failure to require even a modicum of prior annuity sales experience inevitably leads to unsuitable sales, such as the sale made to Plaintiffs.

44.    Bankers delegates to this untrained outside sales force the task of selling complex Annuities to seniors, and does so with full knowledge and understanding that  the Agents do not understand either the Annuities of how to determine if the particular Annuity being marketed is suitable for the prospective annuitant.

45.    This failure is even more egregious because Bankers recognizes that seniors "may no longer have the same understanding of financial matters that they did at a younger age".[23]

46.    Further, only properly licensed insurance Agents are supposed to solicit, offer and sell Annuities.[24] This licensing requirement is intended to ensure that consumers receive appropriate and informed guidance from a duly qualified agent, as well as ensure accountability for any statutory or common law sales violations. The licensing requirement accordingly limits those permitted to transact insurance to professional agents and brokers – persons not only having the training and knowledge to counsel prospective insureds regarding the material aspects and complex details of coverage – but who are required to refrain from misleading vulnerable consumers. For example, insurance agents are required to disclose all facts and information that may be "material" to a prospective annuitant's decision to purchase a deferred annuity. An agent's

---

[21] *Id.* at 93:10-16.
[22] *See,* Exhibit 14, excerpts from the deposition of Bankers' Vice-President Michael Catania, pg. 110:11-17, 115:11-17; Exhibit 3, Worry Box Guide, at BLR038722.
[23] *See,* Exhibit 15, document titled "Code of Ethics", BLR001173 – BLR001178, at BLR001174; Goldberg Depo., pg. 108:17-25;
[24] *See, e.g.,* Cal. Ins. Code § 1631; Ohio Admin. Code § 3901-601(E) (34); Fla. Stat. Ann. § 626.112; 40 Pa. Cons. Stat. Ann. § 310.31; 215 Comp. Stat Ann. § 5/500-15; Ariz. Rev. Stats. § 20-282.

failure to disclose or concealment of such material facts entitles the injured party to rescind the insurance contract.[25]

47. Although Bankers purports to train their Agents, Bankers has no program in place to actively monitor, oversee or regulate their Agents' marketing activities directed towards seniors.

48. In short, when recruiting potential new Agents to sell complex annuities to seniors who may have diminished financial acumen, Bankers will take all comers.

ii. Lack Of Training Or Supervision

49. Once it appoints its Agents, Bankers requires virtually no substantive, written training by its Agents on the features of Bankers' complex Annuities before allowing them to begin selling to seniors.[26]

50. The only required Annuity training that a new Bankers' Agent must undergo is a cursory slideshow presentation that new Agents can view on Bankers' web portal from home.[21]

51. Bankers does not test new Agents to ensure that they understand the content of the Annuity slideshow; rather, the new agent must simply click a box attesting to the fact that they understand the material.[22] Bankers recognizes that new Agents' retention of such information is poor and yet, Bankers makes no effort to test the new Agent's annuity product knowledge at any time.[23]

52. The departments of insurance in Iowa, Wisconsin, Maine, Arkansas, Oregon, Vermont and Pennsylvania have all independently investigated Bankers' system, as has the National Association of Insurance Commissioners ("NAIC") in coordination with thirty-nine

---

[25] *See, e.g.,* Cal. Ins. Code §§ 330 & 331.
[26] *See,* Exhibit 16, excerpts from the deposition of Bankers officer Karen Martinez, pg. 66:7-20, 96:1 –24, 97:24-98:6; Catania Depo., pg. 83:22 – 84:9.
[21] *See,* Catania Depo., pg. 70:5-14.
[22] *See,* Martinez Depo., pg. 62:20 - 63:20; Catania Depo., pg. 70:5-11.
[23] *See,* Catania Depo., pg. 272:19 - 273:18.

states.[26]  These investigations arrived at the same conclusion: Bankers' sales practices are deeply flawed, and its Agent training is patently deficient.[27]

53.    Such findings prompted Bankers to develop an improved teaching tool (the "Annuity Coach") which could provide a "measuring stick" to ensure that new Agents understand the characteristics of Bankers' Annuities and when an Annuity is suitable.[24]  Even though Bankers determined that the Annuity Coach training was needed to serve as a remedial tool to shore up its historically inadequate training,  Bankers made a conscious decision that new Agents were not required to undergo such elevated training.[25]

54.    Indeed, Bankers has admitted in other litigation that it does not require Agent training while simultaneously denying that it controls how its Agents market and sell Bankers' Annuities.[26]

55.    Bankers' Agents have agreements with Bankers to sell their Annuities and are required to adhere to the sales procedures, protocols and materials dictated, prepared and/or approved by Bankers.[28]  These sales protocols and procedures include the use of standard Annuity marketing materials, product guides, agent-use-only materials, illustrations, and form contracts created and/or authorized by Bankers.

---

[26] *See*, Certification Exhibit 37, State of Oregon Market Conduct Exam, Exhibit 21-22 to Karen Leonard's Deposition; Certification Exhibit, 38, State of Vermont Market Conduct Exam, Exhibit 23-25 to Karen Leonard's Deposition; Certification Exhibit 39, State of Iowa Market Conduct Exam, Exhibit 26 to Karen Leonard's Deposition; Certification Exhibit 40, State of Maine Market Conduct Exam, Exhibit 27-28 of Karen Leonard's Deposition; Certification Exhibit 41, NAIC Market Conduct Exam (Multi-state), Exhibit 29 of Karen Leonard's Deposition; Certification Exhibit 42, State of Wisconsin Market Conduct Exam, Exhibit 30 of Karen Leonard's Deposition; Certification Exhibit 43, State of Arkansas Market Conduct Exam, Exhibit 31 of Karen Leonard's Deposition; Certification Exhibit 44, State of Pennsylvania Market Conduct Exam Results, ROWE003491-ROWE003492.
[27] *Id*.
[24] *See,* Catania Depo., pg. 65:2-11.
[25] *Id.* at 67:12-24, 264:17 – 265:5.
[26] *See,* Exhibit 17, Bankers' Answer filed in the case *Walker v. Bankers Life and Casualty Company*, N.D.Ill. Case No. 06cv06906, and document titled "Chart of Current Agent Testimony Regarding Product Training", also filed in *Walker*.
[28] *See,* Bankers' Agent contract, attached hereto as Exhibit 18, BLR000114-BLR000-124, at BLR 000117, Section 16.

56.     Thus, Bankers maintains stringent control over the creation and use of the marketing materials used by their Agents and the sales presentations made by their Agents.  The Agents failure to disclose the material facts listed herein occurs as a direct result of such control.

57.     Bankers further exerts control over their Agents and sales presentations by requiring Agents to submit any non-Bankers advertising, sales, or seminar material to Bankers for review and approval prior to use. Finally, Bankers further exerts control over its Agents and sales presentations by requiring the use of scripts during solicitation of new business.[29]

58.     Bankers has stated that it  makes available to its Agents certain standardized documents and marketing materials related to Bankers' Annuities, which were created, disseminated, and/or approved by Bankers, such as the Agent's Guide To Annuities.[30] However, Bankers does not require its Agents to read, understand or comprehend such materials before selling Bankers' complicated Annuities to senior citizens, and certainly does not test its Agents in order to gauge their independent knowledge of Bankers' products.  In fact, Bankers' internal documents acknowledge the fact that Agents do not read the Agent's Guide.[31]

59.     Furthermore, even if Bankers' Agents read the standardized materials, the materials are incomplete and inaccurate and are created as a façade to deter scrutiny.

60.      Bankers does not properly or accurately educate its Agents with regard to specific details of its management of the Annuities.  For example, it fails to disclose (to Agents and Class members) how participation rates are calculated, and the precise relationship between returns and the performance of the S&P 500. Bankers also does not explain that clients funds are not actually invested in the S&P 500 or any equity listed on it, that Bankers does not itself invest in the S&P 500 and does not explain how the client will actually realize a return based upon the performance

---

[29] *See,* various scripts produced by Bankers collectively attached hereto as Exhibit 19.
[30] A copy of which is attached hereto as Exhibit 20.
[31] *See,* Exhibit 21 hereto, BLR001261 – BLR001264, at BLR001264.

of the S&P 500.

61.    In fact, Bankers not only fails to require its Agents to read and understand the Annuity training materials, it intentionally fails to monitor and investigate Agent compliance to determine whether Agents provide <u>required</u> disclosure documents to Annuity applicants, and acknowledges that it has "no means of knowing if (the disclosure document) actually has been provided."[32]

62.    Bankers intentionally promotes improper sales tactics by failing to require meaningful Annuity product training and failing to ensure Agent product competence.  In order to create the façade of regulatory compliance, and in an effort to conceal the Agents' improper sales tactics that it fosters and encourages, it prepares Annuity materials and documents to placate regulators that Bankers knows its Agents do not use, do not read; do not understand, and do not follow.

iii.    Manipulative And Deceptive Sales Techniques.

63.    Bankers does provide its Agents with one form of training, and in good measure; sales technique training. New Agents are required to go through rigorous training on how to *sell* to seniors, [33] which in reality is nothing more than a "how to" manual for exploiting seniors and their fears by "pivoting" from selling Medicare supplement coverage or long-term care insurance to selling Annuities.[34]

64.    The process begins with Bankers providing  senior citizen "prospect" lists[35] to Agents with direction to contact the seniors for the ostensible purpose of arranging an in-home

---

[32]  *See,* Exhibit 21, BLR001261 – BLR001264, at BLR001263.
[33] *See,* Exhibit 2, NAS Training Guide, at ROWE003315; Exhibit 3, Worry Box Guide, at BLR038721.
[34] *See,* Exhibit 2, NAS Training Guide, at ROWE003418; Cummings Decl., pg. 3; Haulk Decl., pg. 3.
[35] *See,* Exhibit 10, Career Opportunity Seminar, at ROWE003245; Exhibit 23, excerpts from the deposition of former Bankers agent Robert Jagus, pg. 104:1 – 105:10.

meeting to discuss Medicare supplement coverage or long term care insurance.[36]   The lists provided by Bankers to these Agents are derived from sources related primarily if not solely to Medicare or long term care insurance.  Bankers has devised "scripts" that Agents can then utilize to contact Seniors for the purpose of arranging in-home meetings to discuss such insurance.  In fact the real purpose of the in person meeting, as trained by Bankers, is to gain entry into the seniors home to obtain as much financial information as possible and to sell an Annuity.  The face amount of Annuities sold is often limited only by the assets that can be immediately accessed by the Agent.   Bankers is so thorough in its training of these "hard sell" sales tactics that its scripts come with guidelines on how to "overcome objections"[37] raised by Seniors to in home meetings.

65.    Agents are taught that their compensation is inextricably linked to the number of appointments they make,[38] and that it is easier to sell seniors an insurance product in their home than by telephone.[39]

66.    Consequently, Agents are trained to maximize the number of in-person senior meetings by *not* providing seniors with information about Bankers' products when the Agents first contact them by telephone.[40]

67.    Oddly, these tactics are characteristic of the "hard sell", which Bankers acknowledges in its Code of Ethics as an unethical practice.[41]

68.    Once in the seniors' homes, Bankers Agents are taught to get the seniors to divulge

---

[36] *See,* Exhibit 23, document titled "New Agent Training Package", ROWE00856 – ROWE00913, at ROWE00865; Jagus Depo., at 37:9 – 38:7, 44:1-25; Cummings Decl., pg. 3; Haulk Decl., pg. 3.
[37] *See,* Exhibit 2, New Agent Training Package, at ROWE00866 – ROWE00867; Exhibit 3, Worry Box Guide, at BLR038735 – BLR038737.
[38] *See,* Exhibit 2, NAS Training Guide, at ROWE003328 – ROWE003330, ROWE003332; Exhibit 10, Career Opportunity Seminar, at ROWE003246.
[39] *See,* Goldberg Depo., pg., 219:5 - 220:6, 223:9-14.
[40] *See,* Exhibit 2, NAS Training Guide, at ROWE003321.
[41] *See,* Exhibit 15, Code of Ethics.

as much about their finances as is possible.[42]

69.    These Agents go to seniors' homes armed with questionnaires designed to identify a senior's assets that can be locked-up in Bankers' Annuities.[43]

70.    While helping senior citizens complete their purported estate or financial forms, Bankers' Agents garner the senior citizens' trust and confidence and simultaneously determine whether the senior citizens have available assets to purchase an Annuities.[44]

71.    Once assets are identified the Agents are taught techniques to get the senior to buy an Annuity, even if the senior has to liquidate assets or Annuities already in place.[45]

72.    Agents are taught how to respond to seniors who indicate that they do not wish to purchase Annuities using scripted responses,[46] which are specifically designed to prey upon the fears of seniors, and pander to the senior's pride and his/her desire to be independent.[47]

73.    Bankers instructs its Agents that it is both a priority and a goal to close Annuity sales at the first meeting.   Agents are taught to do whatever it takes to get the premium at the first visit,[48] even if it means driving seniors to their bank to obtain funds.[49]

74.    Bankers acknowledges that seniors are more susceptible to pressure tactics, and realizes that seniors place their "trust" in Bankers to act in the senior's best interests.[50]

75.    Yet, Bankers teaches its Agents to "prey" on those same seniors with sales tactics

---

[42] *See,* Exhibit 24, documented titled "Annuity Tracker", ROWE003490; Exhibit 25, document titled "Fact Finder", ROWE00548-ROWE00-551; Cummings Decl., at 3; Haulk Decl., at 3.

[43] *See,* Jagus Depo., pg. 79:13 – 80:15.

[44] *See,* Exhibit 8, Agent's Compliance Guidelines, ROWE00379-BLR00392, at BLR00383; Exhibit 26, Smart Consumers Guide to Annuities, ROWE00561 - ROWE00567, at ROWE00562.

[45] *See,* Jagus Depo., pg. 79:13 – 80:15; Exhibit 26.

[46] *See,* Exhibit 23, New Agent Training Package, at ROWE00883; Exhibit 4, Worry Box Guide, at BLR038735 – BLR038737; Exhibit 2, NAS Training Guide, at ROWE003423 – ROWE003428.

[47] *See,* Exhibit 2, NAS Training Guide, at ROWE003425 – ROWE003426, ROWE003418; Exhibit 45, 2045 Field Success Guide, BLR078303 - BLR078348, excerpts attached hereto, at BLR078337-BLR078342.

[48] *See,* Jagus Depo., pg. 79:13 – 80:15, 96:24 – 98:1.

[49] *See,* Jagus Depo., pg. 66:19 – 67:21.

[50] *See,* Exhibit 15, Code of Ethics, at BLR001174; Exhibit 26, document titled "Smart Consumer's Guide to Annuities", ROWE00561 - ROWE0576, at ROWE0562; Exhibit 27, excerpts from the deposition of Bankers' officer Mariann Dobbs, pg. 50:20 - 51:2

that include directives to "make (the senior) almost cry", make them think they are "in the nursing home" and "disturb" seniors by exploiting "worries" of which the senior was unaware before talking with the Bankers' agent.[51]

76.     In addition to encouraging such deceptive and unfair practices, Bankers uses coercive methods to <u>compel</u> their Agents to aggressively market Annuities to Class Members.  These methods include repeated demands and instruction:

a.   That Agents not focus on actually selling the "low hanging fruit" (referring to insurance products with lower commissions, such as long term care contracts), but use such products to bait Class Members into meeting with the Agents in order to sell the Class Members an Annuity;

b.   That Agents market and sell Annuities to each and every potential customer regardless of any basis in fact to believe that the Annuity is suitable for that customer;

c.   That Agents attempt to close all Annuity sales during the first meeting with the prospective customer and Class Member, regardless of whether sufficient information had been given to that customer and regardless of whether Bankers has sufficient information about the customer's financial condition;

d.   That Agents use catch phrases and buzz words to entice or scare customers, including statements designed to alarm customers that they would not have sufficient resources to see them through retirement, that they were losing money on their current investments, and that their current investments were not performing as well as Bankers' Annuities;

e.   That Agents use rote questions and answers to communicate the need to

_____
[51] *See,* Exhibit 2, NAS Training Guide, at ROWE003308 - ROWE003309, ROWE003315; Exhibit 1.

purchase Bankers' Annuities to Class Members

f.   That Agents attempt to convince Class Members to liquidate their high-performing investments in order to fund the purchase of Annuities;

g.   That Agents avoid explaining the details of the annuities that were being offered, and to avoid discussion of, or disclosure of, the penalties which would be incurred if the customers needed the funds used to purchase the Annuities in advance of their scheduled distribution periods;

h.   That, in light of Bankers' practices to accept Annuity applications of individuals who were not suitable, Agents sell Annuities even when the Agent believed that the customer was not suited for such a product because any sale made would in all likelihood be approved and the Agent would earn a commission;

i.   That Agents use unfair and illicit methods to obtain customer funds in payment for Annuities;

j.   That, despite a thirty (30) day cooling off period allowing customers to recoup funds invested into the Annuities, Agents instruct the customer, when funding the purchase of the Annuity through the liquidation of an existing security or investment, to authorize the **immediate transfer** of the existing account to an affiliated clearing broker, Uvest, who immediately caused any currently owned securities or other investments to be transferred to it, oftentimes incurring surrender and other charges, as a result of the liquidation;[52]

---

[52]  *See,* Exhibit 44, Annuity Action Plan 2009, ROWE00803-ROWE00821, at ROWE00815-ROWE00816, ROWE00820.

k.  To utilize the clearing brokerage firm Uvest when the Agent believes the customer's current investment advisor may get involved to stop the transfer of the Class Member's assets. [53]

l.  That Agents sell Annuities, and the Agents' failure to produce Annuity sales would result in termination, and;

m.  That Agents not answer the questions of their "prospects", the Class Members.

77.  By committing the acts referenced above, and in particular the use of immediate transfer of assets to fund these Annuities, Bankers sought to prevent the Class Members' current investment counselor or financial advisor from counseling the Class Member prior to the purchase of the Annuity, thereby preventing the Class Member from being able to effectively use the statutory cooling off period and cancel the purchase of the Annuity if they chose to do so.[54]

78.  Bankers' sales practices are manipulative, deceptive and uniformly unfair.  But, Bankers has not undertaken the above described practices and activities in isolation.  Rather, it did so as part of a common scheme and conspiracy, which includes not only Bankers, but also other affiliated entities and individuals, including, Uvest Financial Services Group, Inc. and Bankers' independent Agents, who systematically market and sell Bankers' Annuities to Class Members.

iv.  Agent Compensation Structure Assures Inappropriate Sales

79.  Bankers deliberately utilizes a compensation structure which results in a revolving door of inexperienced sales Agents because doing so is more profitable to Bankers than a stable, knowledgeable, experienced sales force.

---

[53] *Id.*
[54] Exhibit 44, *Id.*

80. When a new Bankers Agent sells an annuity, part of the commission is paid to the Agent's supervisors, including the Branch Sales Manager ("BSM") and Unit Sales Manager ("USM") of the particular branch where the agent is assigned.[55]

81. These supervisor payments, called "overrides", are paid to other supervisors on all new Agent sales on a descending sliding scale.[56] Thus, a BSM will make more in overrides on an Annuity sale by a first year Agent than the BSM would make on the exact same sale by a fourth year Agent.[57]

82. Consequently, it is more profitable for Bankers and its BSM employees to maintain an inexperienced sales force because that directly results in higher sales and override commissions paid to Bankers.[58]

83. This perverse incentive structure, while ensuring a relatively young and inexperienced sales force, is effective for Bankers tactics; its Agent attrition rate is 90% in the first year and 50% in the second year.[59] The net result is an untrained, inexperienced Agent force where less than 1 in 20 Agents have been with Bankers for more than two years.[60]

84. Annuities are such a vital part of Bankers' business model that it monitors an Agent's productively in the sales of these investments through the use of a form "annuity tracker".[61] This form records the success or failure of an Agent to sell Annuities. Bankers has, in fact, terminated Agents who did not produce high volumes of Annuity sales.

---

[55] *See,* Exhibit 28, document titled "Unit Sales Manager's Compensation Schedule (10/04)", BLR038008 – BLR038064 and BLR038058 - BLR038064, and document titled "Branch Sales Manager Elements of Compensation (01/04)", BLR037997 – BLR038004; Exhibit 29, document titled "Branch Sales Manager's Compensation Schedule (01/05)", BLR038005 – BLR0380007.
[56] *See,* Exhibit 30, document titled "Unit Supervisor Compensation Schedule", BLR037944; Exhibit 31, document titled "Field Trainer Elements of Compensation", BLR038046 – BLR038057; Downing Depo., Exhibit 9 pg. 69:15-22.
[57] *Id.*
[58] *See,* Downing Depo., pg. 79:16-25.
[59] *See,* Goldberg Depo., pg. 163:2 – 166:7.
[60] *Id.*
[61] *See,* Exhibit 24, Annuity Tracker, ROWE003490.

85.     The results of these annuity tracker forms are shared with other Agents at weekly sales meetings, with praise, bonuses and exotic trips for Agents who sell more annuities[62] and criticism for those who do not.

v.     Failure To Ensure Suitability

86.     Bankers has a duty to ensure that its Annuities are suitable for the seniors to which they are sold.[63] Its Code of Ethics requires it;[64] its Agent Guidelines emphasize it,[65] and Bankers has so testified.[66]

87.     Yet, prior to the filing of this lawsuit in January 2009, Bankers had no centralized process to ensure that its Annuities were suitable for the seniors to which they were being sold.[67]

88.     That failure is especially egregious in light of the multiple market conduct examinations conducted by state departments of insurance, which routinely cited Bankers for systematically failing to ensure suitability.[68]

89.     As noted above, numerous state departments of insurance have investigated Bankers' sales practices, as has the National Association of Insurance Commissioners ("NAIC") in coordination with thirty-nine states.[69] Each of these investigations arrived at the same conclusion: Bankers' sales practices were deeply flawed, and its agent training was patently

---

[62] *See,* Exhibit 32, excerpts from document titled "2008 Bankers Year In Review", ROWE003493-ROWE003495, (noting that top Agents are bonused with trips to exotic locales, such as Argentina, Uruguay and Cancun if they "qualify" based on total sales production).

[63] *See,* Goldberg Depo., pg. 113:2-9; ILL. ADMIN. CODE §§ 3117.200, 3120.50; CAL. INS. CODE § 10509.8

[64] *See,* Exhibit 15, Code of Ethics.

[65] *See,* Exhibit 20, document titled "Agents Guide to Annuities", BLR002258 - BLR002301, at BLR002265 - BLR002268.

[66] *See,* Dobbs Depo., Exhibit 27 pg. 194:7 – 195:18.

[67] *See,* Exhibit 33, document titled "Field Compliance Alert" ("FCA") dated February 9, 2009 BLR000456 – BLR000460; Exhibit 34, FCA March 17, 2009 BLR000444 – BLR000453.

[68] *See,* Exhibit 37, State of Oregon Market Conduct Exam, Exhibit 21-22 to Karen Leonard's Deposition; Exhibit, 38, State of Vermont Market Conduct Exam, Exhibit 23-25 to Karen Leonard's Deposition; Exhibit 39, State of Iowa Market Conduct Exam, Exhibit 26 to Karen Leonard's Deposition; Exhibit 40, State of Maine Market Conduct Exam, Exhibit 27-28 of Karen Leonard's Deposition; Exhibit 41, NAIC Market Conduct Exam (Multi-state), Exhibit 29 of Karen Leonard's Deposition; Exhibit 42, State of Wisconsin Market Conduct Exam, Exhibit 30 of Karen Leonard's Deposition; Exhibit 43, State of Arkansas Market Conduct Exam, Exhibit 31 of Karen Leonard's Deposition; Exhibit 44, State of Pennsylvania Market Conduct Exam Results, ROWE003491-ROWE003492.

[69] *Id.*

deficient.[70]

90.     Incredibly, as the various state departments of insurance were finding Bankers' Annuity suitability system flawed and inadequate, Bankers persisted in its refusal to implement a nationwide suitability program and continued to promote and sell Annuities to consumers through their Agents, with little or no Agent product training, oversight or instruction.

91.     Even after these numerous department of insurance examinations, Bankers continued to place profits before its duties to the senior Class members.  When asked why it failed to implement nationwide suitability in the wake of so many state investigations, Bankers testified that it "did not want to impose upon [Bankers] Agents standards that weren't really in place"[71] and that it was "an additional burden on the field (agents)."[72]  But, the real reason for Bankers' failure to monitor Annuity suitability seems obvious: Bankers profited enormously from their sale of Annuities to senior citizens.  Between 2007 and 2008, Bankers' total annuity premium collections grew from $885 million to more than $1.2 billion; a majority of these revenues were garnered from deceptive sales to seniors.

92.     Although Bankers finally began requiring use of a rudimentary suitability form for all Annuity sales in 2006,[73] it still failed to implement a process to ensure that its Agents were completing the forms accurately and that Annuity sales were, indeed, suitable.[74]

93.     In fact, even if Bankers had attempted to do so, it could not; until 2009, Bankers' information-gathering tool used to determine suitability (i.e., the "fact finder" form) failed to capture crucial policyholder information that is necessary to determine suitability, such as the prospective annuitant's net annual income, net annual expenses, nature and amount of liquid

---

[70] *Id.*
[71] *See*, Dobbs Depo., pg. 85:17-87:17.
[72] *Id.* at pg. 92:19-93:2.
[73] *See*, Exhibit 5, FCA dated July 31, 2006, BLR000473.
[74] *See*, Exhibit 6, excerpts from the deposition of Bankers' officer Karen Martinez, pg. 35:24-36:14, 42:5-12.

assets and the nature and amount of non-liquid assets.[75]

94.    Moreover, many annuity sales involve replacement of existing securities or the sale of those securities as the vehicle to fund the annuitant's payment to Bankers of the premium for the Annuity .[76]   Those transactions require that someone with a securities license be involved,[77] but Bankers' Agents are not required to maintain a securities license.

95.    Bankers' failure to ensure suitability is even more egregious in light of the fact that Illinois law, which controls Bankers as an Illinois insurance company, specifically requires that Bankers maintain a system to ensure Annuity suitability.[78]

96.    The model rules from the NAIC similarly require that insurers ensure suitability,[79] as does the law of many states.[80]

97.    Simply put, Bankers knew as early as 2002 that suitability was a problem.[81] It did nothing to attempt to ensure suitability until after this lawsuit was filed.[82]

   b.    Bankers' Flawed Annuity Products

98.    Plaintiffs' actuarial expert Tom Bakos ("Bakos"), an actuary with forty years of experience in the insurance industry, has examined Bankers' Annuities and determined that they are virtually incomprehensible to the consumer and systematically fail the policyholder through design flaws, and adverse calculation methodologies.[83]

---

[75] *See*, Exhibit 36, excerpts from the deposition of Bankers' officer Aaron Roberson, pg. 159:12 – 162:3, 170:19 – 171:2.
[76] *See*, Downing Depo., pg. 100:2-9.
[77] *See*, Exhibit 37, document titled "Non-Securities Licensed Agents Guidelines For Investment Products", BLR038429 – BLR038432.
[78] *See*, ILL. ADMIN. CODE §§ 3117.200, 3120.50.
[79] *See*, Exhibit 39, document titled "Suitability in Annuity Transactions Model Regulation", BLR044474 - BLR044481.
[80] *See*, CAL.INS. CODE § 10509.8.
[81] *See*, Dobbs Depo., Exhibit 27 pg. 88:6 – 89:1.
[82] *See*, Roberson Depo., Exhibit 36 pg. 64:12-65:1; Exhibit 33, February 9, 2009 FCA; Exhibit 34, March 17, 2009 FCA; Exhibit 39, document titled "Field Compliance Alert" dated May 14, 2009, BLR000442 – BLR000443.
[83] *See*, Decl. Bakos, Certification Exhibit 6.

99.    In his report, Bakos details how Bankers' Annuities products are a poor retirement investment choice for seniors. Bakos establishes numerous flaws in Banker's Annuities, including but not limited to:

    a. Banker's Premium bonuses are an illusory benefit for which there is a hidden charge in the Annuity pricing;

    b. Bankers' Annuities and deferred annuities in general are illiquid assets and adversely restrict putative class members' free access to their wealth;

    c. Seniors, specifically, are an inappropriate target for the sale of an equity indexed deferred annuity product since value accumulation within an equity indexed annuity is in significant part dependent on performance in the highly volatile equities markets, and

    d. Class members suffered economic losses directly attributable to the undisclosed policy acquisition expenses (including Agents' compensation) included in the Annuity policies sold to them resulting in lower returns.[84]

100.   Bakos' report exposes Bankers' Annuity products for what they are: flawed investments that <u>no</u> senior should be sold.

### c.    Bankers' Systemic Omissions and Misrepresentations

101.   Bankers' marketing and sales documents consistently misrepresent and fail to disclose material facts to consumers.  Bankers' entire system, including key documents and forms that are utilized by Agents, is designed around the absolute that only Bankers' approved messages should be communicated to seniors..

102.   Bankers, through their headquarters in Illinois, prepare, disseminate and approve

---

[84] *See*, Certification Exhibit 6, Bakos Decl., pgs. 4-5.

standardized information, brochures, illustrations, marketing and sales materials to Agents for effectuating the sale of Annuities. However, Bankers' standardized information, brochures, illustrations, marketing and sales materials systematically omit or fail to disclose that such annuities are inappropriate investments for Class Members, while failing to adequately disclose or downplaying the substantial *risks,* drawbacks and other adverse features inherent in Annuities.

103.  Bankers' Annuities are drafted so that the average person cannot readily understand the terms. Senior consumers, in part, are an ideal target for Bankers' illegal, unfair and deceptive business practices and are particularly susceptible to this conduct. Many seniors have a diminished ability to understand complex investment transactions, harbor concerns about risky investments and have a fear of outliving their assets.

104.  Bankers' marketing materials are designed to appeal to consumers and prey on their fears of risky or insecure investments. Bankers' customer brochures advertising their Annuities, however, are misleading. Bankers' marketing materials deceptively promote product features purportedly providing security of principal, wealth accumulation through generous returns, liquidity and other attributes without disclosing the material facts from which a consumer would discern that the  Annuities in reality are illiquid, poorly performing products that carry substantial risk, and are far inferior to other available investment products.

105.  In addition to surrender penalties, tax disadvantages and other adverse features, Bankers fail to disclose numerous additional material facts that make their Annuities extremely disadvantageous for consumers.

106.  Bankers represents through marketing materials, brochures, Agent training guides and other materials that the Annuities are beneficial investments because the principal and the interest they accrue is tax-deferred prior to withdrawal. After that deferral period, it is taxed at ordinary

income tax rates. Although this may be beneficial to an annuitant who is currently working and, therefore, paying income tax, Bankers' "exclusive" market is senior citizens.[85] Any supposed tax benefit <u>does not</u> typically benefit senior citizens because they are at or near retirement and, therefore, not as directly or negatively affected by income taxes as younger investors.

107. In perpetrating their unlawful, unfair and deceptive business practice scheme to defraud senior citizens, Bankers either fails to disclose altogether, or inadequately discloses and obscures, the following facts about their Annuities and Bankers' System:[86]

     a. That Bankers' Annuities are burdened with undisclosed "loads" and "expenses" embedded in the Annuities sold to seniors to cover significant acquisition expenses, including extraordinary commissions used to entice Agents to concentrate their efforts on selling Annuities;[87]

     b. That Bankers' utilizes a sales force comprised of untrained, unsupervised and inexperienced independent contractor Agents that have a 95% two-year attrition rate, yet Bankers represents to Class members that Bankers utilizes "dedicated career agents";[88]

     c. That Bankers has had monetary sanctions imposed on it, and on its independent contractor Agents, for selling unsuitable Annuities in numerous states;

     d. That Bankers does not test its Agents to determine their general aptitude or knowledge of Bankers' Annuities;

     e. That Bankers will hire sixteen (16) year old high school students to sell Annuities, which Bankers acknowledges to be "complicated" products;

---

[85] *See*, Exhibit 7.
[86] *See,* Certification Exhibit 6, Bakos Decl..
[87] *See,* Exhibit 52 discussing the existence of a loading expense charge, and Bankers' decision to stop disclosure of the charge to Class members.
[88] *See,* Exhibit 7, at ROWE03480.

f. That Bankers had been the subject of numerous state Department of Insurance examinations that found Bankers' Annuity sales System flawed and problematic;

g. That Bankers' Annuities are poor performing assets during the life expectancies of annuitants with maturity dates set at age 99, with surrender periods up to 10 years from date of issuance of the Annuity;

h. That Bankers' Annuities are illiquid and ill suited for seniors due to high surrender charges that deny policyholders free access to their wealth;

i. That Bankers' Annuities, once purchased, are worth substantially less than the purchaser's original invested funds (i.e. the premium). As a result, Class members who purchase Bankers' Annuities lose substantial value on the very date of purchase. Class members who purchase Bankers' Annuities initially lose as much as 30% of their investment dollars to cover the Agents' commission, Bankers' profits and other undisclosed loads and expenses;

j. That Bankers recoups exorbitant Agent commissions from Class members through undisclosed actuarial and accounting manipulations that adversely impact the performance of the annuities;

k. That the effective cost of owning one of Bankers' Annuities is far higher than the costs associated with readily available alternative investments. Because Bankers do not disclose such costs, similar to the manner in which such disclosures are made regarding annual expense ratios of a mutual fund or the annual expenses of a variable annuity, Class members are unable to understand the risks, costs and minimal benefits of the Bankers' Annuities;

l. That the interaction of steep surrender charges, partial guarantees, and Bankers' virtually

unfettered discretion to change participation rates and equity-index variables, such as the costs of Asian options, exposes Class members to principal and market risk during their anticipated life expectancy;

m.  That Bankers' Annuities have severe surrender charges that effectively grow steadily over time, relative to the value of alternative risk-free investments, to amounts that are far higher than the inadequate disclosures set forth in Bankers' marketing materials and the language of annuity contracts;

n.  That Bankers' pay purchasers of Annuities only a fraction of the actual gains in the indexed S & P 500 markets.  Bankers fails to meaningfully disclose the manner in which the inadequately disclosed index margins[89] interact with changes in the market indices to determine the actual returns to Class members;

o.  That because Bankers uses unsupported and/or unsustainable actuarial assumptions concerning surrender and annuitization rates, expenses and investment performance, it would be required to reduce interest crediting rates, and participation rates available to Class members;

p.  That future performance of Bankers' Annuities was dependant on Bankers' ability to collect surrender charges and early annuitization penalties;

q.  That Bankers' Annuities carry front end and/or back end loads resulting from undisclosed acquisition expenses, unduly steep early surrender charges and bonus forfeitures although Bankers uniformly misrepresents that there are no such loads or expenses;

---

[89]  An "index margin" is defined as the manner that Bankers sets annual participation rates for its  policyholders who are not informed that when participation rates are set they are reduced by undisclosed target pricing spreads, projections of past and future investment performance, cost for purchasing options and additional downward discretionary adjustment factors associated with other competitors' current participation rates.

r. That Bankers requires that each of its policyholders sign a "Disclosure Form" That specifically states, " We <u>do not</u> charge for any loading" when, in fact, Bankers conceals an "expense charge" of 10% in post-February, 2005 Annuities that is not disclosed and which applies to annuitant's calculation of the Minimum Guaranteed Cash Surrender Value;

s. That Bankers' Annuity bonuses are illusory because Bankers recoups those bonuses through higher surrender charges, longer surrender periods, and reduced index credits and participation rates;

t. That Bankers concealed fees and loads through indecipherable product mechanics, such as the index margins, target profit spreads or participation rates;

u. That Bankers charges a load against the annuity payout amount for those annuitants who elect to receive a lifetime income;

v. That other more liquid and lucrative investments existed with less initial loss and equal risk protection if held for the same period of time that Class Members would have to hold their Annuity from Bankers in order to avoid surrender penalties.

w. That Agents are trained to characterize Annuities as "highly liquid" when its Annuity sale "Fact Finder" specifically notes deferred annuities to be non-liquid.

x. Bankers falsely misrepresents that its Annuities contain "No risk of stock losses" when, in fact, they do contain such risks if any potential increase in the S&P 500 market yields a positive return for any given year and policyholders withdraw an amount greater than 10% of their surrender values during that year.

108. Bankers' Annuity contracts also obscure and hide their penalty provisions by, *inter alia,* the use of misleading headings, indistinguishable text characteristics, confusing verbiage,

inconsistent and ambiguous definitions, and "chain" provisions requiring the reader to refer from one provision to another provision. All of these omissions and misrepresentations are uniform to Bankers' sales materials and training, and thus common to the Class.

109. In addition, Bankers fail to disclose the full extent of the business relationships with Agents, including the commissions and other economic incentives paid from the premiums collected from the prospective annuitants, and therefore, Plaintiffs and the Class are unaware of the conflict of interest created by these relationships.

110. Furthermore, because Annuities are complex products and features are often misunderstood by customers, with respect to seniors consumers, insurance companies are required under law, such as California Insurance Code § 10127.13 for example, to disclose all the terms of the surrender provisions in bold 12-point font on the cover page or policy jacket. However, on information and belief, Bankers fails to comply with even this minimal requirement.

111. The problems inherent in senior Annuity sales, coupled with the diminishing resources of the elderly, prompted enactment of the Senior Insurance provisions in California's Insurance Code's General Regulations (Cal. Ins. Code §§ 785, *et seq. (1990)*) and other regulatory protections. These provisions, and similar common law and statutory enactments in Florida, Ohio, Pennsylvania, Illinois and the other states where Bankers market and sell their Annuities impose a duty of honesty, good faith and fair dealing upon insurers when selling new or replacement Annuities to senior citizens. In addition, they prohibit "churning" and similar unscrupulous sales practices. They also require insurers to adhere to strict disclosure requirements in connection with such sales to seniors.[90]

    *C.*    <u>*Plaintiffs' Transaction*</u>

---

[90] *See, e.g.,* Cal. Ins. Code §§ 785, 789.8 and 789.10; Fla. Stat. Ann. § 627.4554(4); 40 Pa. Cons. Stat. Ann. § 510a; 215 Ill. Comp. Stat Ann. § 5/226.

112. In July, 2007, Plaintiff Sam Rowe, an 81 year old retired Civil Servant and World War II veteran, and Plaintiff Estelle Rowe, a retired teacher, were induced, through false, deceptive and misleading practices and representations of Bankers' and its Agents, to liquidate assets and put almost all of their money into purchasing one of Bankers' Annuities that would not pay Plaintiffs any gain or dividend until Sam Rowe was more than 25 years past the average male life expectancy.

113. Specifically, in June 2007, two Agents, Mohammed Javantash and Jose Chavira, made an unsolicited telephone call to the Plaintiffs to arrange an in-home meeting to discuss Plaintiffs' financial situation with respect to long term care insurance. Plaintiffs agreed to a meeting, and met with the Agents on June 20, 2007. At that time, the Agents (each bearing business cards identifying themselves as Agents of Bankers) proceeded to elicit from Plaintiffs' detailed financial information.

114. The notion of selling the Rowes long term care insurance is a ruse typical of Bankers' sales training: By definition, seniors are more interested in long term care insurance and Medicare supplement insurance than other segments of the population. In this regard, Mr. Javantash and Mr. Chavira were adhering to Bankers' sales training techniques-get in the door using a high-interest product and "pivot" the unsuspecting senior citizen into purchasing a completely different product (such as a single-premium Annuity, which carries the highest front-end commission for the agent).

115. During their June 20, 2007, meeting to discuss "long term care insurance", the Agents discovered that Plaintiffs had an existing variable annuity with Hartford with a cash value of approximately $105,000.00. The Agents then, without having seen Plaintiffs' Hartford annuity and with no material information about the benefits of such annuity, proceeded to

recommend that Plaintiffs liquidate their Hartford annuity and purchase one of Bankers' Annuities.

116. The Agents again met with Plaintiffs on June 25, 2007, and at that time, convinced Plaintiffs to liquidate their existing Hartford annuity and purchase one of Bankers' Annuities, Certificate number 7870516. The Agents even assisted Plaintiffs in preparing a surrender request letter to Hartford. Plaintiffs had just been "churned".

117. When Bankers' agent, Jose Chavira, sold Plaintiffs an Annuity, he had been an Agent for approximately three months. His supervisor, Mohammed Javantash, had been working for Bankers for approximately six months.

118. At no point during their two meetings did the Agents discuss the relative strengths and weaknesses of Plaintiffs' Hartford annuity vis-à-vis Bankers' Annuity.

119. At no point during their two meetings did the Agents disclose that there could be tax consequences to the liquidation of the Rowes' Hartford annuity, that the Agents were not tax specialists or that Plaintiffs should seek independent tax advice prior to the transaction.

120. The Annuity purchased by Plaintiffs was marketed by Bankers as a safe and secure investment that was guaranteed to pay competitive rates of return. In reality, the Annuity purchased by the Rowes (like all of Bankers' Annuities) was an illiquid, poorly performing and inappropriate investment for a senior citizen.

121. The Annuity sold to the Plaintiffs also imposed high surrender charges (10% graduated over the first 10 years of the annuity – through to 2017), the duration of which would not expire and allow Plaintiffs to freely cash out or liquidate the Annuity during Mr. Rowe's actuarial life expectancy without a hefty penalizing surrender charge. In short, the Bankers' Annuity sold to the Rowes gave them only one choice if they needed access to the entire value of

their investment: surrender the policy and face substantial surrender charges. Otherwise, they would have to live without complete access to their funds with the false expectation of seeing their investment mature.

122. Once they purchased the annuity, Plaintiffs were effectively locked in. At the time of their purchase, Mr. Rowe was 81 years of age. Plaintiffs' annuity had a maturity date of July 16, 2025, when Mr. Rowe would be **99 years old**, and thus would not mature and begin to distribute the full contracted benefits to Plaintiffs until more than a decade after Mr. Rowe's actuarial life expectancy (88 years of age at the time of the purchase).

123. At the time of the solicitation and sale of the Annuity to Plaintiffs in July 2007, Bankers claimed to "specialize in seniors".[91] Bankers' Agents made a point of attempting to develop a level of trust and confidence with Plaintiffs, as did Bankers, and Plaintiffs reposed their trust and confidence in them. Indeed, Bankers acknowledge a relationship of professional trust and "confidence" with their customers, and expressly stated to Plaintiffs, as it has stated to many other annuity consumers and class members:[92]

> On behalf of all the employees at Bankers Life and Casualty Company, I want to personally thank you for your business and for placing your confidence in us.

124. Bankers continuously confirmed this relationship of confidence and trust at all times material in its dialogue with class members, and deployed this proclaimed relationship as a selling point with seniors in an effort to induce their ongoing trust and confidence with respect to their purchase of Bankers' Annuities. Indeed, at the same time Bankers' Agents were selling Plaintiffs a product that would not mature until a decade after Mr. Rowe's actuarially expected

---

[91] *See,* Exhibit 7 at BLR0003480.
[92] *See,* Exhibit 46, letter from Bankers' CEO Scott Perry mailed to Plaintiffs on or around August 16, 2007, BLR 000205.

death, Bankers was telling Plaintiffs that Bankers was there to **protect** them, *viz.*:[93]

**As a Bankers policyholder, you are part of a group of more than one million individuals across the country that have chosen Bankers to help them protect and enhance their lifestyle and financial security.**

125.  At no time did the Agents disclose to Plaintiffs the material risks and infirmities of the Annuity they were selling, as more fully discussed above and below.

126.  The failure to disclose the risks and infirmities of the Annuity and concealment thereof by Bankers and their Agents induced Plaintiffs to roll over their prior annuity into Bankers' Annuity without an informed consent, and without knowledge or appreciation of the material risks and infirmities of the investment.

127.  Bankers' failure to disclose the risks and infirmities of their Annuities is even more egregious because, once the Annuity is purchased, an owner of the Annuity (like Plaintiffs) are effectively locked into that investment for a lengthy period of time due to the surrender charges.

128.  This is especially true with regard to senior citizens who, by reason of their age, have serious concerns and liquidity needs, including potentially being required to fund prolonged illness of themselves or loved ones. Indeed, given Mr. Rowe's age at the time of this sale – 81 – and his life expectancy of 88 years, Mr. Rowe could not cash out of the policy during his life expectancy without paying a significant surrender charge.  Additionally, Mr. Rowe could not change the maturity date during the 10-year surrender charge period**.**

129.  Comparing the values of Plaintiffs' Annuity to an alternative investment such as a treasury bond reveals that the Bankers' Annuity was ***simultaneously more risky and less favorable*** than a treasury bond.  Bankers and their Agents both failed to disclose this material fact when Plaintiffs were churned into Bankers' Annuity.

---

[93] *Id.*

130.  Plaintiffs purchased Bankers' Annuity with the lump sum payment of a $101,985.92 premium.  Plaintiffs lost approximately $2,957.09 in surrender charges to Hartford when the Agents convinced Plaintiffs to liquidate their Hartford annuity to purchase the Bankers' Annuity.

131.  In December 2007, Plaintiffs were forced to surrender the Bankers Annuity due to a need for liquidity.  At the time of surrender, Plaintiffs were paid approximately $91,787.33 by Bankers.

132.  In short, Plaintiffs lost a significant amount of money in the course of six months due to the improper and unlawful Annuity marketing scheme employed by Bankers and its Agents.

133.  Had all the risks and infirmities of the Annuity been fully and adequately disclosed and affirmatively or otherwise made known to Class Members, to enable them to make fully informed investment decisions before purchasing the Annuities, no reasonable investor, including the Rowes, would have purchased the Annuities instead of selecting or deciding to place his or her assets in other investment products which were superior.

134.  Plaintiffs, and the Class, were induced by uniform and materially false representations and omissions by Bankers and their Agents relating to the concealment of material expenses, risks and infirmities of Bankers deferred annuities products prior to purchase of defendant's unsafe investment products, as set forth herein in more detail.

135.  At no time prior to the Annuity liquidation in December, 2007, did the Rowes know of, or in the exercise of reasonable diligence would they have discovered, the undisclosed and concealed risks and infirmities of their investment, nor would they have purchased the Bankers' Annuity had they been adequately and fully informed of same.

136. Bankers used interstate mail and wire to transmit and receive a variety of materials to effectuate the sale of Bankers' Annuity to Plaintiffs, process Plaintiffs' Annuity application, process the premium payment and pay the commission from the sale of the Annuity, as set forth below.

D. *Rico Allegations*

i. The Structure Of The Enterprise

137. Plaintiffs and Class Members are each "persons" within the meaning of 18 U.S.C. §1961(3), and each of them has sustained injury to their business or property as a result of the acts and the conduct of Defendants described herein.

138. The following group of individuals and entities are associated in fact (which Plaintiffs refer to as the "Bankers Annuity Enterprise" or "BAE") and are responsible for the marketing, solicitation and sale of Bankers' Annuities to the Class, which constitutes an "enterprise" as that term is defined in 18 U.S.C. §1961(4):

a. Defendant Bankers Life and Casualty Company of Illinois, which serves, or served, as an underwriter of life insurance, and markets products and services to consumers contracting with Bankers Life and Casualty Company;

b. Defendant Bankers Life and Casualty Company, which underwrites and issues Annuities to senior citizens through its Agent distribution channel;

c. UVEST Financial Services Group, Inc., a North Carolina corporation which provides advice and investment-related transaction support to assist Bankers' Agents to quickly transfer and replace securities previously owned by annuitants in order to fund new Bankers' Annuities;

d. 40/86 Advisors, Inc., an Illinois corporation which serves as a surrogate and proxy for

38

Bankers in setting interest or equity credits, including participation rates to policyholders, for Bankers' Annuities;

e. Bankers' Agents, who market and sell Bankers Annuities throughout the United States.

139.  The BAE is an ongoing organization which engages in, and whose activities affect, interstate commerce.  In addition, the BAE has an ascertainable and hierarchical decision-making structure separate and apart from the pattern of racketeering activity in which Bankers and its co-conspirators engage.  Each participant in the BAE plays a designated, well-defined and ongoing role in the affairs of the Enterprise.  Bankers is the only member of the conspiracy that develops and underwrites the Annuities, and develop standardized marketing materials.  UVEST facilitates replacement transactions.  40/86 provides investment advice and services for Bankers' illegally reaped funds.  The Agents market and sell the Annuities.

140. As set forth herein, the BAE has an ongoing and continuous existence that is separate from the alleged pattern of racketeering activities and members who have existences and activities that are separate and distinct from those of the Enterprise.  Specifically, while the conspirators participate in and are members and part of the BAE, they also have an existence separate and distinct from the enterprise:

a. Bankers' primary business is not the sale of Annuities, but rather, its primary business is the sale of Medicare supplement policies and long-term care insurance outside of the BAE.[94]  For example, less than one-third of Bankers' premium revenue in 2007 was from annuities in general, of which the Annuities at issue in this case are only a portion.

b. Bankers' Agents are not "exclusive" or "captive" insurance agents; they can, and

---

[94] *See,* Exhibit 11, Goldberg Depo, pgs. 59:1-60:10.

do, sell and write insurance policies from insurance companies other than Bankers,[95] or sell Bankers other non-Annuity insurance products outside of the BAE. However, Bankers' use of the Agents is an essential and central component enabling Bankers to control conduct the illicit affairs of the enterprise.

c. Uvest is a distinct and separate North Carolina corporation that provides brokerage services to numerous businesses other than Bankers;

d. 40/86 Advisors, Inc. is a wholly-owned subsidiary of CNO Financial Group (f/k/a Conseco), and a fixed income investment advisor that manages investments and income outside of the BAE, including "over $21 billion in public corporate debt securities, taxable municipal bonds, emerging market securities, high yield bonds, government bonds, mortgage related securities, privately placed debt securities, commercial mortgages, and bank loans."[96] 40/86 provides investment management, advice and support to several businesses other than Bankers.

141. The structure of the BAE is critical to Bankers ability to promote unsuitable and inappropriate Annuity sales. In short, Bankers has structured the BAE in a manner such that it allows Bankers to perpetrate the unlawful conduct and fraud on the Class by selling unsuitable Annuities through the Agents, <u>which it would not otherwise be able to do</u> if Bankers sold its Annuities directly to the public through employee agents.

142. Specifically, all Agents are independent contractors, rather than employees. That much is clear from Bankers' Agent contract, which specifically states:[97]

**4.    INDEPENDENT CONTRACTOR**
This contract shall not create an employer-employee relationship. The relationship of Agent to Company shall be that of independent contractor.

---

[95] *See*, *Id.* pg 28:19-29:2
[96] *See,* website of 40/86 Advisors, Inc., at: http://www.4086.com/.
[97] *See,* Exhibit 18, at BLR000114.

143.  Bankers goes to great length to avoid having its Agents deemed employees, and has successfully contested that very issue in litigation in the United States District Court for the Northern District of Illinois.[98]  In that litigation, Bankers conceded that it <u>does not</u> require agent training.[99]

144. If Bankers sold its Annuities through employees, rather than independent contractors, Bankers would have heightened oversight responsibilities and obligations under applicable law that would have prevented the sale of countless unsuitable Annuities that were sold to the Class.  Specifically, if Bankers sold Annuities directly and not through the independent Agents, Bankers would be required to obtain the following information from each consumer before the sale of an Annuity:

>   a. The consumer's financial status;
>
>   b. The consumer's tax status;
>
>   c. The consumer's investment objectives; and
>
>   d. Such other information used or considered to be reasonable by Bankers in making recommendations to the consumer. [100]

145.  But, by selling its Annuities through Agents, rather than employees, Bankers is able to evade its responsibilities and obligations by contending that it lacks control or oversight over the actions of its Agents.  Indeed, when Bankers' Agents have been caught selling unsuitable Annuities to the elderly, the structure of the BAE allows Bankers to avoid vicarious liability (due to the lack of an employer-employee relationship) while Bankers' paints the Agent as rogue,  atypical and "not consistent" with Bankers' sales and training practices.[101]

146. The structure of the BAE also enables Bankers to assume that the Agents will not know

---

[98] *Walker v. Bankers Life and Casualty Company*, N.D.Ill. Case No. 06cv06906.
[99] *See*, Exhibit 17.
[100] *See*, ILL. ADMIN. CODE §§ 3117.200, 3120.50.
[101] *See*, Exhibit 40, Bankers' Statement regarding the Agent actions depicted by Inside Edition in Exhibit 1, ROWE003462-003463.

and will not be able to ascertain its internal procedures and policies regarding the features of its Annuities. The information that it withholds from its Agents, which they in turn do not have to pass on to prospective Annuity purchasers, includes but is not limited to: the loads and expenses associated with the annuities sold to Seniors, the participation rates including information setting forth the manner in which the participation rates are established, the lack of a direct relationship between the performance of the S&P 500 and the returns that they might received from the annuities, and the fact that Bankers does not purchase equities comprising or contained in the S&P 500, all as set forth in more detail above.

147. Bankers' failure to provide its Agents with adequate training on Bankers' Annuities is a conscious strategy to use the BAE to accomplish the sale of Annuities. As noted above, Bankers has intentionally not implemented training programs that would have increased Agent knowledge, opting instead to rely on Annuity product materials that Bankers makes available to its Agents. However, even those materials, which the Agents are neither required to read or tested on, are pointless; Bankers' internal documents note its awareness that such materials are not read by its Agents.[102]

148. The Agents' work for the BAE is not merely incidental and identical to the services such Agents would provide if they were employees, rather than independent contractors. Indeed, by maintaining the Agents as independent contractors, Bankers contends that it cannot require its Agents to be adequately trained on annuity suitability,[103] as it could if the Agents were employees.

149. In essence, through the BAE, Bankers has abdicated its responsibility to exercise control over the manner in which its Annuities are sold, and relinquished that power to the Agents, which Bankers intentionally does not train or educate on the concept of suitability, while simultaneously

---

[102] *See*, Exhibit 21.
[103] *See*, Martinez Depo., Exh. 16, pg. 73:5-22; 86:19-87:3.

requiring its Agents to meet target sales quotas. By intentionally not exercising control and oversight over annuity suitability, Bankers allows unsuitable Annuities to be sold to the Class through the untrained, unsupervised Agents.

150. The structure of the BAE is symbiotic. It also allows the Agents to boost their personal profits by selling unsuitable Annuities with impunity and without the responsibility or oversight typical in an employer-employee relationship. When improprieties are discovered, Bankers publicly disavows the conduct, often declaring it to be deplorable, but denying responsibility due to the independent status of the Agents, labeling them as "rogue" and beyond their control.

151. UVEST is also an important part of the BAE. Uvest provides advice and investment-related transaction support to assist Bankers' Agents in selling the Annuities to unsuspecting Class members. By having Uvest serve as the intervening broker, Agents can quickly transfer and replace a Class members' pre-existing security in order to fund the purchase of a new Bankers Annuity. Because Uvest allows for the immediate transfer of assets to fund Annuity purchases, Bankers uses Uvest through the BAE in order to prevent Class Members' current investment counselors or financial advisors from counseling Class Members prior to the purchase of the Annuity, thereby preventing the Class Member from being able to effectively use statutory cooling off periods[104] and cancel the purchase of the Annuity if they chose to do so.[105] Indeed, Bankers specifically instructs its Agents to use Uvest in the sale of Annuities through the BAE "when you feel it is likely the broker will get involved and stop the transfer of assets."[106]

152. 40/86 serves as a surrogate and proxy for Bankers in setting interest or equity credits, including participation rates to policyholders. These rates are crucial to Bankers' maintenance of

---

[104] For example, California law requires a thirty-day period. Cal. Insurance Code § 10127.10(a). Since Bankers' Agents had the Rowes liquidate their Hartford annuity and immediately purchase a Bankers' Annuity, the Rowes were damaged even if they had utilized the thirty day cooling off period and canceled their Bankers' Annuity because they paid surrender charges to Hartford when their Hartford annuity was cancelled.
[105] *See,* Exhibit 44, *Id.*
[106] *See,* Exhibit 44, at ROWE00816.

ample profits earned from the Annuity premiums generated by Agent sales. 40/86 also oversees investment of Bankers' profits earned from the sale of Annuities through the BAE, and sets or determines new money rates, portfolio rates, the interest level, the cost of options and purchases at-the-money options to enable Class members to "share in the upside of the S&P 500."[107]  In short, the actions of 40/86 are integral to Bankers' maintenance of the BAE, and directly responsible for the handling of Annuity premium dollars after they are paid by Class members.

153.  In short, the motivation for the BAE is obvious: Bankers' profits are boosted through the sale of Annuities that are unsuitable and should not be sold to senior citizens, <u>and that would not have been sold if the annuities were sold through employees</u>.  The Agents' profits are boosted by selling unsuitable Annuities that they <u>would not have been able to sell if they were employees</u>.

154. The BAE gives Bankers and its co-conspirators an additional power to harm the Class through unlawful and unconscionable conduct that they would not otherwise have absent the BAE.

ii.      Control And Operation Of The Enterprise

155.  To successfully market and sell the Annuities to senior citizens in the manner set forth above, Bankers requires a systematic means to utilize the BAE to control the substantive information provided to prospective purchasers (i.e., the Class) at the point of sale, including concealing the inherent inferiority of the Annuities as an investment vehicle.

156. The BAE provides Bankers with that systematic means, and its control of and participation in the BAE is necessary for the successful operation of the scheme.  Bankers controls and operates the BAE through the machinations set forth above.

157. Bankers has exerted control and dominance over the operations of the BAE for the purpose of furthering its unlawful scheme of targeting senior citizens for the marketing and sale of

---

[107] *See,* Exhibit 11, Goldberg Depo., pg. 77:22-78:11; 79:9-19; 82:20-83:11; 92:23-93:20.

Annuities.  Each member of the BAE, with knowledge and intent, agreed to the overall objective of the conspiracy.  They also agreed to, and actually committed, the alleged acts herein with the goal of depriving Plaintiffs and other Class Members of their money and property in connection with the sale of the inferior Annuities.

158.  Numerous common facts and similar activities evidence the existence of a conspiracy among the co-conspirators, including, *inter alia:*

> a. Senior citizens are intentionally targeted for the marketing and sale of Annuities with maturity dates beyond their actuarial life expectancy;

> b. Agents who contracted with Bankers, and who Bankers has a duty to train, monitor and oversee, commonly held themselves out as "specializing" in senior citizens in order to gait the trust of senior citizen clients, despite lacking any objective qualifications for such specialization;

> c. Bankers and un-named, unknown co-conspirators' membership, participation, or sponsorship of industry associations, groups, or annual conventions;

> d. Existing policyholders with large accumulated cash values are churned into Bankers' under-performing Annuities; and

> e. The lavish incentives, bonus programs and other perks that Bankers offers its Agents to sell increasing numbers of Annuities to the elderly.

### iii.  Predicate Acts

159. Section 1961(1)(B) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). As set forth below, Bankers and its co-conspirators have and continue to engage in conduct violating each of these laws to effectuate their scheme.

160. In addition, to effectuate their scheme, Bankers and its co-conspirators sought to, and did, aid and abet themselves and each other in violating the above laws within the meaning of 18 U.S.C. § 2. As a result, their conduct is indictable under 18 U.S.C. §§ 1341 and 1343 on this additional basis.

iv. Violations of 18 U.S.C. §§1341 and 1343

161. For the purpose of executing and/or attempting to execute the above-described scheme to market and sell Annuities to senior citizens by omitting material information regarding the critical attributes and risks of the Annuity products, which if disclosed, would reveal the Annuities to be inferior to alternative investments, Bankers and its co-conspirators, in violation of 18 U.S.C. § 1341, committed numerous acts, *viz.*:

    a. placed in post offices and/or in authorized repositories matter and <u>things</u> to be sent or delivered by the Postal Service;

    b. caused matter and things to be delivered by commercial interstate carriers, and

    c. received matter and <u>things</u> from the Postal Service, and/or commercial interstate carriers, including, but not limited to, deferred annuity marketing brochures, annuity disclosure forms, performance illustrations, applications, contracts, training manuals, video tapes, correspondence, annuitant lead lists, premium and commission payments, reports, data, summaries, statements and other materials relating to the marketing and sale of Bankers' Annuities.

162. For the purpose of executing and/or attempting to execute the above-described scheme to defraud or <u>obtain</u> money by means of false pretenses, representations or promises, Bankers and its co-conspirators, also in violation of 18 U.S.C. § 1343, transmitted and received by wire, matters and things, which include, but are not limited to, consumer brochures, annuitant applications, annuity disclosure forms, field memos, correspondence, prospective leads lists,

premium and commission payments, reports, data, summaries, account statements, faxes and other Annuity-related materials.

163. The matter and things sent by Defendants via the U.S. Postal Service, commercial carrier, wire or other interstate electronic media as identified above include, *inter alia:*

    a. omissions of fact concealing that Bankers would and did use the fraudulent and unlawful sales techniques and presentations and the deceptive and misleading sales materials and annuity contracts described above to solicit and induce the Plaintiffs and other members of the Class into purchasing Annuities; and

    b. Material omissions of fact that the sales agents are required (and highly incentivized) to adhere to Bankers' sales materials and thus are not providing prospective annuitants with "independent" insurance advice as represented.

164. Perhaps the most egregious example of Bankers' fraudulent misrepresentations and omissions of fact associated with its use of the mail and wires services is Bankers' intentional concealment of the loading expense charges inherent in its Annuities. Bankers denies that there is a loading expense charge built in to the structure of its Annuities; the Annuity Disclosure Form that Bankers gave to Plaintiff Sam Rowe specifically states:[108]

> **(3) LOADING CHARGE** - A loading charge is a sales or an administrative charge which is deducted from your premium or your policy's Cash Value. We <u>do not</u> charge for any loading. We will, however, deduct any Premium Tax required by state law.

165. Likewise, the Policy Summary that Bankers mailed to Plaintiffs fails to disclose any loading expense charges.[109]

166. However, prior to 2005, Bankers did, in fact, disclose a loading expense charge of 10% of the single premium. Bankers' exemplar pre-2005 Annuity schedule clearly shows the

---

[108] *See,* Exhibit 49, Plaintiffs' Annuity Disclosure Form, BLR000336.
[109] *See,* Policy Summary attached to Exhibit 46, BLR000206.

existence of the loading expense:[110]

```
EXPENSE CHARGE:                          10.00% OF SINGLE PREMIUM
```

167. Likewise, Bankers clearly charged seniors a 10% loading expense charge on Annuities issued prior to 2005.[111]

168. However, in 2005, during the Class period, Bankers ceased disclosure of the loading expense charge on Annuity schedules because it "confused" Class members and made it more difficult for the independent Agents to sell Annuities to seniors.[112]  Interestingly, Bankers did not cease to impose the loading expense charge on Annuities sold after 2005.  Rather, Bankers decided that the loading expense "will not be shown on the schedule page of the new (Annuity)".  In short, Bankers did not quit charging Class members a loading expense, it just quit telling them about it!

169. Such conduct is directly contrary to Bankers' promise to Class members, as set forth in the post-2005 Disclosure Form, that "We <u>do not</u> charge for any loading."[113]  That the existence of the loading expense is a material fact to the sale of an Annuity is manifest: Bankers stopped disclosing the loading expense because it was impairing Annuity sales.[114]

170. Consequently, for every Annuity sold after February, 2005, Bankers failed to disclose the existence of the loading expense on its Disclosure Form.  When Bankers transmitted the fraudulent Disclosure Forms via mail and wire services to the Class members, field offices, field agents or anyone else, it committed separate acts of fraud.

---

[110] See, Exhibit 50, exemplar Annuity Schedule, BLR003335.
[111] *See,* Exhibit 51, collection of Annuity Summaries that, upon information and belief, were mailed to Annuity purchasers on February 1, 1999 (BLR014308), December 21, 1998 (BLR014285), September 1, 1999 (BLR014320) and December 17, 1998 (BLR014274), all of which note the imposition of a 10% expense charge.
[112] *See,* Exhibit 52, Bankers' Inter-Office Correspondence, BLR071180.
[113] Exhibit 49.
[114] Exhibit 52 (disclosure of the loading expense is confusing the client and "making the sale more difficult for the agent").

171. The Disclosure Forms are the joint product of the unlawful acts of Bankers and its Agents. Bankers created the forms, authorized the removal of the loading expense disclosure and mandated use of the Disclosure Form for all Annuity sales. Bankers' fraudulent statements surrounding the Annuity loading expense charges are premised on mail and wire fraud transmissions:

a. The Rowes' Annuity Disclosure Form (Exhibit 49) was faxed to Bankers on Augusts 24, 2007-it still bears the facsimile transmission header;

b. The Rowes' Policy Summary (Exhibit 46) was mailed by Bankers to Plaintiffs on or around July 16, 2007;

c. Upon information and belief, all post-February, 2005 Annuity sales included Bankers' transmission of the fraudulent Disclosure Form to and from Class members, and transmission of the fraudulent policy Summary to and from Class members.

172. Transmission of the Disclosure Forms and policy Summaries are not the only instances where Bankers utilized the mail and wire services to further its scheme. Indeed, based on the transmissions completed by Bankers with respect to the Rowes' Annuity, Bankers' use of the mail and wire services are critical to Bankers' overall operations:

a. Bankers' Agents directed the mailing of correspondence from Plaintiffs to Hartford on or around June 25, 2007, initiating the unlawful liquidation of the Rowes' Hartford annuity;[115]

b. Numerous interoffice facsimile transmissions between June 22, 2007 and July 30, 2007 by Bankers related to the Agents' efforts to sell the Rowes a Bankers'

---

[115] *See,* BLR000133, collectively attached in Exhibit 53 hereto.

product;[116]

c. Interoffice facsimile transmissions between Agents and Bankers on August 9, 2007 related to Agent attempts to obtain the Rowes' signature on the necessary Annuity documents;[117]

d. Mailed correspondence from Bankers to Hartford on August 16, 2007, attempting to obtain additional information related to the Rowes' ill-advised liquidation of their Hartford annuity at the instruction of Bankers' Agents;[118]

e. Mailed correspondence from Bankers' Agent Mohammed Javantash to the Rowes on or about August 16, 2007, seeking referrals to Bankers of other individuals "who might also benefit from" the Agent's services;[119]

f. Numerous transmissions between Agents and Bankers on or about August 24, 2007, transmitting copies of the fraudulent Annuity Disclosure Form referenced above.

g. A standard form letter mailed to the Rowes on or about August 16, 2007 from Bankers' CEO Scott Perry, thanking the Rowes for placing their confidence in Bankers and noting his awareness that the Rowes chose to buy an Annuity from Bankers "to help them protect and enhance their lifestyle and financial security."[120]

173. Upon information and belief, the mail and wire transmissions set forth above with respect to the Rowes' Annuity are common to the type and sort of mail and wire transmissions made by Bankers and the Agents with respect to all Annuity transactions for all Class members.

174. Bankers' omissions of material facts, acts of concealment and failures to disclose

---

[116] *See,* BLR000414-417, collectively attached in Exhibit 53 hereto.
[117] *See,* BLR000140-144, collectively attached in Exhibit 53 hereto.
[118] *See,* BLR000215, collectively attached in Exhibit 53 hereto.
[119] *See,* BLR000162, collectively attached in Exhibit 53 hereto.
[120] Exhibit 46.

were knowing and intentional, and made for the purpose of deceiving Plaintiffs and the Class and obtaining their monies and property for Bankers' gain.

175. Bankers either knew or recklessly disregarded the fact that the misrepresentations and omissions described above and incorporated herein were material, and Plaintiffs and the Class relied on the misrepresentations and omissions as set forth above.

176. As a result, Bankers has obtained money and property belonging to the Plaintiffs and Class Members, and Plaintiffs and the Class have been injured in their business or property by Bankers' overt acts of mail and wire fraud, and by its aiding and abetting its co-conspirators and their acts of mail and wire fraud.

v.      Pattern of Racketeering Activity

177. Bankers have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing or aiding and abetting in the commission of at least 2 acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343 as described above, within the past 10 years. In fact, given the multiple mail and wire fraud violations that occur in each sale of an annuity to a Class member, Bankers has committed or aided and abetted in the commission of thousands of acts of racketeering activity; Bankers sold almost 1,000 Annuities in California alone since 2004.[121]

178. Each racketeering act was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including the Plaintiffs and other members of the Class.

179. The multiple acts of racketeering activity which Bankers committed and/or conspired to, or aided and abetted in the commission of, were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of

---

[121] *See,* excerpts from Bankers' Responses to Plaintiffs' First Interrogatories, No. 9, attached hereto as Exhibit 47.

racketeering activity" as defined in 18 U.S.C. § 3961(5).

### vi.   RICO Violations

180. Section 1962 (c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…."  Through the patterns of racketeering activities outlines above, Bankers has conducted and participated in, and controlled, the affairs of the BAE.

181. Bankers willfully agreed to, and did, materially participate, directly or indirectly, in the conduct of the affairs of the BAE through a pattern of racketeering activity compromised of numerous acts of mail fraud and wire fraud, and so participated in violation of 18 U.S.C. § 1962(c).

182. Additionally, Section 1962(d) of RICO makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  Bankers' conspiracy to defraud the Plaintiffs and other Class Members of their money and property from the sale of inferior Annuities pursuant to the scheme described above violates 18 U.S.C. § 1962(d).

### E.   *Discovery Rule and Equitable Tolling*

183.   Any applicable statutes of limitations have been tolled by Bankers' failure to disclose the facts alleged herein.  Bankers failed to adequately disclose material information to Plaintiffs and the Class about the Annuities purchased.  This information is essential to the pursuit of these claims and was not known to Plaintiffs without fault or lack of due diligence.  Due to the undisclosed nature of Bankers' practices, Plaintiffs could not have discovered them earlier.

184.    Bankers holds itself out as a financial and/or insurance expert "specializing" in senior citizens, and possessing special knowledge necessary to interpret and understand the complex Annuity policies it offered.  Bankers induced Plaintiffs and the Class to purchase Annuity policies, holding itself out as a confidant of Plaintiffs and Class Members, and thereby encouraging Plaintiffs and Class Members to reveal confidential, personal, and proprietary information, including private financial information.  Plaintiffs and the Class reposed confidence and trust in Bankers' Agents, and relied on their alleged superior expertise in recommending appropriate investment and insurance products.

185.    Bankers, however, has used its position as confidant and trusted financial advisor by misleading Plaintiffs and the Class into believing that Bankers was not committing any wrongful acts against them.  Through the Bankers' representations and the concealment of important information, Plaintiffs and Class Members could not suspect, nor were they put on inquiry, that Bankers' business practices were causing them injury until shortly before the filing of this action.

186.    In addition, Bankers did not uphold their duty of good faith and fair dealing by failing to disclose information about the Annuities, which is essential to their bringing these claims.

187.    For the reasons alleged above, the vast majority of Class Members still do not know, and have not been put on inquiry notice, that Bankers is engaging in any wrongdoing, and that the injuries they have sustained were caused by Bankers' unfair and unlawful business practices.

188.    The statute of limitations applicable to any claims that Plaintiffs or other Class Members have brought, or could bring, as a result of the conduct alleged herein has been tolled

as a result of Plaintiffs and Class Members' inability to discover, nor be put on inquiry notice, that Bankers was engaging in any unfair and unlawful business practices. In addition, Plaintiffs and the Class did not and could not have discovered their causes of action until the time alleged below, thereby tolling any applicable statute of limitations. Therefore, Bankers is *estopped* from relying on any statutes of limitations.

## V.  CLASS AND SUBCLASS ALLEGATIONS

189.   Plaintiffs bring this action individually and on behalf of all persons as the Court may determine to be appropriate for class treatment, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b). The class Plaintiffs seek, for all claims set forth herein, is defined as: All persons in the United States that, while 65 years of age or older, purchased one or more Bankers Life and Casualty Company equity-indexed annuities, form numbers LA-07A, LA-07C or LA-07G, after January 1, 2004 (the "Class").[122]

190.   Plaintiffs also seek certification of the following subclass of California residents with respect to Plaintiffs' claims for violations of California's Elder Abuse Code,[123] Unfair Trade Practices Act,[124] False and Misleading Advertising Act,[125] unjust enrichment, breach of fiduciary duty and aiding and abetting breach of fiduciary duty:  All California residents that, while 65 years of age or older, purchased one or more Bankers Life and Casualty Company equity-indexed annuities, form numbers LA-07A, LA-07C or LA-07G, after January 1, 2004 (the "Subclass").[126]  For purposes of this complaint, the "Class" and "Subclass" are referenced collectively.

191.   Excluded from the Class is Bankers and its affiliates, predecessors, successors,

---

[122] *See,* Exhibit 41, Bankers' annuity form LA-07A; Exhibit 42, Bankers' annuity form LA-07C; Exhibit 43, Bankers' annuity form LA-07G.
[123] *See*, CAL. WELF. AND INST. CODE, §§15610, *et seq.*
[124] *See*, CAL. BUS. & PROF CODE, §§17200, *et seq.*
[125] *See*, CAL. BUS. & PROF. CODE, §§17500, *et seq.*
[126] The National and the California classes are collectively referred to as, "the Class", unless otherwise noted.

officers, directors, Agents, servants, or employees, and the immediate family members of such persons. Also excluded is any trial judge who may preside over this action, court personnel and their family members.

192.    Plaintiffs assert class and representative claims against Bankers under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, Cal. Bus. & Prof. Code §§17203, 17204, 17535, and under common law as set forth below. Plaintiffs seek to enjoin Bankers from engaging in the unfair and unlawful business practices and false advertising alleged in this Complaint, and to require Bankers to restore all monies wrongfully obtained through their false advertising and unfair and unlawful business practices to the affected members of the Class and general public.

193.    The members of the Class are so numerous that joinder of all members would be impracticable. Plaintiffs reasonably estimate that the Class Members may number into the thousands or even tens of thousands. The precise number of Class Members and their addresses are unknown to Plaintiffs, but can be ascertained through appropriate discovery of Bankers' records. Class Members may be notified of the pendency of this action by publication and/or other notice.

194.    There is a well-defined community of interest in the relevant questions of law and fact affecting putative Class Members. Common questions of law and fact predominate over any individual questions affecting Class Members, including, but not limited to the following:

      a.    Whether Bankers improperly solicited, referred, marketed, issued, or sold Annuities to senior citizens, including Plaintiffs and the Class;

      b.    Whether Bankers violated the provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*;

c.  Whether Bankers committed unfair and unlawful business practices, in violation of Cal. Bus. & Prof Code § 17200, in their marketing, promotion, solicitation, sales and issuance of Annuities to Plaintiffs and Class Members;

d.  Whether Bankers engaged in unfair and unlawful advertising in violation of Cal. Bus. & Prof Code § 17500;

e.  Whether Bankers committed elder abuse as defined in Cal. Welf. & Inst. Code § 15600 et seq.;

f.  Whether Bankers was unjustly enriched by their marketing, promotion, solicitation, sales and issuance of Annuities to Plaintiffs and Class Members;

g.  Whether Bankers breached its common law fiduciary duties to Plaintiffs and the Class;

h.  Whether Plaintiffs and the Class are entitled to damages; and

i.  Whether Plaintiffs and the Class are entitled to injunctive relief.

195.    The claims of Plaintiffs are typical to those of the Class.  The claims of Plaintiffs and other Class Members have a common origin and share a common basis.  The claims originate from the same wrongful conduct by Bankers, including its own wrongful conduct, as well as conduct by others that aided and abetted the wrongful conduct of others.  If brought and prosecuted individually, the claims of each Class member would require proof of many of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.

196.    Plaintiffs' claims are sufficiently aligned with the interests of the absent members of the Class to ensure that the Class claims will be prosecuted with diligence and care by Plaintiffs as representatives of the Class.

197. Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to or which directly and irrevocably conflict with the interests of other members of the Class.

198. Plaintiffs are willing and prepared to serve the Court and the proposed Class in a representative capacity with all of the obligations and duties material thereto.

199. Plaintiffs have retained the services of counsel, identified below, experienced in complex class-action litigation and in particular class actions involving insurance matters, who will adequately prosecute this action, and will otherwise assert, protect, and fairly and adequately represent Plaintiffs and all absent Class Members.

200. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for the parties opposing the Class. Such incompatible standards of conduct and varying adjudications on the same essential facts, proof, and legal theories would also create and allow the existence of inconsistent and incompatible rights within the Class.

201. Moreover, a class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint because:

202. Individual claims by the Class Members would be impracticable as the costs of pursuit would far exceed what any one Class member has at stake;

203. No litigation has been commenced over the controversies alleged in this Second Amended Complaint and individual Class Members are unlikely to have an interest in separately prosecuting and controlling individual actions;

204. The concentration of litigation of these claims in one forum will achieve efficiency and promote judicial economy; and

205.    The proposed class action is manageable.

206.    In light of the foregoing, class treatment in this case is appropriate and necessary under Fed.R.Civ.P. 23(a), 23(b)(2) and 23(b)(3).

## VI.    CLAIMS

### FIRST CLAIM FOR RELIEF
### Violations of RICO, 18 U.S.C. § 1962(c) and (d)

207.    Plaintiffs and the Class incorporate by reference all allegations contained in the paragraphs above as if fully set forth herein.

208.    This claim arises under 18 U.S.C. §1962(c), which provides in relevant part:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

209.     In violation of 18 U.S.C. §1962(c), Bankers have conducted or participated, directly or indirectly, in the conduct of the affairs of the BGE Enterprise through a "pattern of racketeering activity," as defined by 18 U.S.C. §1961(5).  Therefore, Bankers have violated 18 U.S.C. §1962(c).

210.    As a result and by reason of the foregoing, the Plaintiff and Class Members have been injured, suffered irreparable harm and sustained damage to their business and property, and are therefore entitled to recover actual and treble damages, and their costs of suit, including reasonable attorney fees, pursuant to 18 U.S.C. §1964(c).

211.    In addition to Bankers' violations of §1962(c), Bankers have also violated the provisions of 18 U.S.C. §1962(d), which provides in relevant part:

> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section.

212.    Bankers' conspiracy to defraud the Plaintiff and other Class Members of their

money and property from the sale of inferior annuities pursuant to the scheme described above violates 18 U.S.C. §1962(d).

213.    As a result and by reason of the foregoing, the Plaintiffs and Class Members have been injured, suffered irreparable harm and sustained damage to their business and property, and are therefore entitled to recover actual and treble damages, and their costs of suit, including reasonable attorney fees, pursuant to 18 U.S.C. §1964(c).

214.    In addition, as set forth above, Bankers have violated 18 U.S.C. §§1962(b), (c), and (d), and will continue to do so in the future.  Enjoining Bankers from committing these RICO violations in the future and/or declaring their invalidity is appropriate pursuant to 18 U.S.C. §1964(a), which authorizes the district courts to enjoin violations of 18 U.S.C. §1962.

## SECOND CLAIM FOR RELIEF
### Breach of Fiduciary Duty

215.    Plaintiffs and the Class incorporate by reference all allegations contained in the paragraphs above as if set forth separately in this Claim for Relief.

216.    By reason of their purported positions as objective advisors acting in Plaintiffs' best interests with access to Plaintiffs' personal and confidential information, including bank account information, and because of their superior knowledge and ability to manipulate and control Plaintiffs and other seniors' finances and legal status, the Bankers assumed fiduciary duties owed to Plaintiffs and the Class. The Bankers also assumed fiduciary duties by assuming the position of a trusted advisor providing investment and financial counseling and acting as an insurance agent in selecting and purchasing insurance products.

217.    Bankers hold themselves out as insurance experts, possessing the special knowledge needed to interpret and understand the complex Deferred Annuity policies they offer. Plaintiffs and the Class reposed confidence and trust in Bankers, authorized Bankers to act on

their behalf in procuring their policies, and relied on Bankers' superior expertise in recommending appropriate investment instruments for them.

218.    Plaintiffs and the Class thus depended on the good faith and performance of Bankers. Bankers not only accepted but solicited that confidence and trust through virtually uniform misrepresentations in their publicly available materials and communications.

219.    Further, Bankers' Agents are insurance brokers or Agents characterized by elements of public interest thereby subjecting Bankers to more stringent standards of conduct. Bankers, in inducing Plaintiffs and the Class to purchase Deferred Annuity policies, hold themselves out as confidants of Plaintiffs and Class Members, encouraging Plaintiffs and Class Members to reveal confidential, personal and proprietary information, including financial and medical information. This confidential and proprietary information includes that contained in financial statements, bank accounts, tax returns, and numerous other documents and related personal information.

220.    In addition, Bankers owe a fiduciary duty to Plaintiffs and the Class by virtue of their control, ownership, and oversight of Agents and the materials they use to gain Plaintiffs' and the Class Members' trust, induce their reliance, and sell the Annuities.

221.    Based on the foregoing, Bankers owe Plaintiffs and Class Members common law fiduciary duties, including the duty of good faith and fair dealing, the duty of full and fair disclosure, the duty of loyalty and the duty of care arising out of their relationship with Plaintiffs and Class Members.

222.    Bankers also had a duty to provide complete and truthful information to Plaintiffs and the Class and to provide investment advice in a fair, just and equitable manner.

223.    As set forth above, the Bankers violated and breached their duties of care, loyalty,

truth, reasonable inquiry, oversight, good faith, fair dealing and supervision.

224.    Bankers abused their positions as confidants and trusted financial advisors by misleading Plaintiffs and the Class about the unsuitability of Annuities for senior citizens, especially the lack of access to their funds until a date beyond their life expectancy and the steep surrender charges associated with accessing their funds before that time. Instead, all Bankers provided Plaintiffs and Class Members with misleading and incomplete information about the Deferred Annuity products they purchased.

225.    Bankers performed the acts complained of above with the intent of gaining their own financial advantage to the disadvantage of Plaintiffs and the Class.

226.    Bankers aided and abetted each other in accomplishing the wrongful acts.  In doing so, Bankers acted with awareness of their conduct and knew or should have known that their conduct would substantially further the wrongful conduct.

227.    In performing these acts, each Defendant either ratified the conduct of the other Bankers, acted as the other Bankers' agent, or both.

228.    As a result of Bankers' wrongful conduct, Plaintiffs and the Class suffered and continue to suffer economic and non-economic losses, all in an amount to be determined according to proof at trial.

229.    Upon information and belief, the wrongful acts of Bankers were done maliciously, oppressively, and with the intent to mislead. Plaintiffs and the Class are entitled to punitive and exemplary damages in an amount to be ascertained according to proof, which is appropriate to punish and set an example of the Bankers.

230.    Plaintiffs and the Class are further entitled to an accounting by Bankers with respect to all compensation paid or received by them.

## THIRD CLAIM FOR RELIEF
### Aiding and Abetting Breach of Fiduciary Duty

231.    Plaintiffs and the Class incorporate by reference all allegations contained in the paragraphs above as if set forth separately in this Claim for Relief.

232.    Bankers' Agents owe a fiduciary duty to their clients and prospective purchasers of Bankers' Annuities, including the Class.  Indeed, Bankers' Agent agreement specifically notes that Agents must hold client funds in a fiduciary capacity.[127]

233.    Bankers and the Agents aided and abetted, encouraged, and rendered substantial assistance to one another in order to accomplish the wrongful acts complained of herein.

234.    In aiding and abetting and substantially assisting the commission of the acts complained of, Bankers and the Agents acted with an awareness of their wrongdoing and realized that their conduct would substantially assist the accomplishment of the wrongful conduct and scheme alleged herein.

235.    In performing these acts, each such Agent either acted as agents of Bankers, or Bankers ratified such acts, or both, and benefited financially from their scheme.

236.    As a result of the wrongful conduct of Bankers and Agents, Plaintiffs and the Class have suffered and continue to suffer economic and non-economic losses, all in an amount to be determined according to proof at trial.

237.    In addition, the wrongful acts of Bankers and their Agents were done maliciously, oppressively, and with the intent to mislead and defraud, and Plaintiffs and the Class are entitled to punitive and exemplary damages to be ascertained according to proof, which is appropriate to punish and set an example of Bankers.

---

[127] *See,* Exhibit 18, at BLR000116, Section 11.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment and Imposition of Constructive Trust**

238.    Plaintiffs and the Class incorporate by reference all allegations contained in the paragraphs above as if set forth separately in this Claim for Relief.

239.    Bankers owed various duties to Plaintiffs and the Class as a result of their insurer/insured relationship and/or duty of good faith and fair dealing.

240.    By engaging in their Deferred Annuity scheme, Bankers extracted payments from Plaintiffs and Class Members, including, but not limited to, annuity premiums, commissions, service charges, surrender charges and other fees, expenses and charges based upon misleading and fraudulent uniform sales presentations, marketing materials and annuity illustrations.

241.    As a result of the relationships between and among the parties and the facts stated above, Bankers will be unjustly enriched if they are permitted to retain such funds; therefore, a constructive trust should be established over the monies that Plaintiff and the Class Members paid to Bankers. These monies are traceable to Bankers.

242.    The victims of the unsuitable deferred annuity sales scheme described above have no adequate remedy at law and have been damaged in an amount to be determined at trial.

**FIFTH CLAIM FOR RELIEF**
**Financial Elder Abuse, Cal. Welfare & Institutions Code Section 15600 et seq.**

243.    Plaintiffs and the Class incorporate by reference all allegations contained in the paragraphs above as if set forth separately in this Claim for Relief.

244.    Bankers' conduct constitutes financial abuse under Cal. Welf. & Inst. § 15657.5 *et seq*., as defined in Cal. Welf. & Inst. Code § 15610.30.  California Welfare and Institutions Code § 15610.30 provides in pertinent part:

   a.   "Financial abuse" of an elder or dependent adult occurs when a person or entity

does any of the following:

    i.  Takes, secretes, appropriates, or retains real or personal property of an elder or dependent adult to a wrongful use or with intent to defraud, or both; and

    ii.  Assists in taking, secreting, appropriating, or retaining real or personal property of an elder or dependent adult to a wrongful use or with intent to defraud, or both.

245.    Plaintiffs and each member of the class were 65 years of age or older at all times relevant to this action.

246.    Bankers stand in a fiduciary relationship with the named Plaintiffs and the Class Members for all of the reasons alleged in the third claim for relief. Specifically, and without limiting the scope of prior allegations, Bankers advertise their competence and ability to manage the estate planning, insurance, and financial affairs of the Plaintiffs and the Class Members.

247.    At all relevant times, Bankers took and/or assisted in taking personal property from Plaintiffs and the Class Members in bad faith for a wrongful use and/or with the intent to defraud by unfairly manipulating the class into purchasing Annuities with high surrender charges.

248.    Bankers aided and abetted one another in effectuating the wrongful acts. Each Defendant acted with an awareness of its wrongdoing and realized that its conduct would substantially assist in accomplishing these wrongful acts.

249.    In performing these acts each Defendant either acted as Agents of each other or ratified such acts, or both.

250.    Bankers' conduct was reckless, oppressive, and malicious within the meaning of Cal. Welf. & Inst. Code § 15657 *et seq.* in that Bankers disregarded internal age exemption

practices, industry standards and failed to adequately disclose material facts to elderly applicants and annuitants to facilitate increased sales to seniors and thereby increase their profits at the expense of senior citizens.

251.    Under Cal. Welf. & Inst. Code § 15657.5 *et seq.*, Bankers are liable for reasonable attorneys' fees and costs for investigating and litigating this claim.

252.    Under Cal. Civ. Code §3294 and Welf. & Inst. Code §15657.05(a), Bankers are liable for punitive damages.

253.    Under Cal. Civ. Code §3345, Bankers are liable for treble damages and penalties because: (a) Bankers knew or should have known their conduct was directed as to a senior citizen; (b) Bankers' conduct caused senior citizens to suffer substantial loss of property set aside for retirement, and assets essential to their health and welfare; (c) Plaintiffs and the Class are senior citizens who are more vulnerable than other members of the public to Bankers' conduct because of their age, impaired understanding, impaired health or restricted mobility; and (d) Plaintiffs and the Class actually suffered substantial physical, emotional and economic damages resulting from Bankers' conduct.

254.    Under Cal. Welf. & Inst. Code §§15657 et seq. and 15657.05 et seq., Bankers are liable to Plaintiffs and the Class for their pain and suffering.

## SIXTH CLAIM FOR RELIEF
### Violation of California Business & Professions Code Section 17200 et seq.

255.    Plaintiffs and the Class repeat and reallege all prior allegations contained herein, as if fully set forth herein.

256.    California Business and Professions Code §17200 prohibits any "unlawful . . . business act or practice."

257.    Bankers have violated §17200's prohibition against engaging in an unlawful act or

practice by:

    a.   Violating Cal. Bus. & Prof. Code § 17500 *et seq.* (further alleged in the Eighth Cause of Action);

    b.   Violating Cal. Welf. & Inst. Code §§15610.30 (further alleged in the Sixth Cause of Action);

    c.   Violating the California Insurance Code through the following actions:

        i.   Failing to provide full, adequate or material disclosure of the consequences of purchasing Annuities including the risks involved, surrender charges, undisclosed commissions and other consequences as set forth herein, in violation of Cal. Ins. Code §§ 330-334, 762, 780, 789.8 et seq.;

        ii.   Failing to provide full or adequate disclosure that the Deferred Annuity sold is not backed by, an obligation of, guaranteed or insured by the federal government or one of its Agents, the Federal Deposit Insurance Corporation, or by the depository institution or one of its affiliates, in violation of Cal. Ins. Code §§ 761-762;

        iii.   Failing to provide full or adequate disclosure that the Deferred Annuity sold involves investment risk including the potential that principal may be lost and the product may decline in value, in violation of Cal. Ins. Code §§ 761-762 and 10127.11;

iv. Failing to conduct themselves with persons over the age of 65 in good faith, honesty, and fair dealing, in violation of Cal. Ins. Code § 785 *et seq.*

v. Issuing or approving advertising that was false or misleading about the nature of their uniform sales presentation of Annuities or failing to disclose leads, such as bank tellers or sales Agents, that generate contact with a person over the age of 65, in violation of Cal. Ins. Code § 787 et seq.;

vi. Failing to provide full or adequate disclosure to a person over the age of 65 regarding the sale or liquidation of any stock, bond, IRA, certificate of deposit, mutual fund, annuity or other asset to fund the purchase of the Deferred Annuity sold involves tax consequences, early withdrawal penalties, investment risk, or other costs or penalties and should consult with a legal or financial professional before purchasing, in violation of Cal. Ins. Code §§ 789.8;

vii. Failing to provide full and adequate notice of information practices to all applicants and policyholders in connection with their purchase of a Deferred Annuity, including the collection of personal information in violation of Cal. Ins. Code § 791.04; and

        viii.   Failing to provide full and adequate disclosure of information concerning a Deferred Annuity's surrender charge period and penalties, in violation of Cal. Ins. Code § 10127.13.

   d.   Violating the Code of Federal Regulations through the following actions:

        i.   Failing to provide full, adequate or meaningful disclosure that the Deferred Annuity sold is not backed by, an obligation of, guaranteed or insured by the federal government or one of its Agents, the Federal Deposit Insurance Corporation, or by the depository institution or one of its affiliates, in violation of 12 C.F.R. § 14.30; and

        ii.   Failing to provide full, adequate or meaningful disclosure that the Deferred Annuity sold involved investment risk, the fact that there was an investment risk, including the potential that principal may be lost and the product may decline in value, in violation of 12 C.F.R. §§ 14.30 and 14.40;

258.    Section §17200 also prohibits any "unfair . . . business act or practice by engaging in the activities and conduct alleged in the preceding paragraphs.

259.    As detailed in the preceding paragraphs, Bankers sell Annuities to Plaintiffs and the Class with terms, conditions, and under circumstances that violate federal and state law and the fundamental policies delineated in statutory provisions. Bankers gained the trust of Plaintiffs and the Class, had access to their private financial information, and induced them into moving their funds into annuities even though Annuities with these terms are inappropriate investments for Senior Citizens and even though such terms were inadequately disclosed to them. As a result,

Bankers engaged in unfair business practices prohibited by Cal. Bus. & Prof. Code § 17200 *et seq*.

260.    Section 17200 also prohibits any "fraudulent ... business act or practice." As detailed in the preceding paragraphs, Bankers' conduct was likely to deceive Plaintiffs, the Class and the public. Bankers have made misrepresentations about Annuities to Senior Citizens that Bankers knew were likely to be deceptive and misleading for seniors.  Bankers also concealed from seniors the disadvantages of the Deferred Annuity for persons of their age, including the fact that the annuity would tie up their moneys beyond their actuarial life expectancy and carried steep surrender changes for a lengthy period of time. Bankers gained the trust of Plaintiffs and the Class, had access to their bank information, and through their unscrupulous sales practices, induced them into moving their funds into annuities, all the time knowing that their sales practices were likely to be misleading and deceptive for seniors.

261.    Bankers aided and abetted each other in accomplishing the wrongful acts.  In doing so, Bankers acted with awareness of their conduct and knew or should have known that their conduct would substantially further the wrongful conduct.

262.    As a result of Bankers' practices, Plaintiffs and other Class Members have incurred actual financial losses and damages including diminished access to needed funds, fees, charges and penalties that they would not have otherwise incurred; expenses to hire a conservator, financial planner and/or attorneys; and the lost value in previous investments that they would not have otherwise incurred.

263.    The Cal. Bus. & Prof. Code authorizes injunctive relief. Unless Bankers are enjoined from continuing to engage in the unlawful, deceptive and unfair business practices described above, members of the general public residing within the United States, including

California, will continue to be damaged.

264.     Pursuant to Cal. Bus. & Prof. Code §17203, Plaintiffs seek an order requiring Bankers to immediately cease such acts of unlawful, unfair and deceptive business practices and requiring them to return the full amount of money improperly collected – including, but not limited to, commissions and profits from the sale of annuities, income derived from penalties and fees – to all those who have paid them, plus interest and attorneys' fees.

**SEVENTH CLAIM FOR RELIEF**
**Violation of California Business & Professions Code Section 17500 et seq.**

265.     Plaintiffs and the Class incorporate by reference all allegations contained in the paragraphs above as if set forth separately in this Claim for Relief.

266.     California Business and Professions Code §17500 prohibits the dissemination of "false and misleading statements" with the intent to perform services or otherwise induce the public to enter into any obligation related thereto.

267.     Bankers knew or should have known that their annuity product advertisements directly or indirectly to seniors are false or misleading.  Letters and marketing materials prepared by Bankers, as well as websites, are tailored to attract retired individuals, aged 65 and older, who have assets and are relatively unsophisticated in investing.  The marketing materials are designed to exploit the seniors' insecurities about their finances long-term care, taxes and estates after they die.

268.     Bankers failed to disclose to Plaintiffs, the Class, or the general public that Annuities with these terms are inappropriate investments for Senior Citizens, instead providing virtually uniform messages that such annuities are perfect investments for the elderly. Bankers failed to disclose that Annuities may be inappropriate for seniors because of their life expectancies and their need for liquidity in the event of health care emergencies, sudden need to

reside in a nursing home, or other financial crises.

269.    In making and disseminating these statements and advertisements, Bankers knew or should have known that they were untrue or misleading.

270.    Bankers aided and abetted each other in accomplishing the wrongful acts.  In doing so, Bankers acted with awareness of their conduct and knew or should have known that their conduct would substantially further the wrongful conduct.

271.    As a result of Bankers' misconduct as alleged herein, Plaintiffs have incurred the following types of actual financial losses and damages:

       a.    Plaintiffs had to pay penalties, fees, charges, and deductions as a result of following the advice and recommendations of Bankers that they would not have otherwise incurred if their investments and holdings had remained in the form in which they existed before Plaintiffs followed the advice and recommendations of Bankers. Moreover, even if the form and instruments of Plaintiffs investments and holdings were changed to other, appropriate forms or instruments, the Plaintiffs would not have incurred the penalties, fees, charges, and deductions they incurred;

       b.    Plaintiffs incurred penalties for withdrawal and transfer of funds that they would not have incurred except for the fact that they followed the advice and recommendations of Bankers;

       c.    Plaintiffs incurred fees and charges for the purchase of inappropriate financial products that they would not have incurred except for the fact that they followed the advice and recommendations of Bankers; and

d.      Plaintiffs were assessed taxes, assessments, and penalties that they would not have otherwise incurred but for their reliance on the advice and recommendations of Bankers.

272.    As a direct and proximate result of Bankers' wrongful conduct, Plaintiffs, the Class, and the general public have suffered monetary and non-monetary damage.

273.    Unless Bankers are enjoined from continuing to engage in such wrongful actions and conduct, members of the general public will continue to be damaged by Bankers' false and misleading advertising.

274.    So as not to be unjustly enriched by their own wrongful actions and conduct, Bankers should be required to disgorge and restore to Plaintiffs, members of the Class, and the general public all monies wrongfully obtained by Bankers as a result of their false and misleading advertising, together with interest.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, prays for judgment against Bankers as follows:

275.    An order certifying this action as a Plaintiffs' class action under Rule 23 of the Federal Rules of Civil Procedure as set forth herein;

276.    For a temporary, preliminary and permanent order for injunctive relief enjoining Bankers from pursuing the practices complained of above;

277.    For a temporary, preliminary and permanent order for injunctive relief requiring Bankers to undertake an immediate public information campaign to inform members of the general public as to their prior practices and notifying the members of the proposed Class of the potential for restitution relief;

278.    For an order requiring disgorgement and restitution of Bankers' ill-gotten gains and to pay restitution to Plaintiffs, the Class, and the general public all funds acquired by means of any practice declared by this Court to be unlawful, deceptive or unfair;

279.    For compensatory, special and general damages according to proof and as the Court deems just and proper;

280.    Assuming certification of the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, for distribution of any moneys recovered on behalf of the general public, or the Class, via fluid recovery or *cy pres* recovery where necessary to prevent Bankers from retaining any of the profits or benefits of their wrongful conduct;

281.    For punitive and exemplary damages under Welf. & Inst. Code § 15657(a), Civil Code § 1780(a)(4), Civil Code §3294; and as to counts for which they are available under the applicable law in such amount as the Court deems just and proper;

282.    For treble damages and penalties under Civil Code §3345; Bus. & Prof. Code §§6153, 6175.4, 6175.5 and 17206.1; and Ins. Code §789; and as to counts for which they are available under the applicable law in such amount as the Court deems just and proper;

283.    For double damages under California Probate Code §859; and as to counts for which they are available under the applicable law in such amount as the Court deems just and proper;

284.    For transfer of the wrongfully obtained monies and/or property under Probate Code §§850-859 *et seq.;* imposition of a constructive trust, an Order granting recessionary and injunctive relief and/or such other equitable relief, including restitution, disgorgement of ill-gotten profits and an order requiring Bankers to provide corrective notice to Class Members as set forth herein and as the Court deems just and proper;

285.    An appropriate claims resolution facility to administer the relief in this case;

286.    For reasonable attorneys' fees and costs of investigation and litigation under, among other statutes, C.C.P. §1021.5; Welf. & Inst. Code §§15657.05 *et seq.,* 15657.5 *et seq.;* C.C.P. § 2033, *et seq.;* and Civil Code § 1780(d) or the common fund doctrine;

287.    For costs of lawsuit, pre-judgment, and post-judgment interest; and such other and further relief as the Court may deem necessary or appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all issues stated herein, and all issues so triable.

Dated: October 25, 2010                Respectfully submitted,

Abraham Brustein (ARDC#0327662)
**DiMonte & Lizak, LLC**
216 W. Higgins Road.
Park Ridge, IL 60068
Tel: (847) 698-9600
Fax: (847) 698-9623
Email: abrustein@dimontelaw.com

Larry A. Sackey (CA SBN 54474)
**Law Offices of Larry Sackey**
11500 West Olympic Blvd, Suite 550
Los Angeles, CA 90064
Tel: (310) 575-4444
Fax: (310 575-4520
Email: lsackey@sackeylaw.com

William Litvak (CA SBN 90533)
**Dapeer, Rosenblit & Litvak, LLP**
11500 W. Olympic Blvd. Suite 550
Los Angeles, CA 90064
Tel: (310) 477-5575
Fax: (310) 477-7090
Email: wlitvak@drllaw.com

Asher Levin (CA SBN 71650)
**Levy, McMahon & Levin**
16830 Ventura Boulevard, Suite 500
Encino, CA 91436
Tel: (818) 981-4556
Fax: (818) 981-4558
Email: AALxAAL@aol.com

_____/s/ Joseph A. Kronawitter_____
Robert A. Horn (MO SBN 28176)
Joseph A. Kronawitter (MO SBN 49280)
**Horn Aylward & Bandy, LLC**
2600 Grand Boulevard, Suite 1100
Kansas City, MO 64108
Tel: (816) 421-0700
Fax: (816) 421-0899
Email: rhorn@hab-law.com
jkronawitter@hab-law.com

Seymour S. Goldberg (CA SBN 28088)
**Seymour S. Goldberg Law Corporation**
4519 Admiralty Way, Suite 204
Marina del Rey, CA 90292
Tel: (310) 823-9606
Email: sygoldberg@ca.rr.com

### CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2010 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all attorneys registered for ECF filing as of that date.

_____/s/ Joseph A. Kronawitter_____
Attorneys for Plaintiffs