**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SAMUEL ROWE and ESTELLA ROWE, on behalf of themselves and all others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | No. 09 CV 491 |
| | ) | |
| vs. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| BANKERS LIFE AND CASUALTY COMPANY and BANKERS LIFE INSURANCE COMPANY OF ILLINOIS, | ) ) ) | **ORAL ARGUMENT REQUESTED** |
| | ) | |
| Defendants. | ) | |

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO**
**PLAINTIFFS' MOTION TO CERTIFY CLASS AND APPOINT CLASS COUNSEL**

Joel S. Feldman
Eric S. Mattson
Jason M. Adler
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
Tel:  (312) 853-7000
Fax:  (312) 853-7036
jfeldman@sidley.com
emattson@sidley.com
jadler@sidley.com

# TABLE OF CONTENTS

Page

Introduction...................................................................................................................1

Legal Standards..............................................................................................................2

    A.    The Court Must Consider Evidence, Not Just the Allegations of the
           Complaint................................................................................................2

    B.    Plaintiffs Bear the Burden of Establishing the Requirements of Rule 23...............4

    C.    The Standard of Proof Is "Preponderance of the Evidence."..................................5

Statement of Facts..........................................................................................................5

    A.    Equity Indexed Annuities ........................................................................................5

    B.    Plaintiffs' Allegedly Uniform Facts........................................................................7

          1.    Allegedly Uniform Unsuitability ................................................................7

          2.    Alleged Required Use of Uniform Sales Literature....................................9

          3.    Allegedly Uniform Conversations ............................................................10

          4.    Allegedly Uniform Disregard of Seniors' Interests and Needs ................11

          5.    Allegedly Uniform Lack of Training.........................................................12

          6.    Other Allegedly Uniform Aspects of the Sales Process ...........................13

    C.    Named Plaintiff's Annuity Purchase ....................................................................14

Argument .....................................................................................................................14

I.    The Proposed Class Does Not Meet the Requirements for a Rule 23(b)(3) Class. ...........14

    A.    Individualized Inquiries Would Have to Determine Whether the Annuity
           Was Suitable for Each Particular Class Member....................................................15

    B.    Individualized Inquiries Would Have to Determine Whether Any
           Particular Class Member Received Any Misrepresentations.................................17

    C.    Individualized Inquiries Would Have to Determine Whether Any Alleged
           Misrepresentation or Omission Caused Damages. ................................................19

i

D.     Individualized Inquiries Would Have to Determine Whether Any Particular Class Member Was Damaged and, If So, the Amount of Any Damage. ..................................................................................................21

E.     A Class Action Is Not a Superior Means of Resolving the Claims at Issue Here........................................................................................................22

II.     The Proposed Class Does Not Meet the Requirements for a Rule 23(b)(2) Class. ...........23

A.     The Proposed Class Is Not Cohesive. ...................................................................23

B.     The Proposed Class Does Not Seek Primarily Injunctive Relief...........................24

Conclusion ...........................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allison v. CITGO Petroleum Corp.*,
  151 F.3d 402 (5th Cir. 1998) .....................................................................22

*Allstate Ins. Co. v. St. Anthony's Spine & Joint Inst., P.C.*,
  691 F. Supp. 2d 772 (N.D. Ill. 2010) .......................................................19

*American Honda Motor Co. v. Allen*,
  600 F.3d 813 (7th Cir. 2010) ......................................................................3

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997).....................................................................................4

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451, 457 (2006)...........................................................................19

*Arreola v. Godinez*,
  546 F.3d 788 (7th Cir. 2008) ......................................................................4

*Begley v. Academy Life Ins. Co.*,
  200 F.R.D. 489 (N.D. Ga. 2001)...............................................................19

*Bell Atl. Corp. v. AT&T Corp.*,
  339 F.3d 294 (5th Cir. 2003) .....................................................................21

*Blades v. Monsanto Co.*,
  400 F.3d 562 (8th Cir. 2005) ..................................................................3, 4

*Bridge v. Phoenix Bond & Indem. Co.*,
  128 S. Ct. 2131 (2008)...............................................................................19

*Cohn v. Massachusetts Mut. Life Ins. Co.*,
  189 F.R.D. 209 (D. Conn. 1999)...............................................................19

*Dukes v. Wal-Mart*,
  603 F.3d 571 (9th Cir.), *cert. granted*, 131 S. Ct. 795 (2010) ..................3

*Estate of Felts v. Genworth Life Ins. Co.*,
  250 F.R.D. 512 (W.D. Wash. 2008) .........................................................19

*Frahm v. Equitable Life Assurance Soc'y*,
  137 F.3d 955 (7th Cir. 1998) .....................................................................18

iii

*Gariety v. Grant Thornton, LLP*,
  368 F.3d 356 (4th Cir. 2004) ........................................................................3

*Hewitt v. Joyce Beverages of Wis., Inc.*,
  721 F.2d 625 (7th Cir. 1983) ........................................................................4

*Hyderi v. Wash. Mut. Bank, FA*,
  235 F.R.D. 390 (N.D. Ill. 2006)...............................................................4, 25

*In re Allstate Ins. Co.*,
  400 F.3d 505 (7th Cir. 2005) ......................................................................24

*In re Evanston Northwestern Healthcare Corp. Antitrust Litig.*,
  268 F.R.D. 56 (N.D. Ill. 2010) ......................................................................3

*In re Hydrogen Peroxide*,
  552 F.3d 305 (3d Cir. 2008)..................................................................3, 5, 15

*In re Initial Public Offering Sec. Litig.*,
  471 F.3d 24 (2d Cir. 2006)............................................................................3

*In re LifeUSA Holding Inc.*,
  242 F.3d 136 (3d Cir. 2001).........................................................................19

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
  522 F.3d 6 (1st Cir. 2008) .............................................................................3

*In re Sears Roebuck & Co. Tools Mktg. & Sales Practices Litig.*,
  MDL-1703, 2009 U.S. Dist. LEXIS 97594 (N.D. Ill. Oct. 20, 2009) .................3

*In re St. Jude Med., Inc.*,
  425 F.3d 1116 (8th Cir. 2005) .....................................................................23

*Kent v. SunAmerica Life Ins. Co.*,
  190 F.R.D. 271 (D. Mass. 2000)...................................................................19

*Keyes v. Guardian Life Ins. Co.*,
  194 F.R.D. 253 (S.D. Miss. 2000) ................................................................19

*Lemon v. Int'l Union of Operating Eng'rs, Local No. 139*,
  216 F.3d 577 (7th Cir. 2000) ............................................................23, 24, 25

*Lorenzo v. Qualcomm Inc.*,
  603 F. Supp. 2d 1291 (S.D. Cal. 2009)..........................................................20

*Mangindin v. Washington Mut. Bank*,
  637 F. Supp. 2d 700 (N.D. Cal. 2009) ..........................................................20

iv

*Marcial v. Coronet Ins. Co.*,
880 F.2d 954 (7th Cir. 1989) ........................................................................18

*Markarian v. Connecticut Mut. Life Ins. Co.*,
202 F.R.D. 60 (D. Mass. 2001)......................................................................19

*McCann v. Lucky Money, Inc.*,
29 Cal. Rptr. 3d 437 (Cal. App. 4 Dist. 2005) ........................................17

*McLaughlin v. American Tobacco Co.*,
522 F.3d 215 (2d Cir. 2008)...........................................................................20

*Moore v. PaineWebber, Inc.*,
306 F.3d 1247 (2d Cir. 2002)........................................................................19

*Oplchenski v. Parfums Givenchy, Inc.*,
254 F.R.D. 489 (N.D. Ill 2008)....................................................................14

*Ploog v. Homeside Lending, Inc.*,
No. 00 C 6391, 2001 WL 987889 (N.D. Ill. Aug. 28, 2001)....................5

*Poulos v. Caesars World, Inc.*,
379 F.3d 654 (9th Cir. 2004) ........................................................................19

*Reed v. Advocate Health Care*,
268 F.R.D. 573 (N.D. Ill. 2009)......................................................3, 5, 15, 21

*Rowe v. Morgan Stanley Dean Witter*,
191 F.R.D. 398 (D.N.J. 1999).......................................................................16

*Siegel v. Shell Oil Co.*,
612 F.3d 932 (7th Cir. 2010) ........................................................................20

*Simer v. Rios*,
661 F.2d 655 (7th Cir. 1981) ..........................................................................4

*Spano v. Boeing Co.*,
Nos. 09-3001 & 09-3018, 2011 WL 183974 (7th Cir. Jan 21, 2011).......3

*Street v. Diamond Offshore Drilling*,
No. Civ.A. 00-1317, 2001 WL 568111 (E.D. La. May 25, 2001)...........22

*Sybersound Records, Inc. v. UAV Corp.*,
517 F.3d 1137 (9th Cir. 2008) ......................................................................17

*Szabo v. Bridgeport Machines, Inc.*,
249 F.3d 672 (7th Cir. 2001) .....................................................................2, 3

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
546 F.3d 196 (2d Cir. 2008)........................................................................5

*Thorogood v. Sears, Roebuck & Co.*,
547 F.3d 742 (7th Cir. 2008) ....................................................................20

*Unger v. Amedisys Inc.*,
401 F.3d 316 (5th Cir. 2005) ......................................................................3

*Van West v. Midland Nat'l Life Ins. Co.*,
199 F.R.D. 448 (D.R.I. 2001) ...................................................................19

*Vulcan Golf, LLC v. Google Inc.*,
254 F.R.D. 521 (N.D. Ill. 2008)................................................................23

*West v. Prudential Sec., Inc.*,
282 F.3d 935 (7th Cir. 2002) ......................................................................3

## STATUTES

18 U.S.C. § 1341 ........................................................................................17

18 U.S.C. § 1343 ........................................................................................17

18 U.S.C. § 1964(c) ...................................................................................22

Cal. Bus. & Prof. Code § 17203 ...............................................................22

Cal. Welf. & Inst. Code § 15610.30(a)(1) ................................................17

Fla. Stat. Ann. §627.4554 ("Annuity Investments by Seniors")................7

**Introduction**

At its core, class certification presents a straightforward question: whether the evidence that will decide the named plaintiffs' claims can fairly resolve the claims of all other class members. If one set of uniform evidence can resolve the claims of each and every class member, certification may be granted. If the evidence varies from one class member to another, certification should be denied.

This case involves exactly the type of fraud-based, context-dependent claims that should *not* be certified. If plaintiffs' proposed class were certified, the Court would have to examine detailed, individualized evidence – for example, what class members were told when they spoke with agents of defendant Bankers Life and Casualty Co. ("Bankers Life"), what the class members' financial situation was when they bought their annuities, and so forth – to resolve, one by one, the claims of approximately 25,000 putative class members.

Plaintiffs hope to avoid any analysis of this evidence at this stage of the case, arguing that the Court should accept the allegations of their complaint as true. *See* Pl. Br. at 14; *id.* at 3 n.14. But plaintiffs rely on an old legal standard, one the Seventh Circuit rejected years ago. Under the modern standard, a court considering a request to certify a class must look at the evidence – even evidence bearing on the merits of the case – so long as it is material to determining whether plaintiffs have satisfied the requirements of Fed. R. Civ. P. 23. When this Court considers that evidence, it will be apparent that each class member's situation is unique and that a class-wide trial of this case would be hopelessly unmanageable.

Individualized evidence on just one element of a claim can be enough to defeat class certification, as the Court would have to consider the evidence that applies to that element with respect to each class member. Here, however, the Court would have to consider individualized evidence with respect to at least four distinct elements: (1) whether a Bankers Life annuity was a

suitable product for the class member, (2) whether Bankers Life's agents made any material misrepresentations or omissions when they sold the annuities, (3) whether class members actually considered or relied on the alleged misrepresentations or omissions in deciding to purchase an annuity, and (4) whether the class member suffered damages and, if so, the amount of damages. Class certification should accordingly be denied.

## Legal Standards

The legal standards for class certification determine what this Court should consider in deciding whether to certify. Because the legal standards are critical, and because plaintiffs have misstated them in certain respects, we summarize them below – before examination of the facts.

### A. The Court Must Consider Evidence, Not Just the Allegations of the Complaint.

Plaintiffs have asked this Court to use an outdated legal standard. "For purposes of determining whether class certification is appropriate," plaintiffs assert, "a district court generally takes substantive allegations of the complaint as true." Pl. Br. at 14; *id.* at 3 n.14.

The Seventh Circuit rejected this approach nearly a decade ago. In *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 677 (7th Cir. 2001), the Seventh Circuit admonished the district court for ignoring the evidence and, instead, accepting the plaintiff's allegations as true. "The proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be found in Rule 23 and has nothing to recommend it." *Id.* at 675. Indeed, if plaintiffs' standard were the rule, the judge's role in the certification process would be secondary at best, for "[c]ertifying classes on the basis of incontestable allegations in the complaint moves the court's discretion to the plaintiff's attorneys." *Id.* at 677.

In the wake of *Szabo*, other circuits have followed suit and revised their standards for class certification. The Second Circuit, for example, vacated the certification of a class based in

2

part on "uncontested allegations of the complaint" and, citing *Szabo* with approval, held that courts must examine merits evidence material to Rule 23 at the class certification phase. *In re Initial Public Offering Sec. Litig.,* 471 F.3d 24, 30, 38 (2d Cir. 2006). More recently, the Third Circuit cited *Szabo* four times in holding that courts deciding class certification must consider actual evidence, not just allegations, and resolve conflicts in the evidence if they implicate the requirements of Rule 23. *In re Hydrogen Peroxide,* 552 F.3d 305, 316-23 (3d Cir. 2008).[1]

In short, when evidence is material to a class certification requirement, the court must consider the evidence – even if it involves a preliminary inquiry into the merits. *Szabo*, 249 F.3d at 676; *see also Spano v. Boeing Co.*, Nos. 09-3001 & 09-3018, 2011 WL 183974, at *8 (7th Cir. Jan 21, 2011). And if the parties submit conflicting evidence, the court must "resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits." *Reed v. Advocate Health Care*, 268 F.R.D. 573, 578 (N.D. Ill. 2009) (quoting *Hydrogen Peroxide*, 552 F.3d at 307); *see also In re Sears Roebuck & Co. Tools Mktg. & Sales Practices Litig.*, MDL-1703, 2009 U.S. Dist. LEXIS 97594, at *8-9 (N.D. Ill. Oct. 20, 2009).

These principles extend to expert opinions as well. *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010). A clash between opposing experts is not enough to justify certification; instead, the court must "choos[e] between competing perspectives." *West v. Prudential Sec., Inc.*, 282 F.3d 935, 938 (7th Cir. 2002); *see also Reed*, 268 F.R.D. at 593-94 (rejecting assertion that "the battle of experts" is strictly for the jury); *In re Evanston Northwestern Healthcare Corp. Antitrust Litig.*, 268 F.R.D. 56, 87 (N.D. Ill. 2010) (denying

---

[1] *Szabo* has now been adopted by a majority of circuits. *See In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 24 (1st Cir. 2008); *In re IPO*, 471 F.3d at 33-34 (2d Cir.); *In re Hydrogen Peroxide*, 552 F.3d at 316-23 (3d Cir.); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 366 (4th Cir. 2004); *Unger v. Amedisys Inc.*, 401 F.3d 316, 321-22 (5th Cir. 2005); *Blades v. Monsanto Co.*, 400 F.3d 562, 566-67 (8th Cir. 2005); *Dukes v. Wal-Mart*, 603 F.3d 571, 583 (9th Cir.), *cert. granted*, 131 S. Ct. 795 (2010).

certification after finding expert's method of proving classwide impact to be unreliable).  As discussed below, this rule has particular relevance here because plaintiffs' claims depend on an expert theory – specifically, that deferred annuities are *always* unsuitable for *all* individuals age 65 or older – that is as implausible as it is extreme.

> **B.**     **Plaintiffs Bear the Burden of Establishing the Requirements of Rule 23.**

Plaintiffs bear the burden of establishing all requirements of Rule 23(a) and at least one subsection of Rule 23(b).  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  The failure to establish even one requirement precludes class certification.  *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008).

While plaintiffs bear the burden on all Rule 23 requirements, this memorandum focuses on the "predominance" requirement of Rule 23(b)(3).[2]  In the words of the rule, plaintiffs must demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members."  This means that the court must "focus . . . on the substantive elements of plaintiffs' cause of action and inquire into the proof necessary for the various elements."  *Simer v. Rios*, 661 F.2d 655, 672 (7th Cir. 1981).  The court must also "inquire into the form that trial on these issues would take."  *Id.*

In practical terms, plaintiffs cannot satisfy the predominance requirement unless a trial of the named plaintiffs' case could also fairly resolve the claims of all other class members.  "At its essence, predominance is concerned with whether the putative named plaintiffs can, through their individualized cases, offer proof on a class-wide basis."  *Hyderi v. Wash. Mut. Bank, FA*, 235 F.R.D. 390, 398 (N.D. Ill. 2006); *see also Hewitt v. Joyce Beverages of Wis., Inc.*, 721 F.2d 625, 628-29 (7th Cir. 1983); *Blades v. Monsanto*, 400 F.3d 562, 566 (8th Cir. 2005).

---

[2] Plaintiffs also rely on Rule 23(b)(2), but as explained below, that provision is not remotely relevant.

### C.     The Standard of Proof Is "Preponderance of the Evidence."

Whether plaintiffs have met their burden under Rule 23 is measured by a preponderance of the evidence standard. *Reed*, 268 F.R.D. at 578 (quoting *Hydrogen Peroxide*, 552 F.3d at 307); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 202 (2d Cir. 2008). If plaintiffs fail to meets their burden, certification must be denied. Similarly, if Bankers Life presents evidence that Rule 23 has not been satisfied, certification must be denied unless plaintiffs win the clash of evidence by a preponderance of the evidence. *Hydrogen Peroxide,* 552 F.3d at 320; *Ploog v. Homeside Lending, Inc.*, No. 00 C 6391, 2001 WL 987889, at *4 (N.D. Ill. Aug. 28, 2001).

### Statement of Facts

Recognizing they need factual uniformity to win class certification, plaintiffs claim that the factual predicate for their case is virtually identical for every class member. They identify a number of facts that allegedly apply in the same way to each member of the class. The actual evidence, however, reveals that nearly *all* of these supposedly uniform facts are highly disparate.

### A.     Equity Indexed Annuities

Before addressing plaintiffs' allegedly uniform facts, we provide some background on equity indexed annuities, the insurance product at issue in this case.

Annuities are insurance products that come in several different types. This case involves "equity indexed" annuities. These are "deferred" annuities, meaning that the insurance company does not begin making payments immediately upon its receipt of premium. Instead, this type of annuity is more like a savings vehicle. A policyholder pays a premium; the premium grows on a tax-deferred basis; and the policyholder then withdraws the money, either all at once or over time. Goldberg Decl. ¶ 2.

Like any savings vehicle, there are pluses and minuses to equity indexed annuities. On the plus side, these annuities are guaranteed not to decline in value, and they offer policyholders the opportunity to participate in any increase in the stock market. Goldberg Decl. ¶ 3; Panis Decl. ¶ 21. If the S&P 500 goes up, the value of the annuity will go up too (although usually by a lower percentage than the rise in the S&P 500). But if the S&P 500 goes down, the value of the annuity will stay the same. *Id.* In other words, in terms of investment risk, equity indexed annuities offer some of the upside of investing in the stock market, but none of the downside. *Id.*

One of the potential "minuses" of equity indexed annuities is that they have limited liquidity – or, more precisely, they offer full liquidity at a price. Some liquidity is free: Bankers Life's customers can withdraw up to 10 percent of their money each year after the first year without penalty. Withdrawing larger amounts may result in a "surrender charge." The surrender charge starts at 10 percent of any amounts withdrawn in excess of the penalty-free amount, and declines to zero over time (between 8 and 10 years, depending on the product). Surrender charges are waived under certain circumstances, such as if the policyholder dies. Downing Dep. at 256-57; Goldberg Decl. ¶ 3; Panis Decl. ¶ 14.

The foregoing combination of features, most notably the guarantee that the annuity will not decline in value even when the stock market declines, has created an increasing demand for equity indexed annuities since the markets' steep decline of three years ago. The demand has become so great that some insurance companies (but not Bankers Life) have placed limits on the amount they can sell. Goldberg Decl. ¶ 4.

Like the annuities of other companies, Bankers Life's annuities are extensively regulated by the insurance departments of all fifty states. Downing Dep. at 257. Annuities are sold only

after being submitted to state regulators, all of whom have the authority to reject the sale of those products in their states.   Goldberg Decl. ¶ 5.

### B.     Plaintiffs' Allegedly Uniform Facts

#### 1.     Allegedly Uniform Unsuitability

Fundamental to plaintiffs' claim that uniform facts apply to each class member is their allegation that Bankers Life's equity indexed annuities are unsuitable for every member of the putative class.  According to plaintiffs, these annuities are "flawed investments that no senior should be sold."  Pl. Br. at 12 (emphasis in original).

The evidence demonstrates, however, that the suitability of a Bankers Life annuity for any particular senior citizen depends on facts that vary from person to person.  Florida, for example, has enacted suitability rules that specifically govern the sale of annuities to seniors. *See* Fla. Stat. Ann. §627.4554 ("Annuity Investments by Seniors").  The National Association of Insurance Commissioners' model regulation governing suitability of annuity sales initially applied only to senior consumers, but was later amended to include suitability standards for all annuity sales.  *See* Senior Protection in Annuity Transactions Model Regulation (Exhibit 18).

Other state insurance authorities have issued guides to help seniors decide whether an annuity is right for them.  For example, in a brochure entitled "What Seniors Need to Know About Annuities," the California Insurance Department answers the question, "Is An Annuity Right For You?" with this response:  "The answer depends on your financial situation, your health and goals.  For some, an annuity can be an appropriate part of an overall financial plan. For others, an annuity can be totally unsuitable.  You should think about what your goals are, as

well as how much risk you are willing to take." Exhibit 19.[3]  Similarly, the Illinois Insurance

Department has issued a similar pamphlet titled "Annuities and Senior Citizens."  Exhibit 20.

No state has forbidden the sale of annuities to senior citizens.  Instead, many states,

following the guidance of the National Association of Insurance Commissioners, have enacted

rules that require that sales of annuities – at any age – be suitable for the customer.  *See, e.g.,*

NAIC Suitability in Annuity Transactions Model Regulation (Model 275) (Exhibit 18).

An equity indexed annuity is admittedly not appropriate for every senior.  *See, e.g.,*

Dobbs Dep. at 59.  But whether such an annuity is suitable for a particular customer depends on

each customer's unique circumstances.  Downing Dep. at 145.  Factors relevant to suitability

include risk tolerance, need for liquidity, asset allocation, and age.  *See* Hayn Decl. ¶ 14;

Beckman Decl. ¶ 6; Moncada Decl. ¶¶ 7-8; Goldberg Decl. ¶ 14.

Indeed, even for someone over 80 years old, an annuity may be appropriate if, for

example, "they did not foresee the use of the funds, wanted to pass the funds on avoiding

probate, [or] desired to receive an income from those funds."  Downing Dep. at 145-46.  But

such a sale would not be appropriate "[i]f they didn't have enough liquidity," "if their goals and

objectives didn't meet the features and benefits of the product," or "[i]f they wanted to have all

---

[3] The guide goes on to advise seniors to "ask yourself the following questions:
- How much retirement income will you need in addition to what you will get from Social Security and/or a pension plan?
- Will you need that additional income only for yourself, or for yourself and others?
- If you put your money into an annuity, will you have enough money to cover your expenses?
- How long can you leave money in the annuity and does the annuity let you take out money when you need it?
- How long does the surrender charge period last?
- Is this a single premium (lump sum) or a multiple premium (installment) contract?
- For a fixed annuity, what is the initial interest rate and how long is it guaranteed?
- Can you get a partial withdrawal without paying surrender charges and/or other charges?
- How much of a partial withdrawal can you take without being penalized?
- Is there a death survivor benefit?"
*Id.*

of the proceeds accessible." *Id.* at 146. Stated differently, if a senior has $2 million in assets and almost all of those assets are liquid, no one could reasonably question the suitability of putting a modest percentage of those assets into an equity indexed annuity. Similarly, if the senior has $100,000 in assets, all liquid, then putting $15,000 (for example) into an annuity may be suitable – while putting over $75,000 into an annuity might not. *See* Hayn Decl. ¶¶ 15-16.

Further complicating the individualized nature of suitability are the differing values that seniors place on different features of equity indexed annuities. As one former Bankers Life agent put it, "Different people have different needs." Chavira Dep. at 135-36; *see also* Downing Dep. at 256-59. These differences and others affect the suitability analysis. For example:

- Many seniors place great value on knowing that their premium cannot lose money even if the stock market goes down (Moncada Decl. ¶ 9; Beckman Decl. ¶ 7; Hayn Decl. ¶¶ 10, 14);

- Other customers purchase because they know they can take out 10 percent of their money each year after the first year without penalty (Beckman Decl. ¶ 7; Moncada Decl. ¶ 9);

- Other seniors buy equity indexed annuities as a way to safely save money that accumulates tax free and can be passed on to their heirs without going through probate (Beckman Decl. ¶ 7).

In short, the suitability of an equity indexed annuity for any particular senior citizen, or for any other customer, depends on the circumstances of the customer's situation.

## 2. Alleged Required Use of Uniform Sales Literature

In addition to claiming that Bankers Life's annuities are always unsuitable for people over the age of 65, plaintiffs claim that the sales process for these annuities is always the same. For example, plaintiffs claim that "Bankers required its sales agents to strictly adhere to written sales materials and contracts." Pl. Br. at 21. Because of "the across-the-board use of only Bankers-approved sales literature," they say, "this case is particularly susceptible to class treatment." *Id.* at 2-3.

9

But plaintiffs present no evidence – none – that Bankers Life required agents to use specified, or indeed any, written sales materials. The evidence demonstrates the opposite: Whether any particular agent uses any particular sales literature is discretionary and "depends on the situation." Javantash 6/18/09 Dep. at 94; Moncada Decl. ¶ 12; Goldberg Decl. ¶ 13. According to one agent, "I am not required to use any brochure when meet with clients. Sometimes I use them, sometimes I do not." Hayn Decl. ¶ 9.

Even when brochures are used, different agents highlight different features for different customers. As noted by one agent:

> Bankers Life does not require the use of any marketing materials or brochures. Whether I use a marketing piece or brochure is entirely up to me. Sometimes I use a Bankers Life brochure or marketing piece, and sometimes I don't use any at all. Even when I decide to use a marketing piece or brochure, how I use it and what I highlight changes from sale to sale.

Beckman Decl. ¶ 9; *see also* Hayn Decl. ¶ 9.

### 3.     Allegedly Uniform Conversations

Plaintiffs also claim that the conversations that lead to a sale are uniform. They assert that Bankers Life teaches agents to go to seniors' homes with "scripted responses" designed to sway reluctant customers. Pl. Br. at 7. Again, however, plaintiffs present no evidence to show that agents *ever* use scripts, much less that they are required to use scripts, during the home visits that are the focal point of the sales process. To the contrary, the evidence shows that the information presented orally changes from transaction to transaction.

To begin with, Bankers Life agents do not use scripts for sales presentations. Downing Dep. at 256-59; Goldberg Dep. at 104. The only "script" ever used is for the initial telephone calls that are sometimes used to try to schedule a home visit. Hayn Decl. ¶ 5; Goldberg Decl. ¶ 11. The "script" for the initial telephone call is itself just an introduction, and agents can deviate

10

from it as much as they want. Goldberg Dep. at 104-05; Chavira Dep. at 92. Many home visits, moreover, are obtained without the use of a script at all, as many agents obtain business from referrals from satisfied clients. Moncada Decl. ¶ 5.

Scripts are never used for the home visits, which are "the focal point" of the sales presentation. Hayn Decl. ¶ 5; Moncada Decl. ¶ 6; Beckman Decl. ¶ 4; Goldberg Dep. at 104; Dobbs Dep. at 72. Far from trying to control the conversations between agents and prospective customers, Bankers Life encourages agents to tailor their presentations to each customer's needs. Downing Dep. at 208-09; Hayn Decl. ¶ 7; Moncada Decl. ¶ 4; Goldberg Decl. ¶ 12. As one agent explained, the "features I focus on and the way I explain them changes from customer to customer. Different customers have different needs, so they ask about different aspects of Bankers Life's products. And how I explain Bankers Life's products changes from customer to customer and sales meeting to sales meeting." Moncada Decl. ¶ 10.

In short, the sales presentations that form the basis for plaintiffs' claims are neither scripted nor uniform. Plaintiffs have identified no evidence to the contrary.

### 4. Allegedly Uniform Disregard of Seniors' Interests and Needs

Plaintiffs also aver that Bankers Life uniformly sells annuities to seniors "without regard to their interests or needs." Pl. Br. at 3. They provide no evidence to support this bold statement. The evidence shows not only that different senior customers have different interests and needs, but also that seniors place different values on different features of the annuities.

In fact, the sales process typically begins with an assessment of the very issue that plaintiffs say is ignored. *See* Hayn Decl. ¶ 7 ("[e]ach customer has unique needs and desires . . . I try to get to know my client and understand their unique circumstances"); Moncada Decl. ¶ 9 ("[m]y focus is on each particular customer's needs"); Beckman Decl. ¶ 4. The uniqueness of each customer means that sometimes their interests and needs are consistent with the purchase of

11

an equity indexed annuity; other times they are not. When one Bankers Life agent was asked at his deposition whether the management in his office taught agents that they "should" sell annuities, he testified, "When you say 'should,' I [ ] mean, that is [a] strong word to me. If it fits the situation and fits the client and you think is a good thing for the client, you should, you should do that if it fits the situation. So when you say 'should,' should for what? Depends on the situation." Javantash 5/19/10 Dep. at 166.

### 5. Allegedly Uniform Lack of Training

Plaintiffs assert that Bankers Life requires "virtually no substantive, written training by its agents." Pl. Br. at 5. The theory here seems to be that all Bankers Life agents are insufficiently trained, and that therefore all Bankers Life agents make unsuitable sales. Even if this leap of logic were credited, the level of training – and the level of expertise in annuities – varies markedly from agent to agent.

There is, of course, a base of training that all agents must experience. This training covers the basic features of equity indexed annuities, suitability issues, and ethical sales practices. Goldberg Decl. ¶ 8; Moncada Decl. ¶ 14; Beckman Decl. ¶ 16. One of the agents who sold plaintiff Samuel Rowe his annuity testified that he attended training "every Tuesday and Thursday." Chavira Dep. at 49-50. Another described "constant training in our office." Javantash 6/18/09 Dep. at 30-31. Bankers Life also offers several optional training programs. Dobbs Dep. at 59-61; Goldberg Decl. ¶ 8; Beckman Decl. ¶ 16; Moncada Decl. ¶ 14. Some agents attend all the seminars, some opt not to attend any, and others fall in between. Beckman Decl. ¶ 16; Moncada Decl. ¶ 14.

In addition to formal training, newer agents receive individualized training on the job, going on sales calls with more seasoned agents. Dobbs Dep. at 167, 188-89; Goldberg 30(b)6) Dep. at 74-75. In one branch, for example, agents must be supervised on at least ten sales visits

12

before closing an equity indexed annuity sale on their own. Moncada Decl. ¶ 14. How each agent is trained varies from agent to agent because each senior agent is involved in each sale to a different extent, uses different sales techniques, and discusses different issues with prospective customers. Beckman Decl. ¶ 17; Goldberg Dec. ¶ 10.

Differences in agent training also depend on when the agent joined Bankers Life, as the company's training program has evolved over time and varies from branch to branch. Downing Dep. at 101-03, 140-41; Goldberg Decl. ¶ 9. Until 2004, branch managers used a compilation of learning models known as "Bankers Excellence in Sales Training" to train agents in a live setting. *See* Catania Dep. at 45-50. As the modules became outdated, they were replaced by newer versions. *Id.* at 46-47. This approach changed in 2004, when the hard-copy system was replaced by the "Bankers Learning Network" web portal. *Id.* at 19, 58. The Bankers Learning Network contains courses specifically geared toward annuity suitability, as well as an "Annuity Coach" that provides role-play cases for agents to complete. *Id.* at 64-66.

### 6. Other Allegedly Uniform Aspects of the Sales Process

Plaintiffs claim to identify various other allegedly uniform sales practices. But once again, each allegedly "uniform" practice is anything but uniform.

For example, according to plaintiffs, "agents are taught to do whatever it takes to get the premium at the first visit, even if it means driving seniors to their bank to obtain funds." Pl. Br. at 7. The affidavits submitted with this brief confirm that some sales close on the first visit, but most involve two or more. Hayn Decl. ¶ 4; Beckman Decl. ¶ 3; Moncada Decl. ¶ 3.

Plaintiffs also claim that "agents are taught techniques to get the senior to buy an annuity, even if the senior has to liquidate assets or annuities already held in place." Pl. Br. at 7. Once again, this allegedly uniform practice is highly individualized. Some annuity purchases do indeed arise from the liquidation of other assets, including other annuities; that was the case with

13

Mr. Rowe. But whether that happens in any particular case depends on the circumstances. Hayn Decl. ¶ 8.

### C.  Named Plaintiff's Annuity Purchase

One of the named plaintiffs, Mr. Rowe, purchased an equity indexed annuity from Bankers Life in 2007. 2d Am. Compl. ¶ 112. Plaintiffs allege that two Bankers Life agents met with Mr. Rowe and his wife to "discuss [their] financial situation with respect to long term care insurance," but ended up recommending an annuity. *Id.* ¶ 113. Mr. Rowe testified that neither of the agents told him anything he later learned was untrue. S. Rowe Dep. at 35.

To buy a Bankers Life annuity, plaintiffs cashed in an annuity they had with another company. That annuity was a "variable" annuity, meaning that, unlike the equity indexed annuity Mr. Rowe bought from Bankers Life, the value of the annuity could drop. *See* Martinez Dep. at 72. When plaintiffs cashed in their variable annuity, they incurred a surrender charge of nearly $2,957.09. 2d Am. Compl. ¶ 130. Mr. Rowe then deposited $101,985.92 in a Bankers Life equity indexed annuity. Six months later, he surrendered that annuity, incurring a surrender charge of more than $10,198.59 and receiving $91,787.33. *Id.* ¶ 131. If he had held his annuity to today, it would be worth more than $110,000. Panis Decl. ¶¶ 18-23.

### Argument

### I.  The Proposed Class Does Not Meet the Requirements for a Rule 23(b)(3) Class.

To establish Rule 23(b)(3) predominance, plaintiffs must demonstrate that the evidence regarding their individual claims can fairly resolve the claims of all other class members. Class certification should be denied if even one key factual issue is individualized because the Court would need to hold "mini-trials" to resolve each class member's claims. *See Oplchenski v. Parfums Givenchy, Inc.*, 254 F.R.D. 489, 500-01 (N.D. Ill 2008). Here, no fewer than four key

questions are individualized. Plaintiffs therefore cannot satisfy the predominance requirement of Rule 23(b)(3). *Reed*, 268 F.R.D. at 580-81.

### A. Individualized Inquiries Would Have to Determine Whether the Annuity Was Suitable for Each Particular Class Member.

Plaintiffs contend that Bankers Life's equity indexed annuities are universally unsuitable. *See* 2d Am. Compl. ¶ 153; Pls.' Interrog. Resps. at 10 (5/18/09) (Exhibit 17); Pl. Br. at 12. In other words, plaintiffs claim that not a single annuity was suitable for a single class member. To support this extraordinary proposition, plaintiffs rely on the idiosyncratic *ipse dixit* of their expert, Tom Bakos, who has opined that no senior should ever purchase a deferred annuity. But when balanced against the evidence submitted with this brief, along with the state regulations governing suitability, the individualized nature of suitability becomes self-evident.

Bakos's opinions are the subject of a separate *Daubert* motion. But even if Bakos's testimony were admissible, it would not carry the day for plaintiffs. "[O]pinion testimony should not be uncritically accepted as establishing a Rule 23 requirement merely because the court holds the testimony should not be excluded, under *Daubert* or for any other reason." *Hydrogen Peroxide*, 552 F.3d at 323. If the Court considers Bakos's testimony, it must consider it in the context of competing evidence. Here, that evidence reveals irremediable flaws in the conclusion that equity indexed annuities are *per se* unsuitable for seniors.

First, state statutes, regulations and insurance department pronouncements from around the country confirm the individualized nature of suitability. *See supra* at 7-8. These regulations do not outlaw the sale of annuities to seniors; rather, they presuppose that annuities may be suitable for seniors (and anyone else) depending on individualized factors such as appetite for risk, need for liquidity, and financial goals. Whether an equity indexed annuity meets the needs

of any particular senior depends on those factors and more. Panis Decl. ¶¶ 43; Dobbs Dep. at 61-63; Goldberg Decl. ¶ 14; Hayn Decl. ¶¶ 7, 14; Beckman Decl. ¶ 6; Moncada Decl. ¶¶ 7, 8.

Second, as underscored by the downturn in the markets three years ago, equity indexed annuities can be good investments for senior citizens who have sufficient liquidity and are looking for a product that can increase in value when the markets go up yet never lose value when markets go down. Panis Decl. ¶¶ 30, 43; Goldberg Decl. ¶¶ 3-4. In fact, the annuity purchased by Mr. Rowe would have safeguarded against market risk if he had not surrendered it. Panis Decl. ¶ 23.

Whether the annuity Mr. Rowe purchased was in fact suitable for him is not at issue here – maybe it was, maybe it wasn't. But either way, the suitability (or lack thereof) of the sale to Mr. Rowe would say nothing about the suitability of any other sale to any other class member. The Rowes' need for liquidity says nothing about the need for liquidity of any other class member; the Rowes' risk tolerance says nothing about the risk tolerance of any other class member; the Rowes' financial goals say nothing about the financial goals of any other class member; and so on. Trying the named plaintiffs' case, in other words, would determine just that – the named plaintiffs' case. All other claims would require individualized trials. This means that individual questions of fact, not common issues, predominate, and class certification should be denied. *See, e.g., Rowe v. Morgan Stanley Dean Witter*, 191 F.R.D. 398, 413 (D.N.J. 1999) (denying certification where claim of unsuitability "necessarily requires an individualized and fact intensive review").

**B.      Individualized Inquiries Would Have to Determine Whether Any Particular Class Member Received Any Misrepresentations.**

The individualized suitability determination by itself requires the denial of class certification.  But there is more.  Plaintiffs' claims sound in fraud,[4] and plaintiffs have identified misrepresentations and omissions that they claim, again without evidence, were uniformly transmitted to (or withheld from) the putative class.  The evidence demonstrates that these supposed "misrepresentations and omissions" were anything but uniform.

First, plaintiffs have identified no allegedly fraudulent written materials that were transmitted on a class-wide basis.  While plaintiffs refer in passing to "across-the-board use of only Bankers' approved sales literature," Pl. Br. at 2, they cite no evidence to support this assertion, and the evidence shows that agents' use of sales brochures was entirely optional.  Some agents always used them; some never used them; and some used them when they deemed it appropriate.  Goldberg Decl. ¶ 13; Moncada Decl. ¶ 12; Hayn Decl. ¶ 9; Beckman Decl. ¶ 9.

Second, plaintiffs have identified no oral misrepresentations or omissions that were made on a class-wide basis.  Bankers Life does not use scripts for the home visits where the actual sales transaction occurs.  Hayn Decl. ¶ 5; Moncada Decl. ¶ 6; Beckman Decl. ¶ 4; Goldberg Dep. at 104; Dobbs Dep. at 72.  It is undisputed that what each agent discussed in their face-to-face conversations with customers changed from agent to agent and transaction to transaction.  Moncada Decl. ¶ 10; Beckman ¶¶ 8, 10; Hayn Decl. ¶ 8; Goldberg Decl. ¶ 12.

---

[4] To prove mail or wire fraud under RICO, plaintiffs must establish a "scheme to defraud."  18 U.S.C. §§1341, 1343.  Similarly, to prevail on their "elder abuse" claim, plaintiffs must prove that Bankers Life converted their money and the money of other class members "for a wrongful use or with intent to defraud, or both."  *See* Cal. Welf. & Inst. Code § 15610.30(a)(1).  And for their California 17200 and 17500 claims, plaintiffs must prove that Bankers Life engaged in unlawful, unfair, misleading or fraudulent practices.  *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1152 (9th Cir. 2008) (17200); *McCann v. Lucky Money, Inc.*, 29 Cal. Rptr. 3d 437, 441 (Cal. App. 4 Dist. 2005) (17500).

By way of example, plaintiffs claim that Bankers Life uniformly failed to disclose the "extraordinary" commissions earned by its agents. Pl. Br. at 12-13. (The commissions are actually in the middle of the pack of commissions in the industry.) Yet many agents did tell their clients that they were receiving a commission. *See* Moncada Decl. ¶ 11; Beckman Decl. ¶ 12. And many customers – including Mr. Rowe – do not care that their agents receive commissions. S. Rowe Dep. at 81. Determining who received this disclosure and who did not – even assuming it is material, which it is not – would require still more individualized inquiries.

The same holds true for disclosures about surrender periods. Many agents highlighted the fact that withdrawing money during the surrender period would result in a penalty. Beckman Decl. ¶ 10; Hayn Decl. ¶ 11; Moncada Decl. ¶ 10. Surrender charges are the primary drawback of deferred annuities, and Bankers Life's agents and marketing brochures disclose these charges. But determining who received and understood these disclosures and who did not would, once again, require individualized inquiries. Downing Dep. at 259-60. Similarly, plaintiffs' claims about agents appealing to their clients' "emotional buying motives," to make the sale at any cost, and to make the sale at the first meeting (Pl. Br. at 1) would require individualized investigations and individualized analysis of the evidence.

In short, what the Rowes' agents said to the Rowes has no bearing on the discussions between other agents and the other 25,000 members of the putative class. In situations like this, where the claims revolve around what was said to individual class members, the Seventh Circuit has consistently refused to certify classes. *See, e.g.*, *Frahm v. Equitable Life Assurance Soc'y*, 137 F.3d 955, 957 (7th Cir. 1998) (denying certification where "everything depends on what was said or sent to each [plaintiff] personally, and different benefits advisors said or wrote different things to different [plaintiffs]"); *Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957-58 (7th Cir.

18

1989) (denying certification where liability could be established only by individualized evidence regarding what defendant said to each customer).[5]  The same result should obtain here.

### C.    Individualized Inquiries Would Have to Determine Whether Any Alleged Misrepresentation or Omission Caused Damages.

For class members who can establish, after their individualized hearing, that they were victimized by a misrepresentation or omission and bought an unsuitable annuity, yet another individualized inquiry would have to address the question of causation.  Plaintiffs contend that Bankers Life effected a "singular fraudulent scheme to market, promote, and sell deferred annuities to senior citizens . . . resulting in damage to the entire Class."  Pl. Br. at 21-22.  They make this claim for a reason – causation is a critical element for each of plaintiffs' claims.[6]  If class members would have purchased the annuity had they known the "truth" (as plaintiffs describe it), then there is no causal link between the alleged wrongdoing and any damage.

If some class members would have purchased their annuities even with all the disclosures plaintiffs argue should have been made, causation is individualized and class certification must

---

[5] Cases denying certification in these circumstances are legion.  *See, e.g.*, *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252-53 (2d Cir. 2002); *In re LifeUSA Holding Inc.*, 242 F.3d 136, 147 (3d Cir. 2001); *Estate of Felts v. Genworth Life Ins. Co.*, 250 F.R.D. 512, 525-26 (W.D. Wash. 2008); *Markarian v. Connecticut Mut. Life Ins. Co.*, 202 F.R.D. 60, 64 (D. Mass. 2001); *Begley v. Academy Life Ins. Co.*, 200 F.R.D. 489, 498 (N.D. Ga. 2001); *Van West v. Midland Nat'l Life Ins. Co.*, 199 F.R.D. 448, 454 (D.R.I. 2001); *Keyes v. Guardian Life Ins. Co.*, 194 F.R.D. 253, 256-57 (S.D. Miss. 2000); *Kent v. SunAmerica Life Ins. Co*., 190 F.R.D. 271, 279-80 (D. Mass. 2000); *Cohn v. Massachusetts Mut. Life Ins. Co*., 189 F.R.D. 209, 213 (D. Conn. 1999).

[6] "Causation lies at the heart of a civil RICO claim," and "[l]umping claims together in a class action does not diminish or dilute this requirement."  *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 664 (9th Cir. 2004).  "A party making a RICO claim must demonstrate that the fraudulent representation was not only a 'but for' but also proximate cause of the injury."  *Allstate Ins. Co. v. St. Anthony's Spine & Joint Inst., P.C.*, 691 F. Supp. 2d 772, 790 (N.D. Ill. 2010) (citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006)).  Although plaintiffs are correct that reliance is not a stand-alone element of a civil RICO claim (Pl. Br. at 21), the Supreme Court has held that absent reliance, causation can seldom if ever be proven:  "Of course, none of this is to say that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations. . . . In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation."  *Bridge v. Phoenix Bond & Indem. Co.,* 128 S. Ct. 2131, 2144 (2008). *See also*

be denied. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 936 (7th Cir. 2010), illustrates this point. There, the Seventh Circuit found that individualized issues of causation precluded certification in a case alleging price-fixing in the gasoline market: "Absent proof as to why a particular plaintiff purchased a particular brand of gasoline, [plaintiff] cannot establish that the defendants' conduct caused him or her to make that purchase." *See also Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 746-48 (7th Cir. 2008). Similarly, in *McLaughlin v. American Tobacco Co.*, 522 F.3d 215, 225-26 (2d Cir. 2008), the district court certified a class because the defendant falsely claimed that "light" cigarettes were healthier than other cigarettes. The Second Circuit reversed, finding that causation was individualized because some people would have bought "light" cigarettes even if they had they known that they were just as unhealthy as other cigarettes. The same is true of plaintiffs' claims here: Whether any particular purchase was caused by any particular alleged misrepresentation or omission would require an analysis of why each class member bought an annuity.

Plaintiffs try to dodge this problem by alleging that "no rational person" would purchase an equity indexed annuity and that these annuities are inherently and always unsuitable for purchasers over the age of 65. *See* Pl. Br. at 22. As explained above and in Bankers Life's *Daubert* motion, this theory is meritless. Seniors buy annuities for a multitude of reasons, and their decisions – and the wisdom of their decisions – depend on their individual circumstances. Moncada Decl. ¶ 9; Beckman Decl. ¶ 7; Hayn Decl. ¶¶ 10, 14. Thus, whether Mr. Rowe would have purchased an annuity had he received all conceivable disclosures has no bearing on whether any other putative class member would still have purchased in the face of similar disclosures.

---

*Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291, 1303 (S.D. Cal. 2009) (17200 causation); *Mangindin v. Washington Mut. Bank*, 637 F. Supp. 2d 700, 709-10 (N.D. Cal. 2009) (17500 causation).

### D. Individualized Inquiries Would Have to Determine Whether Any Particular Class Member Was Damaged and, If So, the Amount of Any Damage.

If a class were certified, individualized inquiries would also be necessary to determine which class members, if any, were damaged by their annuity purchase and, if so, by how much. Admittedly, when differences in damages can be addressed in a formulaic way, that is generally not a reason to deny class certification. But courts deny certification "where the calculation of damages is not susceptible to a mathematical or formulaic calculation, or where the formula . . . is clearly inadequate." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003). In other words, plaintiffs "must present a damages model that functions on a class-wide basis." *Reed v. Advocate Health Care*, 268 F.R.D. at 595. They have failed to do so; any viable damages theory would require the Court to analyze the data class member by class member.

Plaintiffs seek "to restore all monies wrongfully obtained" (2d Am. Compl. ¶ 192), the "disgorgement and restitution of Bankers' ill-gotten gains . . . to pay restitution to Plaintiffs [and] the Class" (*id.* ¶ 278), "compensatory, special and general damages according to proof" (*id.* ¶ 279), and, finally, "punitive and exemplary damages" (*id.* ¶ 281). None of these forms of relief can be fairly calculated through any formula. For example, determining compensatory damages "according to proof" would require an evaluation of what purchasers would have done with their money had they not purchased an annuity. Mr. Rowe testified that if he had not bought the Bankers Life annuity, he would have kept the money where it was – in a variable annuity. Rowe

Dep. at 67. Examining whether Mr. Rowe was damaged would mean comparing the actual outcome of his purchase with what would have happened had he kept his prior annuity.[7]

Plaintiffs' request for "punitive and exemplary damages" (2d Am. Compl. ¶ 281) is yet another reason why damages computations would require individualized evidence. The award of punitive damages would depend on what was said by each particular agent and the other circumstances of the transaction. Courts routinely deny certification in cases seeking punitive damages. *E.g.*, *Allison v. CITGO Petroleum Corp.*, 151 F.3d 402, 419 (5th Cir. 1998); *Street v. Diamond Offshore Drilling*, No. Civ.A. 00-1317, 2001 WL 568111, at *11 (E.D. La. May 25, 2001).

### E. A Class Action Is Not a Superior Means of Resolving the Claims at Issue Here.

Class plaintiffs sometimes try to justify certification by arguing that individual damages are so small that it would be impracticable to litigate individual cases, and plaintiffs here are no exception. Pl. Br. at 24-25. But this is not such a case. The Rowes claim that they are entitled to at least $15,000 in compensatory damages. Individual cases with damages in that range are commonplace. The stakes may not be high enough to tempt the class action bar, but they are surely enough to justify a lawsuit – particularly where, as here, the relevant statutes permit the recovery of attorneys' fees. *See, e.g.*, 18 U.S.C. § 1964(c); Cal. Bus. & Prof. Code § 17203. In

---

[7] Plaintiffs' damages expert, Joseph DeVito, has not actually calculated anyone's damages (DeVito Dep. at 39), and he admitted that his proposed approach would not capture the Rowes' (or anyone else's) damages resulting from having cashed in another annuity to buy a Bankers Life annuity. *Id.* at 40-44. Moreover, DeVito's formula assumes that no one who bought Bankers Life's annuities was told about surrender charges, *id.* at 51-52, even though that is manifestly not the case. *See* Hayn Decl. ¶ 11; Beckman Decl. ¶ 10; Moncada Decl. ¶ 10. DeVito's approach would strip out any surrender charges, even where (as was most often the case) these charges were fully disclosed. DeVito Dep. at 25-28, 119-22. His proposed approach cannot avoid the need for individualized inquiries.

combination with the overwhelmingly individualized nature of the evidence, this means that a class action is not a "superior" method of resolving these claims. Fed. R. Civ. P. 23(b)(3).

## II. The Proposed Class Does Not Meet the Requirements for a Rule 23(b)(2) Class.

Plaintiffs also seek certification under Rule 23(b)(2). This presents a classic "square peg/round hole" problem – the rule is not a remotely appropriate basis for certifying the proposed class. Rule 23(b)(2) applies only when "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." A classic example is a civil-rights action, "where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration." Rule 23, Advisory Committee Notes (1966).

Plaintiffs' proposed 23(b)(2) class fails in two independent respects: (1) it does not constitute a cohesive group amenable to classwide relief, and (2) the request for individualized monetary damages – not just injunctive relief – is the focus of the case.

### A. The Proposed Class Is Not Cohesive.

Rule 23(b)(2) presumes that "the interests of the class members are cohesive and homogeneous such that the case will not depend on adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among class members." *Lemon v. Int'l Union of Operating Eng'rs, Local No. 139*, 216 F.3d 577, 580 (7th Cir. 2000). Indeed, "even greater cohesiveness generally is required than in a Rule 23(b)(3) class." *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1121 (8th Cir. 2005). As discussed above, however, the individualized evidence this Court would be required to navigate thwarts Rule 23(b)(3) certification. Rule 23(b)(2) certification would be no more appropriate. *Vulcan Golf, LLC v. Google Inc.*, 254 F.R.D. 521, 535 (N.D. Ill. 2008) ("The court has just discussed in detail the

individual inquiries that the plaintiffs' proposed classes would require; accordingly, Rule 23(b)(2) relief is not appropriate in this case.").

      **B.**      **The Proposed Class Does Not Seek Primarily Injunctive Relief.**

      "A suit for money damages, even if the plaintiffs seek uniform, class-wide equitable relief as well, jeopardizes th[e] presumption of cohesion and homogeneity." *Lemon*, 216 F.3d at 580. Money damages accordingly can be part of a Rule 23(b)(2) injunctive class action only if they are secondary, or "incidental," to the claim for injunctive relief. *Id.* "Incidental damages do not depend in any significant way on the intangible, subjective differences of each class member's circumstances and do not require additional hearings to resolve the disparate merits of each individual's case." *Id.* at 581 (citations and quotation marks omitted). Any damages must flow automatically from the injunction, such that "computation of damages is mechanical, without the need for individual calculation." *In re Allstate Ins. Co.*, 400 F.3d 505, 507 (7th Cir. 2005) (citations and quotation marks omitted).

      Plaintiffs' complaint confirms that damages in this case are anything but "incidental." Plaintiffs seek, among other types of pecuniary relief:

- restoration of "all monies wrongfully obtained" to the class members;

- restitution of "ill-gotten gains";

- compensatory damages; and

- punitive damages.

2d Am. Compl. ¶¶ 192, 278-80. There is simply no way for this requested monetary relief to be administered in a classwide manner in accordance with the precepts of Rule 23(b)(2). Indeed, plaintiffs explicitly ask for individualized review as part of their claim for injunctive relief. *See* Pl. Br. at 19. Each putative class member is seeking a different award – "valuation credits . . . in amounts equivalent to Bankers [sic] failure to disclose material facts" to that class member. *Id.*

24

To calculate such an award, the Court would have to determine, class member by class member, the amount of the credit, if any, due to each.

Plaintiffs also seek to establish an "Audit Program" to evaluate, class member by class member, whether each annuity sale was suitable. *Id.* And plaintiffs ask this Court to appoint a "Special Master" to adjudicate suitability-related disputes – a decidedly individualized determination – arising from this program. *Id.* In other words, plaintiffs seek, under the pretext of declaratory and injunctive relief, a case-by-case analysis of each annuity sale and the amount of money damages due.

Because plaintiffs' case is undeniably focused on money damages, their Rule 23(b)(2) request should be denied. *Lemon,* 216 F.3d at 577, 580; *cf. Hyderi*, 235 F.R.D. at 398.

## Conclusion

For the foregoing reasons, and for reasons to be discussed in any additional briefing and at oral argument, plaintiffs' motion for class certification should be denied.

Dated:  January 31, 2011

Respectfully submitted,

BANKERS LIFE AND CASUALTY COMPANY

By:      /s/ Eric S. Mattson
            One of its attorneys

Joel S. Feldman
Eric S. Mattson
Jason M. Adler
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
Tel:  (312) 853-7000
Fax:  (312) 853-7036
jfeldman@sidley.com
emattson@sidley.com
jadler@sidley.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 31, 2011, I filed the foregoing Defendant's Memorandum in Opposition to Plaintiffs' Motion to Certify Class and Appoint Class Counsel with the U.S. District Court for the Northern District of Illinois utilizing the e-filing system, which will send notice to all counsel of record.

<u>/s/ Eric S. Mattson</u>

CH1 5677223v.6