**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ESTELLA ROWE, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 09-cv-491 |
| v. | ) ) | Judge Robert M. Dow, Jr. |
| BANKERS LIFE AND CASUALTY COMPANY and BANKERS LIFE INSURANCE COMPANY OF ILLINOIS, | ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Estella Rowe sued Bankers Life and Casualty Company and its former affiliate, Bankers Life Insurance Company of Illinois[1] (collectively, "Bankers"), on behalf of herself and all others similarly situated. Rowe alleges that Bankers conspired with its independent sales agents and others to induce elderly consumers to buy equity-indexed deferred annuities, which, according to Rowe, are unsuitable investment vehicles for anyone over sixty-five years old. Before the Court is Rowe's motion for class certification and to appoint class counsel [94]. For the reasons stated below, the Court denies Rowe's motion – although the denial is without prejudice to the filing of a new motion to certify a California subclass.

---

[1] In their answer, the Defendants state that Bankers Life Insurance Company of Illinois was an affiliate of Bankers Life and Casualty Company until 2007, when Bankers Life and Casualty Company assumed the obligations, debts, and liabilities of Bankers Life Insurance Company of Illinois. (Answer to 2d Am. Compl. ¶¶ 11-12.)

I.      **Background**

A.      **Class Allegations**

Bankers is an Illinois corporation that sells life insurance, long-term care insurance, and annuities to senior citizens and others in California, Illinois, and other states. An annuity is a type of insurance product. When purchasing an annuity, a consumer agrees to make an upfront lump-sum payment (a premium), or a series of payments, to the insurance company. In return, the insurance company agrees to make payments to the purchaser over a period of time. With a deferred annuity, the product at issue here, the insurance company does not begin making payments immediately upon receipt of the premium. During this period, the premium grows on a tax-deferred basis. In this sense, a deferred annuity is a savings vehicle, not an immediate income stream.

There are different types of deferred annuities. A "fixed" deferred annuity is an annuity in which the insurance company pays the consumer a guaranteed interest rate on his or her premium payments for a set period of time. An "equity-indexed" deferred annuity, on the other hand, typically guarantees a lower rate of interest on the consumer's premium payments, but is also tied to a market index. If the market index goes up, the rate of interest and, thus, the value of the annuity also will increase, although not by the same percentage as the rise in the market index. Bankers' equity-indexed deferred annuities are linked to the S&P 500. The "cost" of a deferred annuity is limited liquidity, or, as Bankers puts it, "full liquidity at a price." (Resp. at 6.) A purchaser of one of Bankers' equity-indexed deferred annuities, for example, may withdraw a small percentage of her money each year after the first year without a penalty, but incurs a "surrender charge" if she needs to withdraw a larger amount before the maturity date.

Rowe alleges that Bankers, its independent sales agents, UVEST Financial Services Group, Inc., and 40/86 Advisors, Inc. constitute an "enterprise" as defined in 18 U.S.C. § 1961(4), over which Bankers maintains systemic control. Rowe contends that Bankers "develops and underwrites the [a]nnuities, and develops standardized marketing materials[,]" while UVEST "facilitates replacement transactions[,]" 40/86 "provides investment advice and services" for the funds that Bankers takes in, and the independent sales agents "market and sell the [a]nnuities." (2d Am. Compl. ¶ 139.) Rowe alleges that the structure of the enterprise is critical to Bankers' ability to market and sell its equity-indexed deferred annuities to seniors for whom such annuities are unsuitable.

Most important to the scheme, Rowe contends, is Bankers' use of independent sales agents to sell its annuities. By using independent contractors instead of employees, Bankers is able to "evade its responsibilities and obligations by contending that it lacks control or oversight over the actions of its [a]gents." (2d Am. Compl. ¶ 145.) Bankers markets and sells its annuity products through a network of more than 4,600 independent sales agents located in over 200 nationwide sales offices. According to Rowe, using standardized recruiting techniques, Bankers hires sales agents without regard to their skills or ethics. She contends that despite the fact that its annuities are complex products, Bankers does not require that its prospective sales agents have prior annuity sales experience. Further, once Bankers hires sales agents, Rowe alleges, it does not require them to complete any substantive, written training on the features of its annuities or the suitability of such products for seniors.[2] Rowe also asserts that despite its large network of independent sales agents, Bankers does not have a nationwide program to determine

---

[2] Although Rowe acknowledges that some annuity training is available, she contends that it is not mandatory.

when an annuity is suitable for a senior. Nor does Bankers supervise or review the sale processes of its independent agents.

What Bankers does require, according to Rowe, is sales technique training. Rowe alleges that Bankers teaches its sales agents "aggressive, predatory sales practices designed to threaten, intimidate and scare seniors," (2d Am. Compl. ¶ 32), and that it provides lavish incentives, bonuses, and commissions to its sales agents that successfully target seniors for annuities, regardless of their suitability. Rowe also contends that Bankers instructs its agents to use marketing and sales materials that contain omissions and misrepresentations. According to Rowe, Bankers' sales materials do not disclose the fact that (1) its annuities contain loads and other expenses; (2) it uses a cadre of untrained, unsupervised, and inexperienced agents to sell its annuities; (3) its annuities are poor-performing assets; and (4) deferred annuities in general are illiquid and ill-suited for seniors.

Rowe asserts that in order to effectuate the scheme described above, Bankers and its co-conspirators have committed numerous acts indictable as mail or wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343, respectively. Rowe points to a number of annuity-related forms that she claims contain material omissions and that, "on information and belief," Bankers sent to each of its customers nationwide. "[M]ost egregious" among them, according to Rowe, is a statement in the Annuity Disclosure Form that specifically states that Bankers does not charge for any loading. (2d Am. Compl. ¶ 164.) Rowe contends that despite this statement, there is a loading expense charge inherent in its annuities.

## B. Rowe's Allegations

Rowe asserts that in July of 2007, she and her late-husband, Samuel Rowe ("the Rowes"), both of whom were over sixty-five years old at the time, fell victim to Bankers'

scheme. According to Rowe, two sales agents working for Bankers made an unsolicited telephone call to the Rowes to arrange an in-home meeting to discuss the Rowes' long-term care insurance. The Rowes agreed to meet with the agents. During their meeting, the agents learned that the Rowes had a variable annuity with another company that had a cash value of approximately $105,000.00. The agents recommended that the Rowes liquidate that annuity and purchase one of Bankers' annuities instead and, at their second in-person meeting with the agents, the Rowes agreed to do so. The Rowes purchased the annuity with a lump sum payment of $101,985.92.

The equity-indexed deferred annuity that the Rowes purchased started with a ten percent surrender charge. It also had a maturity date of July 16, 2025, meaning that the Rowes would not receive any payment or return on the annuity until Samuel Rowe was ninety-nine years old. In December of 2007, however, because the Rowes needed money, they surrendered their annuity and incurred a charge of more than $10,198.59. Rowe claims that the sales agents never discussed with the Rowes the relative strengths and weaknesses of the Rowes' existing annuity compared to the annuity that they bought from Bankers. Nor did the agents discuss the tax implications of Bankers' annuity. According to Rowe, had she and her husband known all of "the undisclosed and concealed risks and infirmities of their investment," they would not have purchased one of Bankers' annuities. (2d Am. Compl. ¶¶ 133-35.)

Believing that through the pattern of alleged racketeering activities described above, Bankers has violated and conspired to violate §§ 1962(c) and 1962(d) of RICO, Rowe sued Bankers on behalf of herself and all others similarly situated. Rowe also alleges that Bankers has violated the California Elder Abuse Code, Cal. Welfare & Inst. Code §§ 15600, *et seq.*; the California False and Misleading Advertising Act, Cal. Bus. & Prof. Code §§ 17200, *et seq.*; and

the California Unfair Trade Practices Act, Cal. Bus. & Prof. Code §§ 17500, *et seq.*; has breached and aided and abetted the breach of fiduciary duties owed to the potential class members; and has been unjustly enriched. In her second amended complaint, Rowe seeks injunctive relief; disgorgement and restitution; compensatory, special, and general damages; punitive and exemplary damages; treble and double damages; the imposition of a constructive trust; and reasonable attorneys fees and costs.

Now before the Court is Rowe's motion to certify two classes pursuant to Federal Rule of Civil Procedure 23. The first is a nationwide class relating to Rowe's RICO claims ("the nationwide class"):

> All persons in the United States [who], while 65 years of age or older, purchased one or more Bankers Life and Casualty Company equity-indexed deferred annuities, form numbers LA-07A, LA-07C, or LA-07G, after January 1, 2004.

The second class Rowe seeks to certify is a sub-class of California residents that relates to Rowe's California statutory and common law claims ("the California subclass"):

> All California residents [who], while 65 years of age or older, purchased one or more Bankers Life and Casualty Company equity-indexed deferred annuities, form numbers LA-07A, LA-07C, or LA-07G, after January 1, 2004.

Rowe also requests that the Court appoint Rowe's counsel as counsel for the two classes.

Rowe argues that class certification is appropriate in this case because (1) all of the potential members of the nationwide class (and thus, the California subclass) were subjected to the same marketing and sales materials that omitted and misrepresented material facts, and (2) Bankers failed to establish and maintain a system to ensure that each annuity was suitable for each customer.

## II.     Procedural History

This Court previously ruled on several motions that are directly related to Rowe's motion to certify.  In an order dated September 30, 2011 [186], the Court granted in part and denied in part Rowe's request for judicial notice [93], granted in part and denied in part without prejudice Bankers' motion to exclude the testimony of Rowe's expert [138], and granted in part Bankers' motion for leave to file a sur-reply to Rowe's motion to certify the class [173].

As an initial matter, the Court found that it was compelled by *American Honda Motor Co. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010), to address Bankers' motion to exclude the testimony of Rowe's expert, Thomas Bakos, at this juncture because at least part of Bakos' testimony was "critical to class certification."  Specifically, the Court concluded that Bakos' view as to the suitability of equity-indexed deferred annuities for people over the age of sixty-five figured centrally in its class certification analysis.  [186 at 2.]  The Court then concluded that Bakos' opinion number five – an absolutist view that all equity-indexed deferred annuities are always unsuitable for all persons over the age of sixty-five – was unsupported by his methodology and data.  [186 at 5.]  Accordingly, for purposes of its motion to certify, Rowe may not rely on Bakos' opinion number five to support her theory that Bakers' equity-indexed deferred annuities are "flawed investments that no senior should be sold" and that "no rational person would purchase one of Bankers' annuities."  (Mot. to Cert. Class at 12, 22.)  The Court denied without prejudice Bankers' motion to exclude the remainder of Bakos' report.

The Court also granted in part and denied in part Rowe's request that the Court take judicial notice of (1) an appendix filed by a plaintiff in another Northern District of Illinois case to which Bankers was a party; (2) Bankers' answer in that same Northern District of Illinois case; (3) the National Association of Insurance Commissioners' Suitability in Annuity

Transactions Model Regulations; and (4) a reproduction of a CBS *Inside Edition* documentary investigative report of Defendant's sales practices. The Court denied outright Rowe's request as to the CBS documentary. And while the Court agreed to take judicial notice of the fact that Bankers filed the documents in the previous case, Bankers' position in that case, and the fact that the National Association of Insurance Commissioners have model regulations as to the suitability of annuity transactions, the Court declined to conclude that anything within those documents establishes anything as a matter of fact in this case. [186 at 6.]

III. **Legal Standard**

To be certified as a class action, a proposed class must satisfy the requirements of Federal Rule of Civil Procedure 23(a), as well as one of the three alternative requirements in Rule 23(b). *Messner v. Northshore University HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). "As a threshold matter, a proposed class must always meet the Rule 23(a) requirements of numerosity, typicality, commonality, and adequacy of representation." *Id.* Rule 23(b) sets forth four circumstances under which a class action may be maintained, two of which Rowe relies on here, Rule 23(b)(2) and Rule 23(b)(3). See Fed. R. Civ. P. 23(b). Rule 23(b)(2) permits class certification if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Rule 23(b)(3) permits class certification if (1) questions of law or fact common to the members of the proposed class predominate over questions affecting only individual class members; and (2) a class action is superior to other available methods of resolving the controversy. *Messner*, 669 F.3d at 811.

Plaintiffs bear the burden of proving that they are entitled to class certification. *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). Although class certification proceedings

are not "a dress rehearsal for the trial on the merits," *Messner*, 669 F.3d at 811, for purposes of deciding the certification question, the Court does not presume that all well-pleaded allegations are true. *Szabo v. Bridgeport Machs.*, *Inc.*, 249 F.3d 672, 676-77 (7th Cir. 2001). Rather, before it allows a case to proceed as a class action, the Court "should make whatever factual and legal inquiries are necessary under Rule 23." *Id.* at 676. "A party seeking class certification must affirmatively demonstrate his compliance with th[e] Rule – that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores v. Dukes*, 131 S. Ct. 2541, 2551 (2011). But the showing need not be "to a degree of absolute certainty. It is sufficient if each disputed requirement has been proven by a preponderance of evidence." *Messner*, 669 F.3d at 811. The Court exercises broad discretion in determining whether class certification is appropriate given the particular facts of the case. *Keele v. Wexler*, 149 F.3d 589, 592 (7th Cir. 1998).

## IV. Analysis

### A. Nationwide Class

Rowe first seeks certification of a nationwide class of senior citizens to prosecute her RICO claims. Rowe argues that the nationwide class satisfies the threshold requirements of Rule 23(a) and seeks certification of that class pursuant to Rule 23(b)(2) or Rule 23(b)(3). Bankers does not contest the fact that the nationwide class meets the requirements of Rule 23(a). Instead, it argues that Rowe has not satisfied the requirements of either 23(b)(2) or 23(b)(3). Although the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes* has made the question of whether the nationwide class satisfies the commonality requirement in Rule 23(a) a more

challenging one,[3] a thorough analysis of that issue is not necessary here because, as explained below, Rowe has not met the requirements of either Rule 23(b)(2) or 23(b)(3).

### 1.     Rule 23(b)(2)

Rowe first contends that the nationwide class satisfies the requirements of Rule 23(b)(2). Rule 23(b)(2) allows for certification of a class when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole."  As the Supreme Court recently made clear, the rule "applies only when a single injunction or declaratory judgment would provide relief to each member of the class," and "does not authorize class certification when each class member would be entitled to an individualized award of money damages."  *Dukes*, 131 S. Ct. at 2557.  Here, Rowe argues that the proposed class qualifies for Rule 23(b)(2) certification because Bankers has acted or refused to act on grounds that apply generally to all of the proposed members of the nationwide class through the use of uniform illicit sales practices and misleading sales representations and documents.

Rowe does not contend, nor can she, that a single order granting declaratory or injunctive relief would end this case.  Along with injunctive relief, Rowe also demands individual monetary relief for each member of the nationwide class, as well as punitive, treble, and statutory damages for Bankers' alleged violations of RICO and California law.  This would not defeat class certification under Rule 23(b)(2) if Rowe's request for monetary relief was "merely incidental to the grant of an injunction or declaratory relief:  'incidental' in the sense of requiring only a mechanical computation."  *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 825 (7th Cir. 2011).

---

[3] See, *e.g.*, *Pennsylvania Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, No. 09 C 5619, 2011 WL 6819081, at *9 n.3 (N.D. Ill. Dec. 28, 2011) ("The Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes* suggests that plaintiffs' failure to establish that all of the defendants engaged in a common course of misconduct may also defeat their ability to satisfy the less demanding commonality requirement of Rule 23(a).").

The Court is not persuaded, however, that individual monetary relief is merely incidental here. In fact, the Court questions whether Rowe's inclusion of injunctive claims was simply a creative "effort to make [her] case more amenable to class certification * * *." See *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 889 (7th Cir. 2011) (suggesting that the plaintiff called for an injunction to give itself "a fallback position on the class-certification question"). Regardless, because "individualized monetary claims belong in Rule 23(b)(3)," *Dukes*, 131 S. Ct. at 2558, certification under Rule 23(b)(2) is not appropriate here.

### 2.    Rule 23(b)(3)

Next, Rowe argues that the nationwide class satisfies the requirements set forth in Rule 23(b)(3). According to Rowe, certification is appropriate here because Bankers subjected all of the potential nationwide class members to the same unfair treatment; specifically, Bankers' "common course of conduct in making uniform material omissions," (Reply at 3), and its failure to maintain a system to ensure suitability. As set forth above, Rule 23(b)(3) permits class certification where common questions of law and fact predominate over individualized questions, and where a class action is superior to other available methods of resolving the controversy. Bankers focuses its challenge on the issue of predominance.

### a.    Predominance

The predominance inquiry tests whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). Although related to the commonality requirement found in Rule 23(a), "the predominance criterion is far more demanding." *Id.* at 624. A party meets the predominance requirement if she can show that "'common questions represent a significant aspect of [a] case and * * * can be resolved for all members of [a] class in a single adjudication.'" *Messner*, 669

F.3d at 815 (quoting 7AA Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 1778 (3d ed. 2011)). "'If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question.'" *Messner*, 669 F.3d at 815 (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005)).

In determining whether questions of law or fact common to potential class members predominate over individual questions, the Court begins with the elements of the underlying cause of action. *Erica P. John Fund, Inc. v. Halliburton Co.*, --- U.S. ---, 131 S. Ct. 2179, 2185 (2011); *Messner*, 669 F.3d at 815. Section 1964(c) provides a private right of action to "[a]ny person injured in his business or property by reason of a violation of section 1962 * * *." Here, Rowe alleges that Bankers violated both §§ 1962(c) and 1962(d) (conspiracy to violate § 1962(c)). To state a claim for relief under § 1962(c), Rowe must allege "'(1) conduct (2) of an enterprise (3) through a pattern of racketeering activity.'" *DeGuelle v. Camilli*, 664 F.3d 192, 199 (7th Cir. 2011) (quoting *United States v. Shamah*, 624 F.3d 449, 454 (7th Cir. 2010)). To have standing to sue, Rowe must also establish that she and the other potential class members (1) suffered injury to their business or property, and (2) that Bankers' RICO violation was both the "but for" and proximate cause of that injury. See *DeGuelle* 664 F.3d at 199.

Bankers concedes that there are some common issues of law and fact as to Rowe's RICO claims, and the Court agrees. The questions of whether Bankers participated in the "conduct" of the enterprise's affairs, whether Bankers and its alleged coconspirators constitute an "enterprise," and whether any alleged racketeering activity amounted to a "pattern" of activity are all common to the class and could be proven with class-wide evidence. Bankers argues, however, that a

determination of (1) whether Bankers engaged in racketeering activity, and (2) whether Bankers' alleged RICO violation was the "but for" and proximate cause of any injury suffered will require individualized inquiries for each potential member of the nationwide class.[4]

### i. Racketeering Activity

Rowe alleges that Bankers has violated §§ 1962(c) and 1962(d) by conducting its affairs through a pattern of racketeering activity involving numerous acts of mail or wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343. To allege a violation of the mail or wire fraud statutes, a plaintiff must show that (1) "the defendant knowingly devised or participated in a scheme to defraud or obtain money or property by means of materially false pretenses, representations, promises, or omissions"; (2) "the defendant did so knowingly and with the intent to defraud"; and (3) "the defendant used the United States mail [or wires] as a carrier." *United States v. Thyfault*, 579 F.3d 748, 751 (7th Cir. 2009) (citing 18 U.S.C. § 1341).

Rowe contends that Bankers implemented its scheme through standardized misrepresentations and omissions as to the essential characteristics and true costs of its equity-indexed deferred annuities. Although Rowe broadly claims that Bankers "required its sales agents to strictly adhere to written sales materials and contracts, while simultaneously failing to give the agents adequate product training in order to understand the annuities they were selling," (Mot to Cert. Class at 21), when pressed to provide common evidence of a scheme to defraud, Rowe relies primarily on what she claims is Bankers' "common course of conduct in making uniform material omissions" to the potential members of the nationwide class. (Reply at 3). Specifically, Rowe points to the "Annuity Disclosure Form" ("disclosure form"), which she and

---

[4] Bankers also questions whether the issue of damages could be established through class-wide proof. Because individualized questions of damages will not defeat class certification, however, and because Rowe cannot meet the predominance requirement on other grounds, the Court need not reach that issue.

her husband received – and her husband signed.   Among other things, the disclosure form explains what a loading charge is ("a sales or an administrative charge which is deducted from your premium or your policy's Cash Value"), and then explicitly states that Bankers does not charge for any loading.  (2d Am. Compl., Ex. 49.)  Rowe asserts that (1) this form was presented to each potential member of the nationwide class, and (2) the form is false and misleading because Bankers' annuities actually *do* have a built-in loading charge.   Rowe contends that Bankers stopped disclosing this material fact in 2005 because it had been impairing its ability to sell annuities.

The problem with Rowe's argument is that she has not identified any uniform misrepresentations or omissions made to each potential member of the nationwide class.  First, Rowe asserts "on information and belief" that Bankers mailed the disclosure form to each potential member of the nationwide class.  (2d Am. Compl. ¶ 171(c).)  But that is not enough to affirmatively demonstrate, by a preponderance of the evidence, that every potential member of the nationwide class received this document.  See *Dukes*, 131 S. Ct. at 2551; *Messner*, 669 F.3d at 811.  That is particularly true in light of the declaration that Bankers has submitted from Karen A. Martinez, Bankers' Field Compliance Manager, which states that the disclosure form that Rowe has identified is used only in California.  (Sur-reply, Ex. B ¶ 3.)[5]  As outlined above, when ruling on a motion for class certification, the Court must "make whatever factual and legal inquiries are necessary under Rule 23."  *Szabo*, 249 F.3d at 676.  Rowe's bald assertion that each potential member of the nationwide class received the same disclosure form that she and her

---

[5] Although Bankers provides this evidence in its sur-reply, Rowe had the opportunity to contradict Martinez's declaration with evidence of her own in her response in opposition to Bankers' motion for leave to file a sur-reply.  [See 176.]  She did not do so.

husband received is not enough to convince the Court that Bankers' allegedly fraudulent conduct was systematically directed to each potential member of the class.

Likewise, Rowe cites to no evidence to support her assertion that Bankers independent sales agents use only Bankers' approved sales literature. In the face of Bankers' evidence that its agents' use of Bankers' sales brochures was entirely optional, (Resp., Ex 2 ¶ 13; Ex. 4 ¶ 12; Ex. 3 ¶ 9; Ex. 1 ¶ 9), the Court cannot conclude that Rowe has demonstrated by a preponderance of the evidence that Bakers' independent sales agents nationwide used the same allegedly fraudulent sale literature.[6]

Nor has Rowe demonstrated that any alleged oral misrepresentations or omissions are uniform to the nationwide class. "[C]lass certification of fraud claims based on oral misrepresentations is appropriate only where the misrepresentations relied upon were materially uniform, allowing such misrepresentations to be demonstrated using generalized rather than individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1249 (2d Cir. 2002).[7] To show predominance, it is not enough for a plaintiff to assert, as Rowe does here, that the defendant engaged in "a common course of conduct * * * because a common course of conduct is not sufficient to establish liability of the defendant to any particular plaintiff." *Id.* at 1255, 1253-54 (agreeing with the Third, Fourth, Fifth, Sixth, and Seventh Circuits that oral

---

[6] Rowe states that the disclosure form "is merely one example" of core documents containing omissions that Bankers presented to each potential nationwide class member. (Reply at 5 (emphasis omitted).) To support this claim, Rowe cites to her Second Amended Complaint, in which she alleges, "on information and belief," that each potential member of the nationwide class received each document that allegedly contained a misrepresentation or omission. Again, that is not enough for the Court to conclude that Bankers used any of these documents on a systemic, nationwide scale.

[7] After the Supreme Court's decision in *Bridge v. Phoenix Bond & Indemnity Co.*, one court has opined that *Moore* is "no longer good law on the question of whether a plaintiff must show that he or she was personally a recipient of a material misrepresentation." *Spencer v. Hartford Fin. Servs. Group*, 256 F.R.D. 284, 297 (D. Conn. 2009). Assuming that to be the case, to satisfy the predominance requirement in a RICO claim based on mail and wire fraud, a plaintiff "must still demonstrate that defendants made standardized misrepresentations * * *." *Id.*

15

misrepresentations must be based on evidence of materially uniform misrepresentations, not simply a common course of conduct); but see *In re First Alliance Mortg. Co.*, 471 F.3d 977, 990 n.3 (9th Cir. 2006) (distinguishing its "common course of conduct" approach from the approach adopted by other circuits, which instead highlights "the importance of uniformity among misrepresentations made to class members in order to establish that element of fraud on a class-wide basis").

Here, while Rowe again makes sweeping allegations and charges in her second amended complaint and her brief, she has not provided evidence suggesting that Bankers' agents used "uniform, scripted, and standardized sales presentations." See, *e.g.*, *In re LifeUSA Holding Inc.*, 242 F.3d 136, 146 (3d Cir. 2001) (citing *In re The Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283 (3d Cir. 1998)); *In re Countrywide Fin. Corp. Mortg. Marketing and Sales Practices Litig.*, 2011 WL 4809846, at *14 (S.D. Cal. Oct. 11, 2011) (concluding that individualized questions predominate over common ones where the defendant used 30,000 independent brokers, no script, no standard sales materials, and no standardized training program). Instead, the evidence before the Court demonstrates that each of Bankers' 4,600 independent sales agents located in over 200 nationwide sales offices had the discretion to conduct their home visits – where the actual sales transactions occurred – as they saw fit. (See Resp., Ex 3 ¶ 5; Ex. 4 ¶ 6; Ex. 1 ¶ 4; Ex. 11 at 104; Ex. 9 at 72). Further, there is evidence that Bankers' agents were willing to share with their clients the fact that they were receiving a commission on the sale, (Resp., Ex. 4 ¶ 11; Ex. 1 ¶ 12), and frequently highlighted the fact that withdrawing money from the annuity during the surrender period would result in a penalty. (Resp., Ex. 1 ¶ 10; Ex. 3 ¶ 11; Ex. 4 ¶ 10.) It is true that in the face of evidence of uniform misrepresentations or omissions, the testimony as to "the independent, voluntary actions taken by

a handful" of a defendant's agents does not destroy predominance. See *Kennedy v. Jackson Nat'l Life Ins. Co.*, No. C 07-0371 CW, 2010 WL 2524360, at *7 (N.D. Cal. June 23, 2010). But that is not the case here. Because Rowe has failed to demonstrate that potential members of the nationwide class received uniform written or oral misrepresentations or omissions, she cannot show predominance on the element of racketeering activity. See, *e.g.*, *Frahm v. Equitable Life Assurance Soc'y*, 137 F.3d 955, 957 (7th Cir. 1998) (approving the district court's decision to not certify a class where "everything depend[ed] on what was said or sent to each [plaintiff] personally, and different benefits advisers said or wrote different things to different [plaintiffs]"); *Szabo*, 249 F.3d at 677 (vacating the district court's grant of class certification where it was "unlikely that dealers in different parts of the country said the same things to hundreds of different buyers"); *In re LifeUSA Holding, Inc.*, 242 F.3d at 146 (reversing the district court's grant of class certification where, among other things, marketing materials that were sent to potential class members were not uniform and the product was not sold according to uniform, scripted sales presentations).

Finally, the Court does not see how Rowe's contention that Bankers failed to ensure that each annuity that it sold was suitable for each customer strengthens Rowe's position. Rowe is challenging Bankers' lack of policy, not a uniform policy that applied to each potential member of the nationwide class. The "'policy' of allowing discretion" by agents, however, "is just the opposite of a uniform * * * practice that would provide the commonality needed for a class action." *Dukes*, 131 S. Ct. at 2554. And although Rowe has alleged "a common mode of exercising discretion that pervades the entire company," *id.* at 2554-45, Rowe's allegations amount to, at most, a common course of conduct toward the potential class members, which is not enough to establish predominance on a RICO claim based on mail and wire fraud.

### ii.     Causation

Individualized inquiries also predominate over common questions of law and fact when it comes to the causation requirement. Section 1964(c) limits recovery to any person injured in her business or property "by reason of a violation of section 1962." Thus, to bring a claim under RICO, a plaintiff must show that the defendant's violation was both a "but for" cause of her injury, as well as the proximate cause. See *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992). Individual reliance on the defendant's alleged misrepresentations is neither an element of a RICO mail or wire fraud claim, nor a requirement for establishing proximate cause. *Bridge v. Phoenix Bond & Indemnity*, 553 U.S. 639, 661 (2008). Nevertheless, proof of reliance is often used to prove causation; indeed, "it may well be that a RICO plaintiff alleging injury by reason of a pattern of mail fraud must establish at least third-party reliance in order to prove causation." *Id.* at 658.

Rowe argues that she can prove causation using both direct and circumstantial evidence of class-wide reliance on Bankers' misrepresentations and omissions. For direct evidence or reliance, Rowe points to the disclosure form, which she contends was signed by each potential member of the nationwide class *before* the potential member decided whether to purchase one of Bankers' equity-indexed deferred annuities. Rowe argues that this document confirms that each potential member of the nationwide class was "subjected to the same misrepresentations and omissions concerning Bankers' annuities," (Reply at 10), and that courts readily find causation and reliance where potential class members have signed standardized documents that omit or misrepresent material facts.

As discussed above, however, Bankers only sent the disclosure form to its California customers. Furthermore, Bankers has submitted evidence demonstrating that the disclosure form

generally is not used during the sales process; rather, it is sent to the customer to sign *after* the customer has decided to purchase one of Bankers' annuities. (Sur-reply, Ex. B ¶ 4.) Again, where Rowe has provided only allegations and Bankers has provided evidence that contradicts those allegations, the Court cannot conclude that Rowe has affirmatively demonstrated that Bankers made uniform misrepresentations or omissions to the potential members of the nationwide class, and that class members relied on those misrepresentations or omissions. See *Kennedy*, 2010 WL 2524360, at *8 (concluding where the defendant provided evidence that its contracts vary from product to product and the plaintiff did not respond to the defendant's proffer of evidence that a theory of causation resting on the defendant's written materials would require an individualized inquiry into which documents each class member received).

As for circumstantial evidence, Rowe argues that class-wide reliance and causation can be inferred in this case based on the "clear and logical connection" between Bankers' uniform misrepresentation and omission of material facts and the injury suffered by purchasers as a result. (Reply at 11.) "[C]ausation can be established through an inference of reliance where the behavior of plaintiffs and the members of the class cannot be explained in any way other than reliance upon the defendant's conduct." *In re Countrywide*, 2011 WL 4809846, at *16; see also, *e.g.*, *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 225 (2d Cir. 2008) (abrogated on other grounds by *Bridge*, 553 U.S. at 661) (stating that "proof of reliance by circumstantial evidence may be sufficient under certain conditions"); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259 (11th Cir. 2004) (concluding that, based on the nature of the misrepresentations at issue, circumstantial evidence common to the entire class could be used to prove reliance); *Poulous v. Caesars World, Inc.*, 379 F.3d 654, 667-668 (9th Cir. 2004) (suggesting that "classwide circumstantial evidence" could, in the proper case, suffice to prove causation). Thus, in certain instances, courts have

inferred class-wide reliance – and thus, causation – where the failure to disclose material information "gives rise to a common sense inference that no rational class member would purchase" the product had they known all of the facts, "regardless of their individual circumstances." *Negrete v. Allianz Life Ins. Co. of N. Am.*, 238 F.R.D. 482, 492 (C.D. Cal. 2006); see also, *e.g.*, *Kennedy*, 2010 WL 2524360, at *8 (finding that an inference of reliance can arise where class members would not have purchased the product had they been fully informed of the facts); *Peterson v. H&R Block Tax Servs., Inc.*, 174 F.R.D. 78, 84-85 (N.D. Ill. 1997) (assuming class-wide reliance where the misrepresentations were all contained in standardized documents and the only logical explanation for the potential class members' behavior was that they relied on the misrepresentations).

Nevertheless, courts are only willing to infer reliance and causation on a class-wide basis where potential class members have been subject to standardized misrepresentations because, in such a case, "an individual plaintiff's receipt of and reliance upon the misrepresentation may then be [a] simpler matter[] to determine." *Moore*, 306 F.3d at 1255; see also, *e.g.*, *Kennedy*, 2010 WL 2524360, at *8 (inferring reliance based on the defendant's "uniform use of the term 'bonus,' its failure to disclose material information and class members' purchase of annuities that are 'high cost, illiquid and poorly-performing'"); *Negrete*, 238 F.R.D. at 492 (concluding that "evidence of standardized written presentations, coupled with plaintiff's allegations that class members purchased annuity products far less valuable than other comparable products or the prices paid for them, adequately establishes proximate causation"); *Garner v. Healy*, 184 F.R.D. 598, 602 (N.D. Ill. 1999) (certifying a class of consumers using circumstantial evidence of reliance after finding that the alleged fraud "was perpetrated in a uniform manner against members of the class"); *Peterson*, 174 F.R.D. at 85 (determining, in a case in which members of

20

the class was subject to misrepresentations presented in standard documents, that causation could be inferred because reliance on the defendant's misrepresentations was the only logical explanation for the plaintiffs' behavior). Again, Rowe has not demonstrated that the potential members of the nationwide class received standardized misrepresentations, either in written form or orally. Without evidence of uniform misrepresentations or omissions, the Court cannot infer that each potential member of the nationwide class relied on the same thing in deciding whether to purchase one of Bankers' equity-indexed deferred annuities.

Furthermore, the "common sense approach to causation" does not apply here because "there is more than one logical explanation for the plaintiff's participation in the transaction or conduct at issue." *In re Countrywide*, 2011 WL 4809846, at *17 (citing *Poulous*, 379 F.3d at 667-68); see also, *e.g.*, *Siegel v. Shell Oil Co.*, 612 F.3d 932, 936 (7th Cir. 2010) (affirming the district court's determination that it would be required to make individual determinations as to proximate cause where there were a number of reasons why the plaintiff chose a particular brand of gasoline; *Martinelli v. Petland, Inc.*, 274 F.R.D. 658, 662 (D. Ariz. 2011) (declining to infer reliance based on the defendant's representations of its puppies' health because the potential class members could have purchased a puppy from the defendant for a variety of reasons). Rowe argues that no rational person would purchase one of Bankers' annuities if she knew all of the facts because the annuities are inherently flawed products. Rowe wants the Court to infer from the facts that (1) potential members of the nationwide class purchased one of Bankers' equity-indexed deferred annuities, and (2) no rational person would purchase such a product, that the potential class members must have been misled. In making this argument, Rowe relies, in part, on the report of her expert, Thomas Bakos.

21

The Court, however, has excluded Bakos' absolutist view of Bankers' annuities and their suitability for those over sixty-five. As the Court pointed out in its September 30, 2011 order, seniors buy equity-indexed deferred annuities for a multitude of reasons, including saving for retirement, saving for some other purpose, or keeping money safe during the purchaser's lifetime so that it can be passed on to his or her heirs. [186 at 4 (citing Panis Decl. ¶¶ 15-35).] Additionally, people age sixty-five and over have varying degrees of need for liquidity and, while some seniors may need to keep all of their assets liquid, that is not the case for all seniors. Thus, because the Court is not convinced that there is no logical reason for a person over the age of sixty-five to purchase one of Bankers' annuities other than the fact that she was misled, it is not appropriate to infer class-wide reliance or causation in this case. Accordingly, Rowe has failed to demonstrate that common issues predominate on the question of causation, or that reliance can be inferred through common evidence.

In sum, the Court concludes that individualized questions of law and fact relating to whether Bankers engaged in mail and wire fraud and whether that alleged mail and wire fraud was the cause of each class member's injuries predominate over any common questions.[8] Accordingly, the Court denies Rowe's motion to certify the nationwide class.

### B.      California Subclass

Rowe also seeks certification of a subclass of California customers. Rowe contends that her claims under California statutory and common law "are predicated on the same wrongful course of conduct by Bankers in marketing and selling its [a]nnuities to seniors that forms the basis of [her] RICO claims * * *."  (Reply at 12.)  Rowe has demonstrated that each potential

---

[8] Because the Court has concluded that common issues of law and fact do not predominate over individual questions, it need not reach the question of whether a class action would be superior to other available methods of adjudication.

member of the California subclass received the disclosure form, which Rowe contends contains material omissions. And the Court agrees that it may be appropriate, in certain cases involving uniform misrepresentations, to certify a class to determine the question "of whether they were indeed misrepresentations * * * with the question of reliance, and damages suffered, by individual class members left for satellite proceedings." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 662 (7th Cir. 2004).

Neither party, however, has given the issues related to the California subclass more than a page or two of discussion, and without the element-by-element analysis of whether each claim meets the predominance requirement, the Court cannot determine whether the subclass satisfies Rule 23. In light of that fact, and the fact that the Court has denied Rowe's motion to certify the nationwide class, the Court denies without prejudice Rowe's motion to certify a California subclass as to Rowe's California state law claims. Rowe is given until 4/27/2012 to file, if she so desires, a renewed motion to certify the California subclass, focusing on whether the proposed class meets the requirements of Rule 23(a) and Rule 23(b)(3) and how the Court's denial of the nationwide affects the subclass, if at all.[9] If Rowe does file such a motion, Bankers is given until 5/25/2012 to respond. If the Court desires a reply, it will advise the parties.

## V. Conclusion

For the foregoing reasons, the Court denies Rowe's motion for class certification and for appointment of class counsel [94]. Rowe's motion is denied in part as to her motion to certify the nationwide class, and denied in part without prejudice as to her motion to certify the California subclass. Rowe has until 4/27/2012 to file, if she so desires, a renewed motion to

---

[9] For the reasons outlined above, certification of the California subclass is not appropriate under Rule 23(b)(2).

certify the California subclass.  If Rowe does file such a motion, Bankers is given until 5/25/2012 to respond.


Dated: March 29, 2012

_____

Robert M. Dow, Jr.
United States District Judge