# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ESTELLA ROWE, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 09-cv-491 |
| v. | ) ) | Judge Robert M. Dow, Jr. |
| BANKERS LIFE AND CASUALTY COMPANY and BANKERS LIFE INSURANCE COMPANY OF ILLINOIS, | ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Estella Rowe sued Bankers Life and Casualty Company and its former affiliate, Bankers Life Insurance Company of Illinois ("Defendant"),[1] on behalf of herself and all others similarly situated. Plaintiff previously moved for certification of a nationwide class of individuals affected by Defendant's alleged RICO violations, as well as certification of a "subclass of California residents with respect to Plaintiffs' claims for violations of California's Elder Abuse Code, Unfair Trade Practices Act, False and Misleading Advertising Act, unjust enrichment, breach of fiduciary duty and aiding and abetting breach of fiduciary duty." [94] at 13. The Court denied certification of both proposed classes, [188] & [189], but did so without prejudice to Plaintiff filing a new motion to certify a California subclass. See [189] at 22-23. Plaintiff's renewed motion to certify a California subclass [202] is currently before the Court. Also before the Court is Defendant's motion for partial summary judgment as to Plaintiff's

---

[1] In their answer, the named Defendants state that Bankers Life Insurance Company of Illinois was an affiliate of Bankers Life and Casualty Company until 2007, when Bankers Life and Casualty Company assumed the obligations, debts, and liabilities of Bankers Life Insurance Company of Illinois. [134] ¶¶ 11-12.

claims sounding under California statutory law [219]. For the reasons stated below, the Court grants Defendant's motion for partial summary judgment [219] and denies Plaintiff's renewed motion for class certification [202].

## I.    Background

### A.    Relevant Facts

Plaintiff Estella Rowe is an individual who lives in West Hills, California. [134] ¶ 9. At all relevant times, Plaintiff was over the age of 65. *Id.* Defendant Bankers Life is an Illinois corporation that sells life insurance, long-term-care insurance, and annuities to individuals in California, Illinois, and other states. *Id.* ¶ 10. Two agents from Bankers met with Plaintiff and her late husband, Samuel Rowe (formerly a plaintiff in this case) in the Rowes' home on or about June 20, 2007, and June 25, 2007. *Id.* ¶¶ 114-15. Shortly after those meetings, Plaintiff and her late husband liquidated an annuity that they had previously purchased from a different company and used the funds to purchase an annuity from Bankers. The Rowes deposited a premium of $101,985.92 in the Bankers Life annuity. The schedule for their policy lists July 16, 2007 as the date of issue. [221-3] at BLR000321; see also *id.* at BLR000310. The policy contained a provision stating, "This policy begins on the Date of Issue shown in the Schedule." *Id.* at BLR000310.

In connection with their purchase of the annuity – the parties dispute whether it was before (Plaintiff) or after (Defendant) the annuity was "purchased" – the Rowes were provided with a "Disclosure Form for a Single Premium Deferred Annuity Policy." (Notwithstanding their dispute about when the Rowes received the form, the parties agree that "[t]he Disclosure Form is presented to new annuity holders by Bankers contemporaneous with the new policy." [237] ¶ 9.) The Disclosure Form stated:

2

(1) READ YOUR POLICY CAREFULLY – This Disclosure Form provides a very brief description of the important features of your policy. This is not the contract. The policy itself sets forth in detail the rights and obligations of both you and us. It is, therefore, important that you READ YOUR POLICY CAREFULLY!

(2) SINGLE PREMIUM DEFERRED ANNUITY – This policy provides a monthly income. The Monthly Income begins on the Date Income Begins. A Death Value is payable if the Annuitant dies before the Date Income Begins. This Single Premium is due on the Date of Issue. This policy does not pay dividends.

(3) LOADING CHARGE – A loading charge is a sales or an administrative charge which is deducted from your policy's Cash Value. We <u>do not</u> charge for any loading. We will, however, deduct any Premium Tax required by state law.

(4) WITHDRAWAL OR SURRENDER CHARGES – A Withdrawal or a Surrender Charge is an additional amount which may be charged against your policy's Cash Value when a Withdrawal is made during the early Policy Years. The Withdrawal Charge is a percentage of the amount withdrawn. The withdrawal percentage is shown in the Schedule.

(5) TAX STATUS – The tax status of this policy, as it applies to you, should be reviewed each year. Keep one copy of this Disclosure Form with your policy. Please sign and return one copy to us.

Plaintiff Rowe's late husband signed the Disclosure Form. The handwritten date on the line near his signature is "8/16/07." [229-1]. Defendants admit that "Mr. Rowe signed the Disclosure Form on August 16, 2007 on behalf of himself and his wife and co-owner, Estella Rowe." [237] ¶ 3. At her deposition, Plaintiff testified that she did not remember or recognize the Disclosure Form. [221-7] at 67:25-68:10. In her response to Defendant's Rule 56.1 statement, "Plaintiff admits that the Disclosure Form was signed, but denies that she ever saw the Form." [228] ¶ 16.

The Rowes' annuity was a type of deferred annuity known as an "equity-indexed annuity." In general, deferred annuities are annuities in which a policy holder pays a premium, and the premium grows on a tax-deferred basis until the policy holder withdraws the money. [228] ¶ 5. Equity-indexed annuities are a specific type of deferred annuity in which the growth of the premium is driven, at least in part, by the performance of a stock market index such as the

S&P 500. In the case of the Rowes' annuity, the relationship between the performance of the S&P 500 and the growth of their annuity was not one-to-one. If the S&P 500 increased in value over the course of a year, the account value of the annuity would also rise, but only by a percentage of the increase in the S&P 500. If the S&P 500 declined, however, the decline would not negatively affect the account value of the annuity. [228] ¶ 6.

The front page of the Rowes' annuity provided, in bold capital letters:

**IMPORTANT**

**YOU HAVE PURCHASED A LIFE INSURANCE POLICY OR ANNUITY CONTRACT. CAREFULLY REVIEW IT FOR LIMITATIONS.**

**THIS POLICY MAY BE RETURNED WITHIN 30 DAYS FROM THE DATE YOU RECEIVED IT FOR A FULL REFUND BY RETURNING IT TO THE INSURANCE COMPANY OR AGENT WHO SOLD YOU THIS POLICY. AFTER 30 DAYS, CANCELLATION MAY RESULT IN A SUBSTANTIAL PENALTY, KNOWN AS A SURRENDER CHARGE.**

[221-3] at BLR000308. The parties agree that this statement – and the so-called "free-look" period it describes – was required by California law. [237] ¶ 5. The next page, headed "COVER PAGE," stated that "Any policy provision giving a right to return the policy for a premium refund is deleted and replaced with the following." It then repeated, in normal typeface, the entire statement from the front page reproduced above. The cover page then continued,

This policy may contain a surrender charge or withdrawal percentage. If applicable, the amounts are shown below.

| POLICY YEAR | WITHDRAWAL PERCENTAGE |
|---|---|
| 1 | 10.00% |
| 2 | 10.00% |
| 3 | 10.00% |
| 4 | 9.00% |
| 5 | 8.00% |
| 6 | 7.00% |
| 7 | 6.00% |
| 8 | 5.00% |

| | |
|---|---|
| 9 | 3.00% |
| 10 | 1.00% |
| 11 AND LATER | 0.00% |

*Id.* at BLR000309. The policy schedule contained the same table. See *id.* at BLR000321.

The schedule also contained a "TABLE OF MINIMUM GUARANTEED CASH SURRENDER VALUES" that set forth, for policy years 1-18, values of the "NET SINGLE PREMIUM (AT BEGINNING OF YEAR)" and the "MINIMUM GUARANTEED CASH SURRENDER VALUE  (AT END OF YEAR)."  *Id.* at BLR000322. Below that table was the following statement: "THE MINIMUM GUARANTEED CASH SURRENDER VALUES SHOWN ABOVE ARE DETERMINED BY ACCUMULATING 87.5% OF THE SINGLE PREMIUM (LESS ANY PREMIUM TAX) AT AN INTEREST RATE OF 2.40%. THESE VALUES WILL BE REDUCED BY ANY PARTIAL WITHDRAWALS." *Id.* Page 3 of the policy provided definitions for the terms "Account Value," "Cash Surrender Value," and "Minimum Guaranteed Cash Surrender Value." *Id.* at BLR000324. The parties agree that "account value" is "the amount that the annuity is worth at any given time assuming that the policyholder does [not] withdraw early enough (or in amounts great enough) to incur surrender charges. The account value is equal to the greater of the minimum guaranteed cash surrender value or the index value. The index value is the initial premium plus any gains that accrue with rises in the S&P 500." [228] ¶ 11 (citations omitted). They also agree that the "cash surrender value is the amount a policyholder would receive if they withdrew all of their money at any given time. It is equal to the greater of the minimum guaranteed cash surrender value or the index value minus any surrender charges." *Id.* ¶ 12. They agree that the "minimum guaranteed cash surrender value is the minimum amount that Bankers Life will pay policyholders who surrender their policies, regardless of any surrender charges or fluctuations in the S&P 500." *Id.*

¶ 10. There likewise is no dispute that the minimum guaranteed cash surrender value is "designed to comply with state non-forfeiture laws," is "listed in the annuity contract," and that in the case of Plaintiff's policy it was "87.5 percent of the initial premium plus an annual interest rate of 2.4 percent." *Id.*

Page 5 of the policy contained text regarding withdrawals. It stated:

> Withdrawals are monies paid to the Owner from the policy's Account Value. This includes monies withdrawn from the policy or riders. The Owner may take Partial Withdrawals or surrender the policy.
>
> At any time before the Maturity Date, the Owner may withdraw the entire Cash Surrender Value of this policy. If the policy is surrendered prior to the next policy anniversary date, no Index Credits will be applied since the last policy anniversary date and the date of the surrender. At the time of full surrender, You may choose a lump sum payout or one of the settlement options offered in this policy. Partial Withdrawals are permitted only if the remaining Account Value is equal to or greater than the amount shown in the Schedule.
>
> Only upon receiving written approval from Your state's Department of Insurance, will We have the right to postpone payment of a Withdrawal for up to six months. This six month period will start on the date We receive the request for the Withdrawal.
>
> WITHDRAWAL CHARGE
> A Withdrawal Charge is an amount which may be charged when any portion of the Index Value is withdrawn from this policy. It is equal to the amount withdrawn multiplied by the Withdrawal Charge Percentage. The Withdrawal Charge Percentage is shown in the Schedule. Index Credits may not be fully realized due to Withdrawal Charges.
>
> PARTIAL WITHDRAWALS
> Each Policy Year, beginning with the second Policy Year, the Owner may take one Partial Withdrawal of up to 10% of the Single Premium without a Withdrawal Charge. If the Owner withdraws more than 10% of the Single Premium, the Withdrawal Charge will apply to the amount in excess of 10%. IF the Owner takes more than one Partial Withdrawal in a Policy Year, the Withdrawal Charge will apply to the amount of the second and later Withdrawals.

[221-3] at BLR000326.

The parties agree that prior to 2005, the schedule used in Bankers Life annuities

referenced a ten percent "expense charge." See [228] ¶ 19; [237] ¶¶ 12-13. Below a table of withdrawal charge percentages similar to that reproduced above, the pre-2005 schedule contained the following provision, offset by horizontal lines as shown:

---

-- MINIMUM GUARANTEED CASH VALUE –
MINIMUM GUARANTEED INTEREST RATE:          3.00%

EXPENSE CHARGE:                              10.00% OF SINGLE PREMIUM

---

See [232-6]. One of Bankers' managers of product marketing, Pam Devlin, stated in a declaration that the "expense charge" "applies to the calculation of the annuity's minimum guaranteed cash value. That is, when calculating the minimum guaranteed cash value, 10 percent of the initial single premium is deducted as part of the calculation." [221-10] ¶ 2; see also [228] ¶ 19. Devlin further stated that "the expense charge is simply a deduction that is made, pursuant to the express terms of the contract, when computing the minimum guaranteed cash value." [221-10] ¶ 3.[2] Bankers Life stopped including the "expense charge" line on its annuity schedules in 2005. An internal Bankers Life memorandum stated: "Our current [equity-indexed annuity] shows an 'Expense Charge' on the schedule page that is not necessary and confuses potential clients, making the sale more difficult for the agent. This will not be shown on the schedule page of the new [equity-indexed annuity] product." [232-8]. The schedule for the Rowes' policy, which was issued in 2007, did not contain this or any other language relating to an "expense charge." Plaintiff has submitted a single-page schedule for annuitant "John Doe," of an unidentified state, that was issued in 2009 that does contain the "expense charge" language. See [229-6].

---

[2] Plaintiff challenges a similar declaration by Rule 30(b)(6) witness Jill Klibanov, which Plaintiff characterizes as an "expert opinion." [228] ¶ 19. Plaintiff does not challenge the Devlin declaration.

### B. Relevant Procedural History

Plaintiff filed a seven-count amended complaint against Defendant on behalf of herself and all others similarly situated. [127]. Count I alleges violations of federal RICO statutes, 18 U.S.C. §§ 1962(c) & (d); Counts II, III, and IV assert common law claims of breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and unjust enrichment, respectively; Count V alleges financial abuse of an elder, in violation of California Welfare and Institutions Code, § 15600 *et seq.*; Count VI alleges unfair, unlawful, or fraudulent business practices in violation of the California Business and Professions Code, § 17200 *et seq.*; and Count VII alleges false and misleading advertisements, in violation of the California Business and Professions Code, § 17500, *et seq.* Plaintiff previously sought certification of a nationwide class relating to the RICO claims that she asserted in Count I, as well as a subclass of California residents relating to her California statutory and common law claims. See [94]. The Court denied Plaintiff's motion as to both proposed classes but granted her leave to file a "renewed motion to certify the California subclass, focusing on whether the proposed class meets the requirements of Rule 23(a) and Rule 23(b)(3) and how the Court's denial of the nationwide affects the subclass, if at all." [189].

Plaintiff filed a renewed motion to certify a California subclass and appoint class counsel pursuant to Federal Rule of Civil Procedure 23. [202]. Plaintiff proposes the following class definition:

> All California residents that (1) while 65 years of age or older, purchased one or more Bankers Life and Casualty Company equity-indexed deferred annuities, form numbers LA-07A, LA-07C or LA-07G, after February, 2005; (2) signed the Disclosure Form within 30 days of receipt of said annuities, and (3) did not cancel their annuities within thirty days after purchase.

[202] at 6. Plaintiff argues that the four requirements set forth in Rule 23(a) are satisfied. *Id.* at 7-9. She also argues that the requirements of Rule 23(b)(3) are satisfied. Plaintiff asserts that her

"California statutory and common law claims should be certified they are predicated on uniform conduct, misrepresentations, and omissions by Bankers." *Id.* at 18. She makes substantive argument only as to the statutory claims, however. See *id.* at 10-18.

Defendant opposes the motion. [218]. Defendant argues that Plaintiff "has failed to meet her burden with respect to three elements [of Rule 23]: typicality and adequacy under Rule 23(a), and the 'predominance' requirement of Rule 23(b)(3)." [218] at 8. Defendant also argues that Plaintiff "fails to satisfy the preliminary requirement of standing," *id.*, and "is not a member of the putative class." *Id.* at 19.

Shortly after Defendant filed its brief opposing class certification, it filed a motion for partial summary judgment [219]. Defendant asserts that it is entitled to summary judgment with respect to Plaintiff's "loading charge" theory, both because the statement about "loading charge" contained in the Disclosure Form is true and because Plaintiff lacks evidence that the alleged misrepresentation about "loading" caused the Rowes to keep their annuity rather than returning it during the thirty-day "free-look" period. See [220] at 1. Defendant also contends that if partial summary judgment is proper on either of these grounds, Plaintiff's "renewed motion for class certification would have to be denied, as her only theory of commonality would no longer be viable." *Id.* Plaintiff disputes that the "failure to disclose loading charges" is the only theory advanced in her motion to certify. [227] at 1. Plaintiff further contends that partial summary judgment should be denied because "Bankers errs in applying its skewed version of California law to the facts of this case," and "fails to establish there are *no* disputed facts as to whether the annuities contain loads." *Id.*

## II. Discussion

### A. Defendant's Motion for Partial Summary Judgment

#### 1. Legal Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 250 (1986) (quotation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); see also Fed. R. Civ. P. 56(c)(1)(B). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [opposing] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson*, 477 U.S. at 252; see also *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010) ("We often call summary judgment the 'put up or shut up' moment in litigation, by which we mean that the non-moving party is required to marshal and present the court with the evidence she contends will prove her case. And by evidence, we mean evidence on which a reasonable jury could rely." (citations omitted)).

### 2. Analysis

Plaintiff has pleaded claims sounding under three California statutes: the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, the False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 *et seq.*, and the Elder Abuse Act ("EAA"), Cal. Welf. & Inst. Code § 15600 *et seq.* The Court first addresses the requirements of each of these statutes, then turns to the arguments and evidence presented by the parties.

### a. Statutory Requirements

### i. Unfair Competition Law

The UCL prohibits, and provides civil remedies for, "unfair competition," which includes "any unlawful, unfair or fraudulent business act or practice" Cal. Bus. & Prof. Code § 17200. The purpose of the UCL "is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services." *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 883 (Cal. 2011) (quoting *Kasky v. Nike, Inc.*, 45 P.3d 243 (Cal. 2002)). "In service of that purpose, the [California] Legislature framed the UCL's substantive provisions in 'broad, sweeping language.'" *Id.* (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527 (Cal. 1999)).

The disjunctive language of the statute prohibits three separate types of conduct: (1) unlawful acts or practices; (2) unfair acts or practices; and (3) fraudulent acts or practices. See *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 540 (Cal. 1999). Each of these types of conduct is broadly defined. "The 'unlawful' practices prohibited by section 17200 are any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made." *Saunders v. Superior Court*, 33 Cal. Rptr. 2d 438, 441 (Cal. Ct. App. 1994); see also *Olszewski v. Scripps Health*, 69 P.3d 927, 947 (Cal. 2003) ("A business practice

11

is unlawful if it is forbidden by any law." (quotation omitted)). A "fraudulent" business practice or act is one that is likely to deceive members of the public; it need not actually deceive anyone to be considered "fraudulent." *Jolley v. Chase Home Fin.*, *LLC*, --- Cal. Rptr. 3d ---, 2013 WL 494022, at *21 (Cal. Ct. App. Feb. 11, 2013). "[T]he proper definition of 'unfair' conduct against consumers is currently in flux among California courts." *Davis v. HBSC Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012) (quotation omitted)); see also *In re Ins. Installment Fee Cases*, 150 Cal. Rptr. 3d 618, 635 (Cal. Ct. App. 2012) (describing approaches taken by different courts). "Some cases hold an 'unfair' practice is one that offends established public policy, that is immoral, unethical, unscrupulous, or substantially injurious to consumers, or that has an impact on the victim that outweighs defendant's reasons, justifications, and motives for the practices." *Jolley*, 2013 WL 494022, at *21; see also *In re Ins.*, 150 Cal. Rptr. at 635. Others "hold that the public policy which is a predicate to a claim under the 'unfair' prong of the UCL must be tethered to specific constitutional, statutory, or regulatory provisions." *Jolley*, 2013 WL 494022, at *21; see also *In re Ins.*, 150 Cal. Rptr. at 635. Still others, borrowing from the Federal Trade Commission Act, deem a business practice "unfair" only if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." See 15 U.S.C. § 45(n); *Davis*, 691 F.3d at 1168-70; *In re Ins.*, 150 Cal. Rptr. 3d at 635.

While the substantive reach of the UCL is expansive, it has a restrictive "standing" requirement. See *Kwikset*, 246 P.3d at 884. To satisfy this requirement, a plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as an injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim." *Id.* at 885

(emphases in original).

### ii.     False Advertising Law

The FAL provides that it is "unlawful for any person * * *  with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation thereto, to make or disseminate or cause to be made or disseminated before the public * * * any statement, concerning that real or personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500. The FAL "has been interpreted broadly to encompass not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood, or tendency to deceive or confuse the public." *Davis*, 691 F.3d at 1162 (quotation omitted). "Consequently, even a perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable" under the FAL. *Id.* (quotation omitted). "'Likely to deceive' implies more than a mere possibility that the advertisement might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner. Rather, the phrase indicates that the ad is such that it is probable that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Lavie v. Procter & Gamble Co.*, 129 Cal. Rptr. 486, 495 (Cal. Ct. App. 2003). Despite its sweeping reach, the FAL is subject to the same "standing" requirement as the UCL. See *Kwikset*, 246 P.2d at 884-85. That is, a plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify

as an injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim." *Id.* at 885 (emphases in original).

### iii.   Elder Abuse Act

The EAA, Cal. Welf. & Inst. Code § 15600 *et seq.*, was enacted to "afford extra protection to a vulnerable portion of the population from mistreatment by abuse or neglect." *In re Conservatorship of Kayle*, 35 Cal. Rptr. 3d 671, 674 (Cal. Ct. App. 2005). For purposes of the statute, an "elder" is "any person residing in [California], 65 years of age or older." Cal. Welf. & Inst. Code § 15610.27. Section 15610.07 of the EAA defines "abuse of an elder or a dependent adult" as either "[p]hysical abuse, neglect, financial abuse, abandonment, isolation, abduction, or other treatment with resulting harm or pain or mental suffering," or "[t]he deprivation by a care custodian of goods or services that are necessary to avoid physical harm or mental suffering." Section 15610.30(a)(1) of the EAA provides that "financial abuse" of an elder occurs when a person or entity "[t]akes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with an intent to defraud, or both." A person or entity is deemed to have taken, secreted, appropriated, obtained, or retained property for a wrongful use if the person or entity "knew or should have known that this conduct is likely to be harmful to the elder." *Id.* § 15610.30(b).

### b.   Plaintiff's "Loading Charges" Theory

Defendant concedes that Plaintiff has alleged "many factual theories" in regard to how she believes these statutes have been violated. See [236] at 1. Its motion for partial summary judgment challenges only Plaintiff's ability to prove what she has identified as "the operative fact underlying Plaintiff's claims," [227] at 1 – namely, Defendant's alleged failure to accurately

14

represent and disclose "loading charges" in the Disclosure Form. Plaintiff alleges that the Disclosure Form, in which Defendant stated "We <u>do not</u> charge for any loading," was false and misleading because "Bankers' annuities do contain significant load charges." [199] at 4; see also [227] at 4 ("Plaintiff contends that Bankers charges a substantial load on its annuity sales, that Bankers does not disclose that expense and that the undisclosed expenses affect Plaintiff's (and every other annuity purchaser's) account value, and that Bankers failed to act in good faith."). Even if the statement about loading charges is true, Plaintiff contends, "the documents and statements that Bankers supplied to Plaintiff are so opaque and convoluted, they are clearly likely to mislead and deceive a reasonable consumer." [227] at 13. Thus, Plaintiff contends that Defendant, via the "loading charges" statement in the Disclosure Form, violated the UCL, the FAL, and the EAA.

Defendant first argues that Plaintiff's statutory claims that rest on the "loading charges" language in the Disclosure Form must be dismissed because Plaintiff cannot demonstrate that the contents of the Disclosure Form caused her alleged injuries. The Court agrees as to the UCL and FAL claims.

The California Supreme Court has held that plaintiffs must link their economic injury to the alleged unfair competition or false advertising. Both statutes – at Cal. Bus. & Prof. Code §§ 17204 & 17535 – contain the phrase "as a result of," which the California Supreme Court has explained means "caused by" and "requires a showing of a causal connection or reliance on the alleged misrepresentation." *Kwikset*, 246 P.3d at 887 (quotation omitted). Thus, "a plaintiff 'proceeding on a claim of misrepresentation as the basis of his or her UCL action must demonstrate actual reliance on the allegedly deceptive or misleading statements, in accordance with well-settled principles regarding the element of reliance of in ordinary fraud actions.'" *Id.* at

888 (quoting *In re Tobacco II Cases*, 207 P.3d 20, 26 (Cal. 2009)); see *id.* at 884-85 (FAL statute has identical requirements). To prevail under the UCL or FAL on a misrepresentation theory, then, "a plaintiff must show that the misrepresentation was an immediate cause of the injury producing conduct," *id.* at 888 (quoting *In re Tobacco II Cases*, 207 P.3d at 39)), or that "he or she was motivated to act or refrain from acting based on the truth or falsity of a defendant's statement, not merely on the fact that it was made." *Id.* at 888 n.10. A plaintiff seeking to represent a class must make the same showing. As the Ninth Circuit has recently explained,

> To establish standing to seek class-wide relief for fraud-based Unfair Competition Law claims, the named plaintiffs must prove "actual reliance" on the misleading statements. Specifically, "a class representative proceeding on a claim of misrepresentation as the basis of his or her UCL action must demonstrate actual reliance on the allegedly deceptive or misleading statements, in accordance with well-settled principles regarding the element of reliance in ordinary fraud actions."

*Gutierrez v. Wells Fargo Bank, N.A.*, 704 F.3d 712, 728 (9th Cir. 2012) (quoting *In re Tobacco II Cases*, 207 P.3d 20, 25-26 (2009)).

Plaintiff's "loading charges" theory is predicated on a statement contained in the Disclosure Form that she and her husband received in connection with their purchase of the Bankers annuity: "We do not charge for any loading." Yet "Plaintiff admits that the Disclosure Form was signed, but denies that she ever saw the Form." [228] ¶ 16. More importantly, given Defendant's admission that Mr. Rowe signed the Disclosure Form "on behalf of himself and his wife and co-owner, Estella Rowe,"[237] ¶ 3, Plaintiff has failed to introduce any evidence showing that either she *or* her late husband relied on Defendant's statements about "loading charges" in deciding to purchase the annuity or failing to exercise their "free-look" right to return the annuity. Plaintiff points to "lengthy sworn interrogatory answers that detail the extent to which [she and her late husband] were essentially tricked into purchasing the Bankers' annuity

due to Banker's [sic] failure to disclose key facts about the annuity, including hidden expenses and charges that are built into the annuity and negatively impact the annuity's performance." [227] at 12. These interrogatory answers do not establish, however, that Plaintiff relied on any of the alleged misrepresentations in making her decision to go forward with the annuity purchase. Similarly, Mr. Rowe's deposition testimony that in Plaintiff's view "indicated that [the Rowes] were concerned about factors and facets of the annuity that would affect them and their annuity," [227] at 12, says nothing about loading charges or the Disclosure Form or what information actually influenced Mr. or Mrs. Rowe's decision to buy the annuity or not take advantage of the "free-look" period. Regardless of the truth or falsity of the "loading charges" statement, Plaintiff cannot proceed to trial on her "loading charges" theory as it relates to the UCL or FAL.

Causality and reliance are not elements of Plaintiff's EAA claim in the same way that they are elements of her UCL and FAL claims. Nor does Plaintiff's EAA claim fail because she cannot demonstrate physical harm or mental suffering, as Defendants contend. See *Negrete v. Allianz Life Ins. Co. of N. Am.*, --- F. Supp. 2d ---, 2013 WL 793239, at *16-17 (C.D. Cal. Mar. 4, 2013); *Bonfigli v. Strachan*, 122 Cal. Rptr. 3d 447, 459 (Cal. Ct. App. 2011) ("The statute does not require a finding of mental suffering. Rather, the statute requires a finding that the defendant took the property for 'a wrongful use or with intent to defraud or both.' Welf. & Inst. Code, § 15610.30, subd. (a)(1)."). Nevertheless, Plaintiff's "loading charges" theory fails for a more fundamental reason: she has not submitted evidence from which a reasonable jury could conclude that Defendant took, secreted, appropriated, obtained, or retained her real or personal property for a wrongful use or with an intent to defraud via its inclusion of the "loading charges" representation in the Disclosure Form. Cal. Welf. & Inst. Code § 15610.30(a)(1). That is because she has not demonstrated that Defendant's representation about the charges that they imposed –

17

however they were styled – was false, misleading, deceptive, or otherwise fraudulent, or that

Defendant intended it to be.

Plaintiff's relies on testimony from her expert, Tom Bakos, for her operative definition of

"load":

> With respect to the recovery of policy acquisition expenses, deferred annuity policies may take one of two forms:
>
> - Front Load – a front loaded deferred annuity design applies a percentage reduction (which the insurance company retains) to the single premium received in payment for the annuity before it is added to the policy owners [sic] account value. The amount of the front load is designed to recover all or most of the policy acquisition expenses. The maximum amount of the front load is subject to state nonforfeiture law and regulation
> - Back Load – a back loaded deferred annuity design uses a pricing spread to recover policy acquisition expenses while the policy remains in force and recovers any unamortized policy acquisition expense remaining when a partial or full withdrawal is made through a surrender charge. The amount of the surrender charge is also subject to state nonforfeiture law and regulation.
>
> The Bankers' [equity-indexed annuity] policies use the Back Loaded design.

[232-4] ¶ 41. Bakos also opined that "Bankers does charge for loading using a Back Load

deferred annuity policy design wherein its pricing spread and its surrender charges allow it to

recover its undisclosed policy acquisition expenses," and that "[i]n effect, Bankers is hiding its

significant policy acquisition expenses in its policy spread and not disclosing this to its [equity-

indexed annuity] policy owners." *Id.* ¶ 42. Plaintiff also has submitted pre-2005 policy schedules

for Maine residents showing a ten percent "expense charge," [232-7], and an internal

memorandum from Bankers stating that "Our current [equity-indexed annuity] shows an

'Expense Charge' on the schedule page that is not necessary and confuses potential clients,

making the sale more difficult for the agent. This will not be shown on the schedule page of the

new [equity-indexed annuity] product." [232-8]. Plaintiff contends that the "expense charge"

depicted on these pre-2005 schedules was a "loading charge," and that, as shown by the internal memorandum, Defendant continued to assess the charge but "simply stopped informing consumers about the loads * * * in bad faith and for no other purpose than to obtain customers' money through the purchase of an annuity." [227] at 7. In support of her contention that Defendant continued to assess the "expense charge," Plaintiff has submitted a single-page policy schedule for an annuity issued to a "John Doe" in 2009.[3] See [232-6]. To demonstrate that Defendants acted in bad faith, she points to the Bankers' Code of Ethics, which notes that elders "may no longer have the same understanding of financial matters that they did at a younger age." [229-20] at 2.

Plaintiff's definition of "load" is significantly broader than that contained in the Disclosure Form. In particular, it encompasses the "surrender charges" that Plaintiff admits (1) were disclosed to her and (2) comprised the entirety of the $10,199 that she was assessed when her annuity was terminated. See [228] ¶ 15. Yet the Disclosure Form distinguishes between a "loading charge" – "a sales or an administrative charge which is deducted from your policy's Cash Value" – and a "withdrawal or surrender charge" – "an additional amount which may be charged against your policy's Cash Value when a Withdrawal is made during the early Policy Years [that is] a percentage of the amount withdrawn." Plaintiff has not demonstrated that, under these definitions, Defendant's representation about "loading charges" was or could be false or misleading to California residents. Plaintiff has pointed to nothing in her policy showing that she was or could be assessed any sales or administrative charges apart from the surrender charge that she admits was disclosed. Instead, she seeks to apply an expansive definition of the term "loading charges" to encompass the charges assessed to the Rowes when they terminated their

---

[3] The "John Doe" policy is not probative, however, as it does not indicate that the unnamed annuitant was a resident of California protected by the UCL, FAL, or EAA.

annuity within months of opening it, as well as other differentials between the revenues generated by the annuities and the amounts Defendants credited to clients. (For instance, the value of Defendants' equity-indexed annuities increased when the S&P 500 went up, but did so only by a percentage of the increase in the S&P 500. In the case of the Rowes' annuity, the percentage was 30%.)

Although the term "loading charge" may have an independent meaning to someone well versed in the world of finance, such as Plaintiff's expert, Mr. Bakos, there is nothing in the record showing that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, would be misled by the non-technical definition provided in the Disclosure Form. "In order to be deceived, members of the public must have had an expectation or an assumption about the matter in question." *Brakke v. Economic Concepts, Inc.*, 153 Cal. Rptr. 3d 1, 9 (Cal. Ct. App. 2013) (quotation omitted). Plaintiff has not provided any basis for concluding (or even inferring) that the California public generally or the elder consumers targeted by the annuities specifically had an expectation that the definition of "loading charges" went beyond the explicit definition contained in the Disclosure Form to encompass the "withdrawal or surrender charges" defined separately in the same document. Plaintiff also ignores her own admissions that the surrender charge that she was assessed was disclosed in the policy, and that the amount she received from Bankers was mathematically consistent with the ten percent surrender charge set forth in the policy – and the definition of "surrender charge" set forth in the Disclosure Form. In short, Plaintiff has not produced evidence from which a reasonable jury could conclude that Defendants made the statement about "loading charges" (or failed to make a statement about "expense charges") with the intent to defraud Plaintiff or any other elder Californian who purchased the annuity.

20

The Court grants Defendants' motion for partial summary judgment as it pertains to Plaintiff's "loading charges" theory. Plaintiff's statutory claims survive to the extent that they are predicated on other legal theories.

### B.     Plaintiff's Motion for Class Certification

Plaintiff has moved for certification of a California subclass pursuant to Federal Rule of Civil Procedure 23(b)(3). [202]. The proposed class is defined as:

> All California residents that (1) while 65 years of age or older, purchased one or more Bankers Life and Casualty Company equity-indexed deferred annuities, form numbers LA-07A, LA-07C or LA-07G, after February, 2005; (2) signed the Disclosure Form within 30 days of receipt of said annuities, and (3) did not cancel their annuities within thirty days after purchase.

To be certified as a class action, a proposed class must satisfy the requirements of Federal Rule of Civil Procedure 23(a), as well as one of the three alternatives in Rule 23(b). *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). "As a threshold matter, a proposed class must always meet the Rule 23(a) requirements of numerosity, typicality, commonality, and adequacy of representation." *Id.* "When certification is sought under Rule 23(b)(3), as it is here, proponents of the class must also show: (1) that the questions of law or fact common to the members of the proposed class predominate over questions affecting only individual class members; and (2) that a class action is superior to other available methods of solving the controversy." *Id.* Plaintiff bears the burden of showing that a proposed class satisfies the Rule 23 requirements. *Id.*; *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). "A party seeking class certification must affirmatively demonstrate his compliance with th[e] Rule – that is, he must be prepared to prove that there are *in fact* numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, --- U.S. ---, 131 S. Ct. 2541, 2551 (2011). If the party seeking certification is unable to meet any of the four requirements of Rule 23(a), class

certification is not appropriate. *Kress v. CCA of Tenn., LLC*, 694 F.3d 890, 893 (7th Cir. 2012); *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 716 (7th Cir. 2012). The Court must conduct a "rigorous analysis" to determine whether the requirements of Rule 23(a) have been satisfied; that analysis often "will entail some overlap with the merits of plaintiff's underlying claim." *Wal-Mart*, 131 S. Ct. at 2551.

Defendant contends that "[i]f the Court grants Bankers Life's Motion for Partial Summary Judgment, then class certification would have to be denied, as plaintiff's sole theory of commonality would no longer be viable." [218] at 7. The Court agrees.

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). That is, "[c]ommonality requires the plaintiffs to demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart*, 131 S. Ct. at 2551 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). The class "claims must depend upon a common contention," and "[t]hat common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "What matters to class certification * * * is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to general common *answers* apt to drive the resolution of the litigation." *Id.*

Plaintiff identifies a single question common to the class: "Whether the statements about the loading charges made in the Disclosure Form are false or misleading, in violation of California law, is a question common to the entire California class." [202] at 8. Because Plaintiff "has demonstrated that each potential member of the California subclass received the disclosure form," [189] at 22-23, and an answer to her presented question would generate a common

22

answer apt to drive the resolution of the litigation, she would ordinarily clear the Rule 23(a)(2) threshold. Here, however, the question she has presented already has been resolved. Thus, there is no longer a "common contention" "capable of classwide resolution." Plaintiff has not satisfied the commonality requirement of Rule 23(a)(2).

Nor has she satisfied the adequacy requirements of Rule 23(a)(4). The adequacy inquiry "consists of two parts: (1) the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests, and (2) the adequacy of the proposed class counsel." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011). The Seventh Circuit has emphasized that a proposed class representative is inadequate if she is subject to "even an arguable defense" not applicable to the class as a whole. *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011); see also *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011). "The fear is that the named plaintiff will become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer." *CE Design*, 637 F.3d at 726 (quoting *J.H. Cohn & Co. v. Am. Appraisal Assocs., Inc.*, 628 F.2d 994, 999 (7th Cir. 1980)). Here, Plaintiff is subject to particular defenses that prevent her from being an adequate class representative. As discussed above, "a class representative proceeding on a claim of misrepresentation as the basis of his or her UCL [or FAL] action must demonstrate actual reliance on the allegedly deceptive or misleading statements, in accordance with well-settled principles regarding the element of reliance in ordinary fraud actions," *Gutierrez v. Wells Fargo Bank, N.A.*, 704 F.3d 712, 728 (9th Cir. 2012) (quoting *In re Tobacco II Cases*, 207 P.3d 20, 25-26 (2009)), and Plaintiff is unable to do so. Moreover, Plaintiff insists that she never saw the Disclosure Form, which may give Defendant grounds to challenge her membership in the proposed class (which consists of elder

California residents who purchased certain Bankers Life annuities and "signed the Disclosure Form within 30 days of receipt of said annuities"). See *Harriston v. Chi. Tribune Co.*, 992 F.2d 697, 704 (7th Cir. 1993) ("[B]ecause Harriston was not a member of the class she describes, the district court properly denied her motion for class certification.").

Because Plaintiff has failed to demonstrate that the requirements of Rule 23(a) are satisfied, the Court declines to certify her proposed class. Plaintiff's motion for class certification [202] is denied.

## III.    Conclusion

For the foregoing reasons, Defendant's motion for partial summary judgment [219] is granted, and Plaintiff's motion for class certification [202] is denied. The parties are directed to appear for a status hearing on April 11, 2013 at 9:45 a.m.


Dated: March 26, 2013                                _____

                                                     Robert M. Dow, Jr.
                                                     United States District Judge